**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| 35 STATE STREET HOTEL PARTNERS, LLC (d/b/a Hotel Californian)<br><br><br>Plaintiff,<br><br>v.<br><br>ISABEL GUZMAN, ADMINISTRATOR OF THE UNITED STATES SMALL BUSINESS ADMINISTRATION, in her official capacity, and UNITED STATES SMALL BUSINESS ADMINISTRATION<br><br><br>Defendants. | Case No. 1:24-cv-00747-JDB<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 5

    I.     The COVID-19 Pandemic Shutters Businesses Nationwide And
Devastates The Hotel Industry ................................................................... 5

    II.    Congress Provides Much-Needed Loan Relief For American Businesses,
And Takes Unique Measures To Protect The Hotel Industry ..................... 7

    III.   Ignoring The Unique Measures That Congress Enacted, The SBA
Restricts Access To Loan Relief For Hotels ........................................... 11

    IV.   Hotel Californian Receives Full Forgiveness Of Its First Loan, But Is
Denied Forgiveness Of Its Second Loan, Even Though Its Affiliated
Hotels Correctly Obtain Relief ................................................................ 12

STANDARD OF REVIEW ....................................................................................... 18

ARGUMENT ............................................................................................................. 19

    I.     Hotel Californian Is Entitled To Full Forgiveness Of Its Second Loan ............. 20

    II.    The SBA Exceeded Its Statutory Authority In Denying Forgiveness Of
Hotel Californian's Second Loan ............................................................. 21

           A.    Applying The Single Corporate Group Limitation To Hotel
Californian Violated The Statute's Affiliation Waiver ............................. 21

           B.    Applying The Single Corporate Group Limitation To Hotel
Californian Was Otherwise Contrary To The Text, Structure, And
Purpose Of The Statute ............................................................................. 28

           C.    The Perplexing Manner In Which The SBA Applied The
Limitation To Hotel Californian Confirms That Its Denial Of Loan
Forgiveness Here Cannot Be Consistent With The Statute ...................... 35

    III.   The Court Should Vacate The SBA's Decision, Declare That Hotel
Californian Is Entitled To Full Loan Forgiveness, And Award Other
Appropriate Relief .................................................................................. 39

CONCLUSION .......................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Excursions LLC v. Yellen*,
    66 F.4th 272 (D.C. Cir. 2023)..................................................................7, 33

*Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*,
    64 F.4th 1354 (D.C. Cir. 2023).....................................................................40

*Azar v. Allina Health Servs.*,
    587 U.S. 566 (2019)......................................................................................26

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)......................................................................................41

*Camelot Banquet Rooms, Inc. v. SBA*,
    458 F. Supp. 3d 1044 (E.D. Wis. 2020)..................................................29, 31

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)......................................................................................39

*Civil Aeronautics Bd. v. Delta Air Lines, Inc.*,
    367 U.S. 316 (1961)......................................................................................27

*Columbia Broad. Sys. v. United States*,
    316 U.S. 407 (1942)......................................................................................26

*DHS v. Regents of the Univ. of Calif.*,
    591 U.S. 1 (2020)..........................................................................................39

*DV Diamond Club of Flint, LLC v. SBA*,
    960 F.3d 743 (6th Cir. 2020).....................................................................31, 33

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009)......................................................................................29

*FCC v. Fox Tel. Stations, Inc.*,
    556 U.S. 502 (2009)..................................................................................18, 39

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)......................................................................................33

*Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*,
    71 F.4th 59 (D.C. Cir. 2023).........................................................................31

*King v. St. Vincent's Hosp.*,
    502 U.S. 215 (1991)......................................................................................29

*Ky. Mun. Energy Agency v. FERC*,
    45 F.4th 162 (D.C. Cir. 2022).......................................................................39

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)........................................................................................28

*Long Island Power Auth. v. FERC*,
    27 F.4th 705 (D.C. Cir. 2022)...........................................................................39

*Loper Bright Enters. v. Raimondo*,
    --- S. Ct. ----, 2024 WL 3208360 (U.S. June 28, 2024).........................3, 18, 28, 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).............................................................................................18

*NAACP v. Trump*,
    315 F. Supp. 3d 457 (D.D.C. 2018)..................................................................39

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
    583 U.S. 109 (2018)..........................................................................................22

*Office of Commc'n of United Church of Christ v. FCC*,
    826 F.2d 101 (D.C. Cir. 1987)..........................................................................26

*Ragsdale v. Wolverine World Wide, Inc.*,
    535 U.S. 81 (2002)............................................................................................27

*In re Roman Cath. Church of Archdiocese of Santa Fe*,
    615 B.R. 644 (Bankr. D.N.M. 2020) ................................................................31

*Ry. Lab. Execs.' Ass'n v. Nat'l Mediation Bd.*,
    29 F.3d 655 (D.C. Cir. 1994)...........................................................................28

*Samantar v. Yousuf*,
    560 U.S. 305 (2010)..........................................................................................29

*SAS Inst., Inc. v. Iancu*,
    138 S. Ct. 1348 (2018)..........................................................................18, 23, 30

*Se. Conf. v. Vilsack*,
    684 F. Supp. 2d 135 (D.D.C. 2010) .................................................................18

*SEC v. Jarkesy*,
    --- S. Ct. ----, 2024 WL 3187811 (U.S. June 27, 2024)....................................26

*In re Skefos*,
    2020 WL 2893413 (Bankr. W.D. Tenn. June 2, 2020)......................................31

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)..........................................................................................35

*Strange ex rel. Strange v. Islamic Republic of Iran*,
    964 F.3d 1190 (D.C. Cir. 2020)........................................................................27

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*Tierney v. Schweiker*,
    718 F.2d 449 (D.C. Cir. 1983) ...................................................................................40

*Whitman v. Am. Trucking Ass'ns, Inc.*,
    531 U.S. 457 (2001) ...................................................................................................31

**Statutes**

5 U.S.C. § 706(2)(A) ...............................................................................................18, 39

5 U.S.C. § 706(2)(C) .....................................................................................................39

15 U.S.C. § 636(a)(36) ....................................................................................................7

15 U.S.C. § 636(a)(36)(D)(i) ....................................................................................8, 30

15 U.S.C. § 636(a)(36)(D)(iv) .......................................................................................22

15 U.S.C. § 636(a)(36)(D)(iv)(I) .............................2, 9, 15, 19, 22, 23, 25, 28, 31

15 U.S.C. § 636(a)(36)(D)(vi) ...............................................................................3, 9, 29

15 U.S.C. § 636(a)(36)(D)(viii) .....................................................................................31

15 U.S.C. § 636(a)(36)(E) ........................................................................................8, 32

15 U.S.C. § 636(a)(36)(F)(i) ..........................................................................................10

15 U.S.C. § 636(a)(36)(F)(ii) .........................................................................................36

15 U.S.C. § 636(a)(36)(F)(iii) ........................................................................................36

15 U.S.C. § 636(a)(36)(G) .............................................................................................20

15 U.S.C. § 636(a)(37) ...................................................................................................10

15 U.S.C. § 636(a)(37)(A)(iv) ........................................................................................30

15 U.S.C. § 636(a)(37)(A)(iv)(I) .......................................................................10, 20, 30

15 U.S.C. § 636(a)(37)(A)(iv)(I)(aa) .............................................................................20

15 U.S.C. § 636(a)(37)(A)(iv)(I)(bb)(AA) .....................................................................20

15 U.S.C. § 636(a)(37)(A)(iv)(III)(bb) ..........................................................................31

15 U.S.C. § 636(a)(37)(A)(iv)(III)(cc)(AA) ...................................................................31

15 U.S.C. § 636(a)(37)(C) ..............................................................................................10

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

15 U.S.C. § 636(a)(37)(C)(i) ........................................................................................ 11, 32

15 U.S.C. § 636(a)(37)(C)(i)(I)(aa) ............................................................................... 32

15 U.S.C. § 636(a)(37)(C)(ii) ....................................................................................... 11, 32

15 U.S.C. § 636(a)(37)(C)(ii)(I)(aa) ............................................................................. 32

15 U.S.C. § 636(a)(37)(C)(ii)(I)(bb) ............................................................................. 32

15 U.S.C. § 636(a)(37)(C)(iii) ...................................................................................... 11, 32

15 U.S.C. § 636(a)(37)(C)(iii)(I)(aa)(AA) .................................................................... 32

15 U.S.C. § 636(a)(37)(C)(iii)(I)(bb) ............................................................................ 32

15 U.S.C. § 636(a)(37)(C)(iv) ........................................................................... 4, 11, 21, 32

15 U.S.C. § 636(a)(37)(C)(iv)(I)(aa) ............................................................................. 32

15 U.S.C. § 636(a)(37)(C)(iv)(I)(bb) ............................................................................ 32

15 U.S.C. § 636(a)(37)(E) ............................................................................................. 2, 15

15 U.S.C. § 636(a)(37)(E)(i) ........................................................... 11, 19, 22, 23, 25, 28

15 U.S.C. § 636(a)(37)(E)(ii) ......................................................................................... 22

15 U.S.C. § 636(a)(37)(G) ............................................................................................. 20

15 U.S.C. § 636(a)(37)(J) .............................................................................................. 32

15 U.S.C. § 636(a)(37)(J)(ii) ......................................................................................... 11, 21

15 U.S.C. § 636(a)(37)(J)(iii) ........................................................................................ 11, 21

15 U.S.C. § 636(a)(37)(J)(iv) ........................................................................................ 11, 21

15 U.S.C. § 636(a)(37)(K) ............................................................................................. 36

15 U.S.C. § 636(a)(37)(O) ............................................................................................. 10, 20

15 U.S.C. § 636m .......................................................................................................... 7

15 U.S.C. § 636m(a)(1) ................................................................................................. 10, 32

15 U.S.C. § 636m(a)(4) ................................................................................................. 10, 32

15 U.S.C. § 636m(b) ...................................................................................................... 10, 32

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

15 U.S.C. § 636m(b)(1) ................................................................................................21

15 U.S.C. § 636m(c)(3) ..........................................................................................10, 16

15 U.S.C. § 636m(d) ......................................................................................11, 21, 32

15 U.S.C. § 636m(d)(1) ..............................................................................................10

15 U.S.C. § 636m(d)(2) ..............................................................................................10

15 U.S.C. § 636m(d)(3) ..............................................................................................10

15 U.S.C. § 636m(d)(4) ..............................................................................................10

15 U.S.C. § 636m(d)(5) ..............................................................................................10

15 U.S.C. § 636m(d)(6) ..............................................................................................10

15 U.S.C. § 636m(d)(7) ..............................................................................................10

15 U.S.C. § 636m(d)(8) ..............................................................................................10

15 U.S.C. § 636m(g) ...................................................................................................16

28 U.S.C. § 2201(a) ....................................................................................................40

Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020) ...................................................7

Pub. L. No. 116-260, 134 Stat. 1182 (Dec. 27, 2020) ...............................................10

**Regulations**

13 C.F.R. § 121.103 .............................................................................8, 9, 22, 25, 29

13 C.F.R. § 121.103(a) ...............................................................................................22

13 C.F.R. § 121.103(a)(1) ...............................................................................9, 22, 23

13 C.F.R. § 121.103(a)(2) ...........................................................................8, 9, 22, 24

13 C.F.R. § 121.103(a)(6) ...............................................................................9, 22, 29

13 C.F.R. § 121.103(a)(8) .............................................................................9, 12, 23, 24

13 C.F.R. § 121.103(c)(1) ...............................................................................9, 22, 24

13 C.F.R. § 121.105(c) ................................................................................................20

13 C.F.R. § 121.201 ........................................................................................9, 22

## TABLE OF AUTHORITIES
(*continued*)

Page(s)

13 C.F.R. § 121.301 ...................................................................................................12, 23, 25

13 C.F.R. § 121.301(a)(2) .....................................................................................................8, 25

13 C.F.R. § 121.301(b)(1) .....................................................................................................8, 25

13 C.F.R. § 121.301(f) ................................................................................................................23

13 C.F.R. § 121.301(f)(1) ..........................................................................................................24

13 C.F.R. § 121.301(f)(1)(iii) ..................................................................................8, 9, 12, 23, 24

13 C.F.R. § 134.1211 ..................................................................................................................17

Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck
    Protection Program*, 85 Fed. Reg. 20,811 (Apr. 15, 2020)...............................................8, 10

Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck
    Protection Program*, 85 Fed. Reg. 20,817 (Apr. 15, 2020).....................................................8

Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck
    Protection Program—Requirements—Corporate Groups and Non-Bank and
    Non-Insured Depository Institution Lenders*, 85 Fed. Reg. 26,324
    (May 4, 2020).................................................................................11, 12, 24, 26, 27

Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck
    Protection Program as Amended by Economic Aid Act*, 86 Fed. Reg. 3692
    (Jan. 14, 2021).............................................................................2, 12, 22, 23, 24, 26, 27

Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck
    Protection Program Second Draw Loans*, 86 Fed. Reg. 3712
    (Jan. 14, 2021).......................................................................2, 10, 12, 15, 22, 23, 30, 37

**Other Authorities**

166 Cong. Rec. S1929-01 (Mar. 23, 2020)................................................................................34

166 Cong. Rec. S1976-03 (Mar. 24, 2020)................................................................................34

Amrik Singh, *Hotels in Financial Distress and Their Resolution*, Boston
    Hospitality Review (July 2021), https://tinyurl.com/4s8vzem5 .................................................7

Centers for Medicare & Medicaid Services, *Current Emergencies* (last updated
    Nov. 7, 2023), https://tinyurl.com/yunc2tae .............................................................................5

Congressional Research Service, *COVID-19: Federal Travel Restrictions and
    Quarantine Measures* (May 28, 2020), https://tinyurl.com/y88fd3kr ......................................5

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

David M. Studdert et al., *Partitioning the Curve—Interstate Travel Restrictions During the Covid-19 Pandemic*, The New England Journal of Medicine (Aug. 5, 2020), https://tinyurl.com/2b2yje74 ............................................................5

*New Oxford American Dictionary* (3d ed. 2010) ..........................................................25

Office of Inspector General, U.S. Dep't of the Treasury, *CARES Act*, https://tinyurl.com/38f3krjs (last visited July 15, 2024) ..............................................7

Press Release, Sen. Susan Collins, *SBA, Treasury Roll Out Information for Small Employers and Lenders to Participate in $350 Billion Loan Program* (Mar. 31, 2020), https://tinyurl.com/3h9xc9hr ..............................................................8

Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020) .......................................5

Ryan Ansell & John P. Mullins, U.S. Bureau of Labor Statistics, *COVID-19 Ends Longest Employment Recovery and Expansion in CES History, Causing Unprecedented Job Losses in 2020*, Monthly Labor Review (June 2021), https://tinyurl.com/5ckx87zn .......................................................................6, 7

Sara Mervosh et al., *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. Times (Apr. 20, 2020), https://tinyurl.com/52k677u4 ...........................6

Smith Travel Research, *U.S. Hotel Performance for April 2020* (May 20, 2020), https://tinyurl.com/5n6txvva ........................................................................7

U.S. Bureau of Labor Statistics, *2020 Results of the Business Response Survey*, https://tinyurl.com/mryv6zb2 (last visited July 15, 2024) ........................................6

U.S. Bureau of Labor Statistics, *Leisure and Hospitality Employment Down 2.1 Percent from February 2020 Level* (Aug. 10, 2023), https://tinyurl.com/yhutpjwn ..............................................................................7

U.S. Dep't of Health & Human Servs., *Determination That a Public Health Emergency Exists* (Jan. 31, 2020), https://tinyurl.com/5dsjt29p ..............................5

U.S. Dep't of the Treasury, *Paycheck Protection Program*, https://tinyurl.com/yck57pu2 (last visited July 15, 2024) ........................................7

*Webster's Third New International Dictionary* (1976 ed.) ......................................25, 30

World Health Organization, *Coronavirus Disease (COVID-19) Pandemic*, https://tinyurl.com/5xb62u77 (last visited July 15, 2024) ........................................5

## INTRODUCTION

The COVID-19 pandemic had a devastating impact on the American economy and its workers.  Travel restrictions, quarantine orders, and other public health mandates forced thousands of businesses to close, and threatened the same fate for countless others.  Most businesses that did manage to stay open faced the prospect of laying off employees or substantially reducing their hours.  These effects were felt perhaps most acutely among businesses in the hospitality industry—such as hotels and restaurants—which rely heavily on travel and foot traffic to attract customers, and whose services necessarily involve close contacts.

Congress responded to this crisis by passing the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in March 2020.  Among other important stimulus measures, the CARES Act created the Paycheck Protection Program ("PPP"), which directed the Small Business Administration ("SBA") to provide fully forgivable loans to small businesses, to help cover payroll costs and other authorized expenses.  These loans came to be known as "First Draw" loans.  In December 2020, Congress renewed the PPP program and directed the SBA to provide "Second Draw" loans to eligible businesses.  The statutory scheme that governs these PPP loans is highly reticulated.  Congress gave the SBA careful and detailed instructions for determining which businesses are eligible for these loans, and which ones are not.  Congress also provided formulas for calculating the specific loan amounts to be disbursed and forgiven.

Because the pandemic hit the hospitality industry particularly hard—leaving its workers especially vulnerable—Congress took special care to maximize loan relief for hotels, and to ensure that as many individual hotels as possible could benefit from the PPP.  The main way Congress accomplished this was to prohibit the SBA from considering a hotel's affiliates when determining whether that hotel qualifies as a small business eligible for a First Draw or Second Draw loan.

Normally, when the SBA determines whether a business is eligible for loan relief, it considers the size of both the individual business and its affiliates. But for hotels and certain other businesses, Congress expressly "waived" affiliation-based limitations on PPP eligibility. 15 U.S.C. § 636(a)(36)(D)(iv)(I); *see id.* § 636(a)(37)(E). This statutory provision—as a shorthand, the "Affiliation Waiver"—means that the eligibility of hotels for PPP loans must be considered on a hotel-by-hotel basis.

The SBA flouted that instruction when adjudicating loan relief for Plaintiff 35 State Street Hotel Partners, LLC (d/b/a Hotel Californian). Hotel Californian—like other hotels—was hit hard by the COVID-19 pandemic and experienced a dramatic decline in revenue in 2020. To avoid having to shut its doors and lay off its workers, Hotel Californian applied for a First Draw PPP loan. The loan was approved, and the SBA later forgave it in full. Because Hotel Californian continued to face the imminent prospect of closure or mass layoffs, it applied for a Second Draw PPP loan in the maximum amount of $2 million. That loan was approved as well, and Hotel Californian used its $2 million loan exclusively for payroll costs.

But this time, after a lengthy review process, the SBA refused to grant any amount of forgiveness for the loan. Its sole basis for that decision was an agency rule that purports to limit an individual business's eligibility for PPP loans based on its affiliation with other businesses—precisely the sort of limitation that the Affiliation Waiver *eliminates* for hotels. This rule—referred to here as the "Single Corporate Group" rule—provides that businesses that share a common majority owner "shall in no event receive more than $4,000,000 of Second Draw PPP loans in the aggregate." Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck Protection Program Second Draw Loans*, 86 Fed. Reg. 3712, 3720 (Jan. 14, 2021); *see* Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck Protection Program as*

*Amended by Economic Aid Act*, 86 Fed. Reg. 3692, 3702 (Jan. 14, 2021). As the agency saw it, because Hotel Californian shares a common majority owner with three other hotels that collectively received $4 million in Second Draw loans before Hotel Californian received its $2 million loan, Hotel Californian was ineligible for forgiveness of that loan, even though Hotel Californian met all other requirements for full forgiveness. Hotel Californian was therefore forced to begin repaying its loan. Both before and after the SBA denied forgiveness for Hotel Californian, however, the agency correctly *granted* Second Draw loan forgiveness for each of the other three affiliated hotels.

The SBA's decision in Hotel Californian's case was unlawful and must be vacated. Applying the Single Corporate Group rule to Hotel Californian squarely violated the Affiliation Waiver, which forbids the SBA from restricting a hotel's eligibility for PPP loans based on its affiliation with other hotels. The Single Corporate Group rule, as applied to Hotel Californian, is exactly this type of limitation. The rule operated here to render Hotel Californian ineligible for any Second Draw loan relief because Hotel Californian shares common ownership with other hotels, and common ownership is one of the bases for affiliation under the SBA's regulations.

Even if the Affiliation Waiver somehow does not expressly prohibit applying the Single Corporate Group rule to Hotel Californian, that course of action was still contrary to the statutory scheme. The Single Corporate Group rule is not part of that scheme. "That omission is telling" in Hotel Californian's case, *Loper Bright Enters. v. Raimondo*, --- S. Ct. ----, 2024 WL 3208360, at *12 (U.S. June 28, 2024), because Congress *did* authorize the SBA to apply affiliation-based limitations to *non*-hotel entities, 15 U.S.C. § 636(a)(36)(D)(vi). Indeed, the statute as a whole gives the SBA comprehensive instructions for determining which individual businesses are eligible for loan relief and calculating the amount of that relief—including a formula unique to hotels and

restaurants, *id.* § 636(a)(37)(C)(iv).  Congress thus did not silently authorize the SBA to come up with new forgiveness conditions for hotels or new maximum loan amounts for those entities (much less maximum loan amounts for corporate groups).  In addition, restricting loan forgiveness for hotels based on their affiliations contradicts Congress's goal of ensuring that as many individual hotels as possible have access to the PPP.

In addition, the SBA's arbitrary decisionmaking—especially the stark divergence in how the agency applied the Single Corporate Group rule to Hotel Californian versus its affiliated hotels, and its failure to consider Hotel Californian's serious reliance interests—underscores that its course of action here could not have been what Congress intended.  It appears, for example, that the SBA denied forgiveness for Hotel Californian because its Second Draw loan was coincidentally approved a mere 18 minutes after the Second Draw loan for one of its affiliated hotels was approved.  It is highly implausible that Congress designed a statute where the difference between $2 million and $0 would depend on this sort of happenstance.  The Single Corporate Group rule is unlawful as applied to each of the affiliated hotels, and all four of them, including Hotel Californian, should have received forgiveness.

The Court should accordingly enter summary judgment for Hotel Californian and vacate the SBA's decision denying forgiveness of Hotel Californian's Second Draw loan.  In addition, the Court should declare that Hotel Californian is entitled to full forgiveness of its Second Draw loan, that Hotel Californian is not required to make any further repayments on its loan, and that Hotel Californian is entitled to receive back the repayments it has already made on the loan.  That declaration would bring the clarity that Hotel Californian has been seeking since it applied for loan forgiveness more than two years ago.  The Court should also enjoin the SBA from requiring Hotel Californian to make any further repayments on its Second Draw loan, and it should order the SBA

to ensure that Hotel Californian receives back the amounts that it was already forced to repay on the loan.

## BACKGROUND

I. **The COVID-19 Pandemic Shutters Businesses Nationwide And Devastates The Hotel Industry**

COVID-19 emerged in the United States in early 2020 and quickly changed daily life. The U.S. government began imposing mandatory quarantine orders and travel restrictions as early as January 31, 2020, the same day the Department of Health and Human Services declared a public health emergency.[1]  Within two months, the World Health Organization had announced a global pandemic,[2] and President Trump had declared a national emergency, *see* Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020)—a declaration that would be renewed 13 times and did not expire until May 11, 2023.[3]

Despite the efforts of public health officials, COVID-19 spread rapidly across the country. By March 2020, the federal government had imposed quarantine and entry restrictions for travelers from China and most of Europe.[4]  States also began imposing restrictions on interstate travel.[5]  As

---

[1] U.S. Dep't of Health & Human Servs., *Determination That a Public Health Emergency Exists* (Jan. 31, 2020), https://tinyurl.com/5dsjt29p; Congressional Research Service, *COVID-19: Federal Travel Restrictions and Quarantine Measures* 1 (May 28, 2020), https://tinyurl.com/y88fd3kr.

[2] World Health Organization, *Coronavirus Disease (COVID-19) Pandemic*, https://tinyurl.com/5xb62u77 (last visited July 15, 2024).

[3] Centers for Medicare & Medicaid Services, *Current Emergencies* (last updated Nov. 7, 2023), https://tinyurl.com/yunc2tae.

[4] Congressional Research Service, *supra* note 1, at 1-2.

[5] David M. Studdert et al., *Partitioning the Curve—Interstate Travel Restrictions During the Covid-19 Pandemic*, The New England Journal of Medicine (Aug. 5, 2020), https://tinyurl.com/2b2yje74.

cases rose, state and local governments issued "stay-at-home" orders and mandated the temporary closure of all non-essential businesses.[6]

These federal and state mandates had severe consequences for American businesses and their employees.  In 2020 alone, 56% of businesses (amounting to 72 million employees) saw a decrease in demand, and 19% of businesses (26 million employees) were subject to a government-mandated closure.[7]  More than 50% of businesses had to tell their employees not to work, and approximately 25% were forced to stop paying their employees altogether.[8]  Another 30% of businesses reduced their employees' hours.[9]  All told, more than 22 million Americans lost their jobs between March and April 2020, a decline of 15%—more than twice the 6% decline that the country saw from 2007 to 2009.[10]

Quarantine orders and travel restrictions had a particularly devastating effect on hotels and restaurants, which rely heavily on travel and foot traffic to attract business, and whose services necessarily "involve close gatherings of people."[11]  As a result, the hospitality industry experienced an unprecedented decline in customers and "suffered the greatest job losses" of any industry.[12]  Hotel occupancy rates fell by nearly 64%, and revenue per available room decreased by

---

[6] *See*, *e.g.*, Sara Mervosh et al., *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. Times (Apr. 20, 2020), https://tinyurl.com/52k677u4.

[7] U.S. Bureau of Labor Statistics, *2020 Results of the Business Response Survey*, https://tinyurl.com/mryv6zb2 (last visited July 15, 2024).

[8] *Id.*

[9] *Id.*

[10] Ryan Ansell & John P. Mullins, U.S. Bureau of Labor Statistics, *COVID-19 Ends Longest Employment Recovery and Expansion in CES History, Causing Unprecedented Job Losses in 2020*, Monthly Labor Review (June 2021), https://tinyurl.com/5ckx87zn.

[11] *Id.*

[12] *Id.*

nearly 80%.[13]  Gross operating profits went down by 85%, and net operating income declined by

103%.[14]  Employment across the hospitality industry declined a full 50% from February 2020 to

May 2020,[15] which translated to 8.2 million lost jobs (and 1 million in the hotel industry alone).[16]

More than three years later, the hospitality industry still had not fully returned to its pre-pandemic

employment levels.[17]

## II. Congress Provides Much-Needed Loan Relief For American Businesses, And Takes Unique Measures To Protect The Hotel Industry

"[T]o help businesses weather the pandemic," *Air Excursions LLC v. Yellen*, 66 F.4th 272,

275 (D.C. Cir. 2023), Congress swiftly enacted the CARES Act, *see* Pub. L. No. 116-136, 134

Stat. 281 (Mar. 27, 2020).  The Act provided more than $2 trillion to stabilize the U.S. economy

and preserve jobs for American workers.[18]  One of the Act's cornerstone programs was the PPP,

which directed the SBA to provide hundreds of billions of dollars in *forgivable* loans to small

businesses.  *See id.*, 134 Stat. at 286-94, 297-301, div. A, tit. I, §§ 1102, 1106 (codified at 15 U.S.C.

§§ 636(a)(36), 636m).  The purpose of the PPP was to give businesses "the resources they need to

maintain their payroll, hire back employees who may have been laid off, and cover applicable

overhead."[19]  Senator Susan Collins, a sponsor of the CARES Act, lauded the PPP as "desperately

---

[13]  Smith Travel Research, *U.S. Hotel Performance for April 2020* (May 20, 2020), https://tinyurl.com/5n6txvva.

[14]  Amrik Singh, *Hotels in Financial Distress and Their Resolution*, Boston Hospitality Review (July 2021), https://tinyurl.com/4s8vzem5.

[15]  U.S. Bureau of Labor Statistics, *Leisure and Hospitality Employment Down 2.1 Percent from February 2020 Level* (Aug. 10, 2023), https://tinyurl.com/yhutpjwn.

[16]  Ansell & Mullins, *supra* note 10.

[17]  U.S. Bureau of Labor Statistics, *supra* note 15.

[18]  Office of Inspector General, U.S. Dep't of the Treasury, *CARES Act*, https://tinyurl.com/38f3krjs (last visited July 15, 2024).

[19]  U.S. Dep't of the Treasury, *Paycheck Protection Program*, https://tinyurl.com/yck57pu2 (last visited July 15, 2024).

needed relief to … small businesses to help prevent them from going under and to help save millions of American jobs."[20]

The CARES Act established eligibility criteria for what came to be known as "First Draw" PPP loans.  The main criterion was a business's size.  Congress mandated that "any business concern" with "not more than" a certain number of employees, and that satisfied certain other conditions, "shall be eligible to receive" a First Draw loan of up to $10 million.  15 U.S.C. §§ 636(a)(36)(D)(i), (E); *see* Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck Protection Program*, 85 Fed. Reg. 20,811, 20,812 (Apr. 15, 2020).  For most industries, including the hotel industry, that maximum number of employees was 500.  *See* 15 U.S.C. § 636(a)(36)(D)(i).

Under normal SBA rules, many hotels would have exceeded that maximum.  The SBA typically takes into account a business's *affiliates* when determining whether the business meets an applicable size criterion for a loan—that is, "[t]he size of the applicant combined with its affiliates must not exceed the [applicable] size standard."  13 C.F.R. § 121.301(a)(2), (b)(1); *see also id.* § 121.103.  This rule generally applied to PPP loans: "[i]n most cases, a borrower [was] considered together with its affiliates for purposes of determining eligibility for the PPP."  Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck Protection Program*, 85 Fed. Reg. 20,817, 20,818 (Apr. 15, 2020).  Because hotels are often affiliated with one another—for example, through common "ownership," 13 C.F.R. § 121.103(a)(2); *see*, *e.g.*, *id.* § 121.301(f)(1)(iii)—many individual hotels that do not have more than 500 employees would nonetheless, under normal SBA affiliation rules, be considered to have more than 500 after adding

---

[20] Press Release, Sen. Susan Collins, *SBA, Treasury Roll Out Information for Small Employers and Lenders to Participate in $350 Billion Loan Program* (Mar. 31, 2020), https://tinyurl.com/3h9xc9hr.

up employees across all affiliates.  So, if normal SBA affiliation rules applied, many hotels would not have received a PPP loan at all, despite suffering some of the worst economic losses of any industry due to the pandemic.

To address this problem—and to ensure more broadly that the SBA could not apply its affiliation rules to prevent hotels from receiving PPP loans—Congress enacted a unique provision for businesses in the hospitality industry (and certain other businesses).  This provision—the Affiliation Waiver—states that "the provisions applicable to affiliations under [13 C.F.R. § 121.103], or any successor regulation, are waived with respect to eligibility for a covered loan for … any business concern with not more than 500 employees that, as of the date on which the covered loan is disbursed, is assigned a North American Industry Classification System [("NAICS")] code beginning with 72."  15 U.S.C. § 636(a)(36)(D)(iv)(I).  Businesses that have a NAICS code beginning with "72" are those in the "Accommodation and Food Services" industries.  13 C.F.R. § 121.201.  And the cited regulation, 13 C.F.R. § 121.103—from which these businesses are exempt—provides that loan eligibility for an individual business is generally based on "the receipts, employees, or other measure of size" of the business itself *and* its affiliates, with affiliation determined by common ownership or other factors.  *Id.* § 121.103(a)(6); *see id.* §§ 121.103(a)(1)-(2), (a)(8), (c)(1), 121.301(f)(1)(iii).

The Affiliation Waiver thus operated to ensure that PPP loans would still be broadly available to individual hotels, notwithstanding present or future affiliation-based restrictions on loan eligibility.  At the same time, Congress specified that "[t]he provisions applicable to affiliations under [13 C.F.R. § 121.103], or any successor thereto, *shall apply* with respect to a nonprofit organization," "a housing cooperative," and certain other entities.  15 U.S.C.

§ 636(a)(36)(D)(vi) (emphasis added).  Congress thus *did* authorize the SBA to apply its affiliation regulations when determining First Draw eligibility for these non-hotel entities.

The other important feature of First Draw loans was that they were subject to full forgiveness, *see* 15 U.S.C. § 636m(a)(1), (a)(4), (b), (d)(1), including for "any accrued interest," 85 Fed. Reg. at 20,813; *see also* 15 U.S.C. § 636m(c)(3).  So long as recipients satisfied certain conditions, they would not have to pay back a dime.  These conditions were minimal.  The main condition was that businesses had to "use at least 60 percent" of the loan "for payroll costs," and to use any remainder for other authorized purposes.  15 U.S.C. § 636m(d)(8); *see also id.* §§ 636(a)(36)(F)(i), 636m(b).  Congress also provided detailed instructions for calculating the precise amount of forgiveness. *See id.* § 636m(d)(1)-(7).

Once it became apparent that the pandemic would continue to rage on—and that First Draw loans, while vital, were insufficient for many struggling businesses—Congress recognized that additional relief was sorely needed.  Through the Economic Aid Act, Congress directed the SBA to provide "Second Draw" PPP loans.  *See* Pub. L. No. 116-260, 134 Stat. 1182, 2001-06 (Dec. 27, 2020) (codified at 15 U.S.C. § 636(a)(37)).  "[A]ny business concern" was "eligible" for a Second Draw loan of up to $2 million so long as it satisfied certain conditions.  15 U.S.C. § 636(a)(37)(A)(iv)(I), (a)(37)(C).  The main conditions were that the business had "received" and "used" a First Draw loan, employed "not more than 300 employees," and "had gross receipts during the first, second, third, or … fourth quarter in 2020 that demonstrate not less than a 25 percent reduction from the gross receipts of the entity during the same quarter in 2019." *Id.* § 636(a)(37)(A)(iv)(I), (a)(37)(O); *see* 86 Fed. Reg. at 3713.

As in the CARES Act, Congress was very careful to maximize loan relief for hotels and other businesses in the hospitality industry.  It specified that the Affiliation Waiver applicable to

10

First Draw loans—that is, the provision that exempts hotels and restaurants from affiliation-based limitations on eligibility—"shall" likewise "apply for purposes of determining eligibility" for Second Draw loans.  15 U.S.C. § 636(a)(37)(E)(i).  In addition, Congress enacted a unique formula for the hospitality industry that made it more likely those businesses would receive the maximum $2 million loan amount.  *Compare id.* § 636(a)(37)(C)(iv) (using a multiplier of "3.5" in the formula for "NAICS 72 entities"), *with id.* § 636(a)(37)(C)(i)-(iii) (using a multiplier of "2.5" in the formula for all other entities).  Congress also once again instructed that the SBA should forgive these loans in full—for all businesses—so long as the recipient used at least 60% of the loan for payroll costs, used any remainder for other authorized purposes, and satisfied certain other conditions.  *Id.* §§ 636(a)(37)(J)(ii)-(iv), 636m(d).

## III.   Ignoring The Unique Measures That Congress Enacted, The SBA Restricts Access To Loan Relief For Hotels

Despite the Affiliation Waiver—and Congress's other careful instructions—the SBA decided to impose a new affiliation-based limitation on PPP eligibility, with no carveout for hotels or other NAICS 72 businesses.  It initially devised this limitation for First Draw loans.  As a "supplemen[t]" to prior First Draw rules, the SBA stated that "businesses that are part of a single corporate group shall in no event receive more than $20,000,000 of PPP [First Draw] loans in the aggregate."   Interim Final Rule, *Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders*, 85 Fed. Reg. 26,324, 26,324-25 (May 4, 2020).  "For purposes of this limit," the SBA explained, "businesses are part of a single corporate group if they are majority owned, directly or indirectly, by a common parent."  *Id.* at 26,325.

This limitation thus restricts PPP eligibility based on common ownership—precisely the sort of affiliation-based limitation that Congress waived for hotels via the Affiliation Waiver.  *See*,

*e.g.*, 13 C.F.R. § 121.103(a)(8) (cross-referencing 13 C.F.R. § 121.301); *id.* § 121.301(f)(1)(iii) (businesses "are affiliated" for purposes of eligibility for SBA's "Business Loan[s]" "[w]hen an individual owns more than 50 percent" of both businesses); 86 Fed. Reg. at 3699 ("Business Loan[s] … include the PPP"). Inexplicably, however, the SBA asserted that "[b]usinesses are subject to this" affiliation-based limitation "*even if* [they] are eligible for the waiver-of-affiliation provision under the CARES Act." 85 Fed. Reg. at 26,325 (emphasis added). In other words, the SBA believed that this affiliation-based restriction would apply even to the businesses (such as hotels) that Congress specifically exempted from such restrictions.

The SBA enacted this Single Corporate Group limitation for Second Draw loans as well, just with a different aggregate limit. "Businesses that are part of a single corporate group," it asserted, "shall in no event receive more than $4,000,000 of Second Draw PPP loans in the aggregate." 86 Fed. Reg. at 3720. And the term "single corporate group" had "the same" affiliation-based meaning as in the prior rule, *id.*—*i.e.*, businesses that "are majority owned, directly or indirectly, by a common parent," 85 Fed. Reg. at 26,325; *see also* 86 Fed. Reg. at 3702 (same). The SBA also once again felt compelled to cancel "the waiver-of-affiliation provision under the CARES Act," giving it no effect as to affiliation-based limitations and treating NAICS 72 businesses the same as any other businesses. 86 Fed. Reg. at 3702.

## IV.    Hotel Californian Receives Full Forgiveness Of Its First Loan, But Is Denied Forgiveness Of Its Second Loan, Even Though Its Affiliated Hotels Correctly Obtain Relief

Hotel Californian is a single hotel property in Santa Barbara, California. SBA_000083.[21] It has a NAICS code of 721110. SBA_000087. Michael Rosenfeld holds majority equity ownership in Hotel Californian and three other hotel properties: Pine & Powell Partners, LLC

---

[21] Citations to "SBA_######" refer to the Administrative Record.

("Pine & Powell"); WRC Newport, LLC ("Newport"); and WRC Huntington, LLC ("Huntington"). SBA_000083; SBA_000084 n.2. Aside from their common ownership, these hotels are unrelated to one another, and Hotel Californian is separately operated from the others. SBA_000083; SBA_000084 n.2.

Like so many other businesses in the hospitality industry, Hotel Californian experienced severe disruption and economic distress as a result of the COVID-19 pandemic. SBA_000083. Between the second quarter of 2019 and the second quarter of 2020, its gross receipts dropped by 78%, putting it at substantial risk of having to close its doors and leave its employees without work during the height of the pandemic. SBA_000083.

To avoid that fate, Hotel Californian applied for a First Draw PPP loan. SBA_000083. The loan was approved, and a loan in the amount of $1,957,400 was disbursed on April 14, 2020. SBA_000083. Hotel Californian used that loan to help cover payroll costs—which enabled it to keep the majority of its workers employed, SBA_000026-27—and the SBA subsequently forgave the loan in full, SBA_000083.

The pandemic nonetheless continued to threaten Hotel Californian's financial survival. To avoid mass layoffs and closure, Hotel Californian applied for a Second Draw PPP loan on January 20, 2021, seeking the maximum $2 million amount. SBA_000019-21. A $2 million loan was approved on February 8, 2021, SBA_000095, and disbursed to Hotel Californian on February 16, 2021, SBA_000030.

The pandemic also continued to threaten the financial viability of the other three affiliated hotels. Like Hotel Californian, each applied for a $2 million Second Draw loan on January 20, 2021, and each application was approved in full. SBA_000083-84; SBA_000095. The applications were, however, processed at different speeds, and thus the loans were approved

and disbursed on different dates.   SBA_000084.   Pine & Powell received its loan on February 5, 2021; Newport on February 16, 2021 (the same day as Hotel Californian); and Huntington on March 25, 2021.  SBA_000084.

As with the First Draw loan, Hotel Californian used the Second Draw loan exclusively to cover the payroll costs of its workers.  SBA_000083; SBA_000030.  Hotel Californian thus applied for full forgiveness of its Second Draw loan in June 2022.  SBA_000084.  Two months later, the SBA informed Hotel Californian that it was "considering recommending a Full Denial" of the loan forgiveness application due to "Potential Affiliation Issues"—specifically, that Hotel Californian, "together with its affiliates, may not meet SBA small business size standards and/or the PPP corporate maximum limits."  SBA_000063-64.  It listed Pine & Powell and Newport as "possible affiliates" of Hotel Californian.  SBA_000064.  The SBA further stated that it was "conducting an affiliation review," and it requested an extensive amount of "additional documents [and] information" "to determine eligibility."  SBA_000063-64.  The requested information covered numerous categories, including a "Comprehensive Corporate Organizational Chart showing relationships between affiliated entities and ownership listed, percentages owned, EIN/SSNs with detailed management listed for those who hold control," and "2018 & 2019 complete, filed and signed Federal Income Tax returns for all entity affiliates."  SBA_000065.  Hotel Californian promptly provided the requested information on August 10, 2022.  SBA_000084.

On August 25, 2022, the SBA informed Hotel Californian that it was denying forgiveness because Hotel Californian had been "ineligible" for a Second Draw loan all along.  SBA_000001. This was so, the SBA concluded, because Hotel Californian, "together with its affiliates, ha[d] received more than $4,000,000 of 2nd draw PPP loans in the aggregate."  SBA_000001.  In the SBA's view, only the "*first*" of the loans to be "funded"—Pine & Powell's—was "eligible for full

forgiveness." SBA_000001 (emphasis added); *see* SBA_000084. Even though full forgiveness of Pine & Powell's loan would have amounted only to $2 million (well below the aggregate $4 million threshold), neither Hotel Californian nor Newport was eligible for *any* forgiveness, according to the SBA, because their loans—$2 million each—by chance were "funded on the same day." SBA_000001. The combination of those two disbursements pushed the affiliates above "the $4MM aggregate threshold," which in the SBA's view somehow "render[ed] *both* loans ineligible" for forgiveness. SBA_000001 (emphasis added). Although the SBA did not expressly invoke the Single Corporate Group limitation, the "$4MM aggregate threshold" is a clear reference to that limitation, since it is the only limitation in either the PPP regulations or the statute that purports to establish a $4 million threshold. *See* 86 Fed. Reg. at 3720.

The SBA made no attempt to explain, however, how it could lawfully apply this affiliation-based limitation to Hotel Californian, a business with a NAICS code of 721110, SBA_000087, when Congress expressly waived such limitations for businesses with a "[NAICS] code beginning with 72," 15 U.S.C. § 636(a)(36)(D)(iv)(I), (a)(37)(E). Nor did the agency address the reliance interests Hotel Californian had developed from having received its $2 million loan over a year earlier and from having used that loan for the exact purpose Congress authorized: to keep Hotel Californian's workers employed in the midst of a debilitating pandemic.

Hotel Californian timely appealed the SBA's decision to the agency's Office of Hearings and Appeals ("OHA"). SBA_000003. Instead of responding to Hotel Californian's petition, the SBA withdrew its August 25, 2022 decision in November 2022, stating only that it was "necessary to complete a further review of" the loan forgiveness application. SBA_000075. The SBA did not explain why it was necessary to conduct additional review when it already had been provided with information on Hotel Californian's affiliations. SBA_000075; SBA_000003-4. Another two

months later, the SBA again requested more information from Hotel Californian. SBA_000153-55. The SBA sought "a detailed ownership breakdown" of the other affiliated hotels, SBA_000153, even though Hotel Californian had already acknowledged that it shares common ownership with those hotels, SBA_000003-4. Nonetheless, Hotel Californian promptly provided the requested information. SBA_000085.

The SBA finally issued a new decision on March 28, 2023, well beyond its 90-day statutory deadline to render forgiveness decisions. 15 U.S.C. § 636m(c)(3), (g). The agency again denied forgiveness, and its rationale was materially identical to the August 2022 decision it had withdrawn four months earlier. The SBA "conclude[d] that [Hotel Californian] [wa]s part of a corporate group"—"a 'family' of 4 entities defined by common ownership"—that had collectively "received $8,000,000 in second draw loans, more than the corporate max of $4MM." SBA_000095. For this reason—and this reason alone—Hotel Californian "d[id] not meet eligibility requirements for forgiveness" of its Second Draw loan. SBA_000095. The reference to a "$4MM" "corporate max" was, once again, necessarily a reference to the Single Corporate Group limitation. And as with the initial denial, the SBA did not attempt to explain how applying this affiliation-based limitation to Hotel Californian was consistent with the statutory Affiliation Waiver, nor did the agency acknowledge Hotel Californian's significant reliance interests.

Hotel Californian timely appealed this decision to the OHA, arguing primarily that the SBA's application of the Single Corporate Group limitation to Hotel Californian violated the Affiliation Waiver and was otherwise contrary to the statute. SBA_000003-13. An Administrative Law Judge ("ALJ") denied the appeal, concluding that it "d[id] not have authority to consider" whether the Single Corporate Group limitation violates the statute, and that it otherwise found no "clear error" in the SBA's decision. SBA_004389-90. Hotel Californian petitioned for

reconsideration, SBA_004391-4403, which the ALJ denied, SBA_004415-20. The SBA Administrator declined to review the ALJ's decision, SBA_004487, which made the SBA's denial of loan forgiveness final and appealable to this Court, 13 C.F.R. § 134.1211.

Although the SBA doubled down on its denial of forgiveness for Hotel Californian at every turn, it ended up correctly *granting* forgiveness for all the other affiliated hotels, including Newport. The SBA initially denied Newport's Second Draw forgiveness application on August 25, 2022—the same day it initially denied Hotel Californian's application—and for exactly the same reason: because their $2 million loans were disbursed on the same day, two weeks after Pine & Powell had already received its $2 million loan, "both" Newport and Hotel Californian were "ineligible" for forgiveness. SBA_000159. Like Hotel Californian, Newport appealed to the OHA, making the same statutory argument that Hotel Californian made. SBA_000085. But instead of contesting that appeal, the SBA ultimately forgave Newport's $2 million loan in full on March 8, 2023, less than three weeks before refusing to grant Hotel Californian the same relief. SBA_000157; SBA_000164. Remarkably, it appears the SBA arrived at this decision because Hotel Californian's Second Draw loan happened to be approved a mere *18 minutes* after Newport's loan was approved. SBA_000281; SBA_000283.

Moreover, on January 10, 2023, the agency granted forgiveness in the amount of $839,792.88 on Pine & Powell's Second Draw loan—the entire amount of forgiveness that Pine & Powell had sought. SBA_000132; SBA_000162. Then, in August 2023, well *after* the SBA's March 2023 decision for Hotel Californian (but before the SBA Administrator denied Hotel Californian's request for review), the SBA granted the vast majority of the $1,040,183.77 that Huntington sought in forgiveness for its Second Draw loan. SBA_000138; SBA_004434; Compl. ¶ 44; Answer ¶ 44. Thus, both before and after the SBA's March 28, 2023 decision

denying forgiveness for Hotel Californian, the agency correctly granted Second Draw loan forgiveness for the other affiliated hotels, and the collective amount of that forgiveness never reached $4 million. The SBA's Single Corporate Group limitation is invalid as applied to all four entities, and therefore all four entities were entitled to loan forgiveness. Yet only Hotel Californian did not receive forgiveness. As a result of the SBA's decision, Hotel Californian was forced to begin paying back its Second Draw loan. Compl. ¶ 50.

## STANDARD OF REVIEW

When ruling on summary judgment motions in cases under the Administrative Procedure Act ("APA"), a district court "decid[es] whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Se. Conf. v. Vilsack*, 684 F. Supp. 2d 135, 142 (D.D.C. 2010). A court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action that violates a statute is "not in accordance with law." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018) (citation omitted). And "the APA requires" that courts "exercise their independent judgment in deciding whether an agency has acted within its statutory authority," which means courts "may not defer to an agency interpretation of the law." *Loper Bright Enters.*, 2024 WL 3208360, at *22. A court also must ensure that the agency has "articulate[d] a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). To satisfy the requirement of a "reasoned explanation," the agency must consider a regulated party's "serious reliance interests." *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 513-16 (2009).

## ARGUMENT

Hotel Californian satisfied the lawful conditions for full forgiveness of its $2 million Second Draw PPP loan. The SBA's sole basis for denying forgiveness was its Single Corporate Group rule. But that was not a lawful reason to deny forgiveness. The statutory Affiliation Waiver provides that the SBA's affiliation-based limitations on loan eligibility are "waived" for purposes of determining whether a hotel is eligible for a PPP loan. 15 U.S.C. § 636(a)(36)(D)(iv)(I); *see id.* § 636(a)(37)(E)(i). And the Single Corporate Group rule is precisely that: an affiliation-based limitation on PPP eligibility. The SBA therefore had no power to apply that rule when adjudicating Hotel Californian's application for loan forgiveness.

Even if applying the Single Corporate Group rule to Hotel Californian somehow does not directly contradict the Affiliation Waiver, that course of action was still contrary to the statute. A Single Corporate Group limitation is not in the statute that Congress wrote, and that silence operates as a constraint on the agency's authority. Congress knew how to authorize affiliation-based limitations on PPP loans—having done exactly that for certain non-hotel entities—but did not do so for hotels (and instead *removed* affiliation-based limitations for hotels). Indeed, Congress wrote an extremely detailed statute that provides specific instructions on how to determine PPP eligibility and calculate loan amounts for individual businesses—especially hotels. As applied to Hotel Californian, the Single Corporate Group rule contravenes that careful statutory design.

The SBA's unequal and inconsistent application of the Single Corporate Group rule underscores that the agency went beyond its statutory authority in denying forgiveness. The agency correctly granted forgiveness for each of the other affiliated hotels, and did not purport to apply the Single Corporate Group rule to limit their relief. In attempting to distinguish Hotel

Californian's case from Newport's materially identical case, the agency cited an 18-minute difference in the approval of their loans.  The agency's need to make that distinction is a telling sign that something went amiss here.  Congress did not intend for the difference between $2 million and $0 to turn on factors entirely outside the control of the businesses (and workers) it sought to assist.  And Hotel Californian quite clearly was not on notice that, in taking a $2 million Second Draw loan, none of it would be forgiven over a year later, and notwithstanding the Affiliation Waiver for hotels and other hospitality businesses.

Because Hotel Californian is entitled to full forgiveness of its $2 million loan—and the SBA's only basis for denying that forgiveness was unlawful—the Court should vacate the agency's decision and enter declaratory and injunctive relief.

## I.    Hotel Californian Is Entitled To Full Forgiveness Of Its Second Loan

Hotel Californian indisputably satisfied all the conditions that Congress put in place for disbursement and full forgiveness of a $2 million Second Draw PPP loan.  *First*, Hotel Californian is a "business concern."  15 U.S.C. § 636(a)(37)(A)(iv)(I).  *Second*, Hotel Californian "received" a First Draw PPP loan and "used" the "full amount of th[at] loan" prior to disbursement of its Second Draw loan.  *Id.* § 636(a)(37)(O); *see* SBA_000020.  *Third*, Hotel Californian "employ[ed] not more than 300 employees" at the time of its Second Draw application.  15 U.S.C. § 636(a)(37)(A)(iv)(I)(aa); *see* SBA_000083 n.1.  *Fourth*, Hotel Californian "had gross receipts during the … second … quarter in 2020 that demonstrate[d] not less than a 25 percent reduction from [its] gross receipts … during the same quarter in 2019."  15 U.S.C. § 636(a)(37)(A)(iv)(I)(bb)(AA).  Hotel Californian experienced a 78% reduction in gross receipts during this period.  SBA_000083; SBA_000019.  *Fifth*, Hotel Californian's loan application made all the required certifications.  *E.g.*, 15 U.S.C. § 636(a)(36)(G), (a)(37)(G); *see* SBA_000019-21 (certifying, for example, that "[c]urrent economic uncertainty makes this loan request necessary

to support … ongoing operations").  *Sixth*, based on the unique statutory formula that Congress enacted for "NAICS 72 entities" like Hotel Californian, SBA_000087, Hotel Californian was eligible for the maximum $2 million amount, 15 U.S.C. § 636(a)(37)(C)(iv); *see* SBA_000019 (performing that calculation).

*Seventh*, Hotel Californian used the entirety of the $2 million loan it received to cover the payroll costs of its employees, SBA_000083; SBA_000030, so it was "eligible for forgiveness" of the loan, 15 U.S.C. § 636(a)(37)(J)(ii); *see id.* § 636m(b)(1).  And *eighth*, based on the statutory formulas for calculating the amount of forgiveness, *see id.* §§ 636(a)(37)(J)(ii)-(iv), 636m(d), Hotel Californian was entitled to forgiveness of the full $2 million amount, *see* SBA_000030-31 (performing and certifying those calculations).

The SBA has never disputed any of this.  To the contrary, the agency found during its review of Hotel Californian's loan forgiveness application that Hotel Californian satisfied each of the statutory conditions for forgiveness, and that it had accurately calculated both the loan amount it requested and the amount of forgiveness it sought.  *See* SBA_000270-76.  The sole basis for denying Hotel Californian's application for forgiveness—as reflected both in the SBA's formal decision, SBA_000095, and its internal notes, SBA_000268; SBA_000280-85—was the Single Corporate Group limitation.  But that agency creation was not a lawful basis to deny forgiveness because, as applied to Hotel Californian, it is in direct conflict with the statutory Affiliation Waiver, and in any event is otherwise contrary to the statute.

## II.    The SBA Exceeded Its Statutory Authority In Denying Forgiveness Of Hotel Californian's Second Loan

### A.    Applying The Single Corporate Group Limitation To Hotel Californian Violated The Statute's Affiliation Waiver

The SBA's decision to apply the Single Corporate Group rule to Hotel Californian was unlawful because it unambiguously contradicted the statute's Affiliation Waiver.  This Court's

analysis thus can "begi[n] … and en[d]" with "the plain language" of that statutory provision. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018) (citation omitted).

The Affiliation Waiver applies to "any business concern with not more than [300] employees that … is assigned a [NAICS] code beginning with 72." 15 U.S.C. § 636(a)(36)(D)(iv)(I); *see id.* § 636(a)(37)(E)(i)-(ii). For business concerns in this category—such as hotels like Hotel Californian, *see* 13 C.F.R. § 121.201; SBA_000087—Congress expressly "waived" "the provisions applicable to affiliations under [13 C.F.R. § 121.103], or any successor regulation," 15 U.S.C. § 636(a)(36)(D)(iv), "for purposes of determining" whether that business concern is "eligib[le]" for Second Draw loan relief, *id.* § 636(a)(37)(E)(i). That means the SBA's present and future affiliation regulations "do not apply" when determining whether a NAICS 72 entity is eligible for a PPP loan. 86 Fed. Reg. at 3714.

The affiliation regulations in place when Congress enacted the Affiliation Waiver restrict loan eligibility for businesses that are affiliated with other businesses. Section 121.103 (the provision referenced in the Affiliation Waiver) starts by identifying the "General Principles of Affiliation" that normally apply when the SBA determines loan eligibility. 13 C.F.R. § 121.103(a). When making those determinations, the SBA typically "counts the receipts, employees, or other measure of size" of both the applicant *and* its "affiliates." *Id.* § 121.103(a)(6). And "in determining whether affiliation exists," the SBA "considers factors such as ownership [and] management." *Id.* § 121.103(a)(2). Business concerns are considered "affiliates," for example, when a third party "owns … 50 percent or more of [each] concern's voting stock," *id.* § 121.103(c)(1); *see id.* § 121.103(a)(1).

Section 121.103 also states that "the size standards and bases for affiliation" for "SBA's Business Loan[s]"—which include PPP loans, 86 Fed. Reg. at 3699—"are set forth in [13 C.F.R.]

§ 121.301." 13 C.F.R. § 121.103(a)(8).  Section 121.301, in turn, reiterates that the SBA generally accounts for a concern's "Affiliates" in determining whether the concern is a "small business" eligible for a PPP loan and other Business Loans.  *Id.* § 121.301.  The regulation also lists several conditions that are sufficient to "establis[h] affiliation" for purposes of determining eligibility for these loans.  *Id.* § 121.301(f).  For example, businesses "in the same 3-digit NAICS subsector" are affiliated where "an individual owns more than 50 percent" of each one.  *Id.* § 121.301(f)(1)(iii).

In short, these provisions operate as limitations on loan eligibility—if business concerns are considered affiliated under these provisions, they may not be "small" enough to be eligible for PPP loans and other SBA loans.  13 C.F.R. § 121.301.  Congress, however, broadly instructed the SBA to "waiv[e]" these affiliation-based limitations, and any "successor" limitations, when determining whether hotels are "eligib[le]" for PPP loans.  15 U.S.C. § 636(a)(36)(D)(iv)(I); *see id.* § 636(a)(37)(E)(i).  The SBA therefore has no power to apply an affiliation-based limitation— whether existing at the time the CARES Act was enacted, or newly devised—in a way that renders hotels ineligible for PPP loan forgiveness.  *See*, *e.g.*, *SAS Inst., Inc.*, 138 S. Ct. at 1355 ("the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer").  Yet the SBA did exactly that when it relied on the Single Corporate Group rule to deem Hotel Californian not "eligib[le]" for forgiveness of its Second Draw loan. SBA_000095.  That rule—which applies when businesses are related to one another via a common owner—is plainly an *affiliation*-based limitation.  And it is also a limitation on PPP *eligibility*, as the SBA's decision in this case demonstrates.

*First*, the Single Corporate Group rule is an affiliation-based limitation.  The rule applies only to businesses that "are majority owned, directly or indirectly, by a common parent."  86 Fed. Reg. at 3702; *see* 86 Fed. Reg. at 3720.  That criterion—common ownership—is a classic basis

for corporate affiliation, and indeed is a basis for affiliation under the regulations that the Affiliation Waiver references. *See* 13 C.F.R. §§ 121.103(a)(1)-(2), (a)(8), (c)(1), 121.301(f)(1)(iii). Like those provisions, moreover, the Single Corporate Group rule provides that businesses affiliated in this way have restricted access to loans.

The SBA's own explanation of its Single Corporate Group rule provides a dead giveaway that the rule is an affiliation-based limitation. The agency stated that its "[existing] affiliation rules … continue to apply independent of this [new] limitation." 85 Fed. Reg. at 26,325; *see* 86 Fed. Reg. 3702 (same). In anticipating potential confusion over how the new rule would interact with existing affiliation rules, the SBA necessarily recognized that the new rule applied the same affiliation principles as those existing rules. Similarly, the SBA felt compelled to state its (erroneous) view that businesses are still "subject to" the Single Corporate Group rule "even if [they] are eligible for the waiver-of-affiliation provision under the CARES Act." 85 Fed. Reg. at 26,325; *see* 86 Fed. Reg. at 3702 (same). There would have been no reason to offer that *ipse dixit* at all if the Single Corporate Group rule were not an affiliation-based regulation.

The SBA's decisionmaking process in this case underscores the point. Throughout that process, the agency invoked Hotel Californian's affiliation with other entities, and spoke in terms drawn directly from its affiliation rules. In its first substantive transmission on August 3, 2022, the SBA informed Hotel Californian that it was conducting an "affiliation review," that it was considering denying forgiveness due to "Potential Affiliation Issues," and that it needed further information about the "ownership" and "management" of Hotel Californian's affiliates. SBA_000063-64; *compare with*, *e.g.*, 13 C.F.R. § 121.103(a)(2) ("ownership" and "management" are factors that "determin[e] whether affiliation exists"); *id.* § 121.301(f)(1) (businesses under common "own[ership]" are "affiliated"). Then in the SBA's August 25, 2022 letter, the agency

said it was denying forgiveness because Hotel Californian was part of a corporate group "affiliated" by common "*ownership* and/or leadership" that had received "a total loan amount of $6MM, which exceeds the PPP Second Draw *Size Standard* of $4MM." SBA_000001 (emphases added); *compare with*, *e.g.*, 13 C.F.R. § 121.301(a)(2), (b)(1) (a business "combined with its affiliates must not exceed the [applicable] size standard" to be eligible for a PPP loan).

The March 28, 2023 denial letter—which was in substance materially identical to the August 25, 2022 letter—likewise cited the "common ownership" that Hotel Californian shared with the other affiliated hotels. SBA_000095. The SBA's internal notes further show that the agency viewed Hotel Californian's inability to overcome the Single Corporate Group limitation as a failure to "meet all Size Standards requirements." SBA_000271. The SBA's own words thus leave no doubt that the Single Corporate Group rule is an affiliation-based limitation: a successor to the SBA's affiliation provisions in 13 C.F.R. §§ 121.103 and 121.301, and indeed a limitation that applies those provisions.

*Second*, the Single Corporate Group rule is a limitation on "eligibility" for a PPP loan. 15 U.S.C. § 636(a)(36)(D)(iv)(I), (a)(37)(E)(i). The word "eligible" means "fitted or qualified to be chosen or used"; "entitled to something." *Webster's Third New International Dictionary* 736 (1976 ed.); *see also New Oxford American Dictionary* 562 (3d ed. 2010) ("eligible": "having the right to do or obtain something; satisfying the appropriate conditions"). The Single Corporate Group rule renders certain businesses unqualified—and therefore ineligible—for Second Draw loans. If a business is part of a corporate group that has already received $4 million in Second Draw loans, the SBA considers that business categorically unqualified for a Second Draw loan (and categorically unqualified for forgiveness of an already-disbursed loan). That is exactly what happened here. Because Hotel Californian "is part of a corporate group [that] ha[d] received more

than $4,000,000 of 2nd draw PPP loans in the aggregate," the SBA concluded that Hotel Californian "does not meet eligibility requirements for forgiveness of" its Second Draw loan. SBA_000095.

The SBA suggested in its interim final rules that the Single Corporate Group rule is merely a "limitation" on the "loan *amount*" that an "eligible" business can obtain. 85 Fed. Reg. at 26,325 n.1 (emphasis added); *see* 86 Fed. Reg. at 3702 n.59 (same). Similarly, the ALJ opined that the rule "does not functionally render hotel and restaurant PPP borrowers ineligible" for a loan. SBA_004388. But these assertions blink reality. The Single Corporate Group rule operates as a wholesale exclusion from the Second Draw program if, as was the case with Hotel Californian, the business concern happens to be affiliated with other business concerns that have taken out separate loans. In ordinary speech, if a business fails to satisfy a condition of obtaining a loan— and therefore receives $0—no one would say that the business was "eligible" for the loan.

Whatever "label[s]" the SBA might give to its Single Corporate Group rule and its application of that rule to Hotel Californian, what "the [C]ourt [is] review[ing]" here is the "agency pronouncement that underlies the label." *Office of Commc'n of United Church of Christ v. FCC*, 826 F.2d 101, 105 (D.C. Cir. 1987). That principle—substance over label—is pervasive throughout the law, especially administrative law. *See*, *e.g.*, *SEC v. Jarkesy*, --- S. Ct. ----, 2024 WL 3187811, at *14 (U.S. June 27, 2024) ("what matters is the substance of the suit, not … how it is labeled"); *Azar v. Allina Health Servs.*, 587 U.S. 566, 575 (2019) ("courts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*, when deciding whether statutory notice-and-comment demands apply"); *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 416 (1942) ("substance of what the [agency] has purported to do and has done," not "[t]he particular label placed upon it by the [agency]," "is decisive" of whether that action is reviewable);

*Strange ex rel. Strange v. Islamic Republic of Iran*, 964 F.3d 1190, 1201 (D.C. Cir. 2020) ("Substance, not name or label, is what matters here."). Put another way, the SBA does not have "the power to do indirectly what it cannot do directly." *Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 328 (1961). The SBA clearly could not enact rules expressly barring NAICS 72 entities from PPP loans based on their affiliations, yet the Single Corporate Group rule "has this precise effect" on those entities, putting it crosswise with the statute's Affiliation Waiver. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91-92 (2002). Labeling the Single Corporate Group rule as merely a limitation on loan amounts—rather than as a limitation on loan eligibility—is nothing more than an attempt to "wor[k] an end run around" the Affiliation Waiver. *Id.* at 91.

Indeed, the SBA itself recognized that the Single Corporate Group rule is a limitation on loan eligibility, and that it was applying the rule here in a way that rendered Hotel Californian ineligible for a Second Draw loan. When issuing the rule, the SBA stated that a "[f]ailure by the applicant" to "notify the lender" that the applicant's corporate group had exceeded its aggregate maximum "w[ould] be regarded as a use of PPP funds for unauthorized purposes, and the loan will not be *eligible* for forgiveness." 85 Fed. Reg. at 26,325 (emphasis added); *see* 86 Fed. Reg. at 3702 (same). Moreover, in this case, the agency concluded in its March 28, 2023 denial that Hotel Californian "d[id] not meet *eligibility* requirements for forgiveness" of the loan because of the Single Corporate Group rule. SBA_000095 (emphasis added). And in its initial August 25, 2022 denial, the SBA likewise determined that Hotel Californian was "*ineligible*" for a Second Draw loan because its corporate group had exceeded the $4 million "Size Standard." SBA_000001 (emphasis added). Even the agency, then, well understood that the Single Corporate Group rule functions as a limitation on a business's eligibility for a Second Draw loan.

In sum, the Single Corporate Group rule is an affiliation-based limitation that applies "for purposes of determining eligibility" for a Second Draw loan.  15 U.S.C. § 636(a)(37)(E)(i).  But Congress expressly "waived" such limitations for business concerns, like Hotel Californian, that are "assigned a [NAICS] code beginning with 72."  *Id.* § 636(a)(36)(D)(iv)(I); *see id.* § 636(a)(37)(E)(i).  The SBA therefore directly contradicted Congress's instructions in applying that limitation to Hotel Californian, and that unlawful decision must be set aside.

### B.    Applying The Single Corporate Group Limitation To Hotel Californian Was Otherwise Contrary To The Text, Structure, And Purpose Of The Statute

Even if applying the Single Corporate Group rule to Hotel Californian somehow did not directly contradict the Affiliation Waiver, doing so still exceeded the bounds of the SBA's statutory authority.  Nowhere in the statute did Congress authorize the SBA to withhold PPP loans from hotels based on their affiliation with other hotels, much less based on the aggregate loan amounts that their affiliates happen to have already received.  The SBA's authority to take that action must come, if at all, from statutory silence.  But, crucially, "silen[ce]" is not a license for an agency to wield power in whatever ways it deems "permissible" or "reasonable."  *Loper Bright Enters.*, 2024 WL 3208360, at *6, *8, *14 (citations omitted).  Indeed, "an agency literally has no power to act … unless and until Congress confers power upon it."  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  As the D.C. Circuit recognized 30 years ago, "[w]ere courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with" even the now-overruled "*Chevron*" doctrine, "and quite likely with the Constitution as well."  *Ry. Lab. Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc).  At least five features of the statutory scheme demonstrate that any "statutory silence" here is "best interpreted as limiting [the SBA's]

discretion" to apply the Single Corporate Group rule to hotels. *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 223 (2009).

*First*, Congress imposed certain affiliation-based limitations on *non*-hotel entities. For First Draw loans, it specified that the existing "affiliation" regulations in 13 C.F.R. § 121.103 and "any successor" regulations "shall apply with respect to" certain entities like "nonprofit organization[s]" and "housing cooperative[s]." 15 U.S.C. § 636(a)(36)(D)(vi). This provision is essentially the flip side of the Affiliation Waiver, in that it authorizes the SBA to impose on certain entities the affiliation regulations that are waived for hotels. Congress thus "knew how" to authorize affiliation-based limitations for specific types of entities "when that was the intent." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 220 n.9 (1991). It is implausible that Congress, in specifying that certain affiliation-based limitations would apply to non-hotel entities, silently authorized the SBA to apply affiliation-based limitations, like the Single Corporate Group rule, to hotels, *see Samantar v. Yousuf*, 560 U.S. 305, 317 (2010) ("Drawing meaning from silence is particularly inappropriate … [when] Congress has shown that it knows how to [address an issue] in express terms.") (alterations in original) (citation omitted).

Conversely, there can be no dispute that the Affiliation Waiver removes affiliation-based barriers to loan access for hotels—for example, it prevents the SBA from counting the employees of a hotel's affiliates when determining whether that hotel's number of employees is below the maximum allowed for a PPP loan. *See* 13 C.F.R. § 121.103(a)(6). It is improbable that Congress, in expressly *removing* certain affiliation-based barriers for hotels, was silently authorizing the SBA to *add* new affiliation-based barriers for hotels. *Cf. Camelot Banquet Rooms, Inc. v. SBA*, 458 F. Supp. 3d 1044, 1056 (E.D. Wis. 2020) (rejecting "inference that, when it enacted the PPP,

29

Congress combed through all SBA regulations … and determined that any regulation that it did not expressly override was consistent with the purposes of the CARES Act").

*Second*, Congress enacted a scheme that makes PPP loans broadly available to "business concern[s]," 15 U.S.C. § 636(a)(36)(D)(i), (a)(37)(A)(iv)—a term that refers to "individual," distinct legal entities, 13 C.F.R. § 121.105(c). A limitation like the Single Corporate Group rule turns that scheme inside out by making PPP loans available only to "group[s]" of affiliated entities. 86 Fed. Reg. at 3720.

*Third*, Congress mandated that "*any*" individual "business concern … *shall* be eligible to receive" a PPP loan if it satisfies the conditions that the statute authorizes. 15 U.S.C. § 636(a)(36)(D)(i) (emphases added); *see also id.* § 636(a)(37)(A)(iv)(I) ("any business concern" that satisfies certain conditions is "eligible" for a Second Draw loan). The word "any" "impl[ies] *every* member of the class or group," and "[t]he word 'shall' generally imposes a nondiscretionary duty." *SAS Inst., Inc.*, 138 S. Ct. at 1354 (first alteration in original) (citations omitted). Congress meant what it said: any business that satisfies the statutory conditions is qualified—indeed, "entitled"—to receive a PPP loan. *Eligible*, *Webster's Third New International Dictionary* 736 (1976 ed.).

On top of this categorical and mandatory language, Congress devised a carefully structured statute that already provides detailed instructions for what makes a business eligible or ineligible for a PPP loan (and forgiveness of that loan). Eligibility mainly depends on a business's number of employees, whether it uses the loan for payroll costs and other authorized purposes, and (for Second Draw loans) whether it experienced a significant reduction in its gross receipts at the height of the pandemic. *See supra*, at 20-21. Congress also affirmatively excluded specific businesses from the program. Certain "issuer" entities, for example, are "ineligible" for First Draw loans.

15 U.S.C. § 636(a)(36)(D)(viii).  Similarly, certain entities—including those "primarily engaged in political or lobbying activities" and those "own[ed]" in part by "an entity … organized under the laws of the People's Republic of China"—are "not include[d]" in the list of "eligible entit[ies]" for Second Draw loans.  *Id.* § 636(a)(37)(A)(iv)(III)(bb), (cc)(AA).

Because Congress gave all these "exhaustive instructions" to the SBA regarding eligibility for PPP loans, it is simply not "plausible" that Congress "g[a]ve the [agency] broad power to pass new rules" pertaining to eligibility, *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 67 (D.C. Cir. 2023), other than the ones it expressly authorized, like "successor" "affiliation" regulations (that are "waived" for hotels), 15 U.S.C. § 636(a)(36)(D)(iv)(I); *see also Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 485 (2001) (an agency "may not construe [a] statute in a way that completely nullifies textually applicable provisions meant to limit its discretion").

Indeed, many courts have recognized that the SBA has no authority to create new restrictions on PPP eligibility that are not found in the statute.  *See*, *e.g.*, *DV Diamond Club of Flint, LLC v. SBA*, 960 F.3d 743, 745-47 (6th Cir. 2020) (holding that plaintiffs were likely to succeed in their challenge to the SBA's "PPP Ineligibility Rule," which "render[ed] sexually oriented businesses and certain other businesses ineligible to receive PPP loan guarantees"); *Camelot Banquet Rooms, Inc.*, 458 F. Supp. 3d at 1055-57 ("highly unlikely that Congress intended the SBA to apply its exclusion" for "sexually oriented businesses" "to the PPP"); *In re Skefos*, 2020 WL 2893413, at *10 (Bankr. W.D. Tenn. June 2, 2020) ("The Administrator exceeded the authority granted to her in the CARES Act by excluding businesses from the PPP on the basis that their owners are 'presently involved in a bankruptcy.'"); *In re Roman Cath. Church of Archdiocese of Santa Fe*, 615 B.R. 644, 655 (Bankr. D.N.M. 2020) (the "[SBA] had no

authority … to change the [PPP] eligibility requirements," and therefore the agency "exceeded its authority by trying to prohibit bankruptcy debtors from getting PPP funds").

*Fourth*, Congress also dictated very specific instructions for how to calculate PPP loan *amounts*. It provided, in mandatory terms, that "the maximum loan amount" for an eligible business "shall be" an amount determined by the applicable statutory formula. 15 U.S.C. § 636(a)(36)(E); *see also id.* § 636(a)(37)(C)(i)-(iv) ("the maximum amount of a covered loan made to an eligible entity *is* the lesser of …") (emphasis added). For Second Draw loans, Congress wrote four formulas, one of which is unique to "NAICS 72 entities," *i.e.*, hotels and other businesses in the hospitality industry. *Id.* § 636(a)(37)(C)(iv). Under each of these four formulas, "the maximum amount" of the loan is a function of the business concern's "monthly … payroll costs." *Id.* § 636(a)(37)(C)(i)(I)(aa), (ii)(I)(aa), (iii)(I)(aa)(AA), (iv)(I)(aa). For example, the maximum Second Draw amount under the first formula is "the product obtained by multiplying … the average total monthly payment for payroll costs incurred" during a certain time period by "2.5," subject to a limit of "2,000,000." *Id.* § 636(a)(37)(C)(i). The multiplier for the next two formulas is likewise "2.5." *Id.* § 636(a)(37)(C)(ii)(I)(bb), (iii)(I)(bb). But the multiplier for the formula unique to NAICS 72 entities is "3.5," *id.* § 636(a)(37)(C)(iv)(I)(bb), which makes it mathematically more likely that those entities will obtain the maximum $2 million loan. Congress also provided detailed formulas for calculating the amounts that businesses would receive in forgiveness for First Draw and Second Draw loans, and the main input in these calculations is how much of the loan the business used on "payroll costs" and other authorized expenditures in the 8 to 24 weeks after receiving the loan. *Id.* §§ 636m(a)(1), (a)(4), (b), (d), 636(a)(37)(J).

The numbers that Congress used in these formulas were not random, but rather carefully calibrated. By making loan amounts a function of a business's average monthly payroll costs and multipliers like "2.5" and "3.5," Congress sought to ensure that businesses would receive loans that would cover at least 2.5 or 3.5 months of their payroll costs. Similarly, Congress made the amount of forgiveness a function of how much of the loan a business used on payroll costs or other authorized expenditures over a period of 8 to 24 weeks (about 2 to 6 months). Congress thus designed the statute to ensure that businesses would receive loans that covered at least a couple months of their payroll costs, and that these loans would be forgiven if eligibility requirements were met—a vital safety net to help struggling businesses and their workers stay afloat during the pandemic. That careful design leaves the SBA with no authority to revise the statute's formulas by introducing new maximums unrelated to payroll costs, much less new maximums for *groups* of affiliated entities. But that is exactly what the Single Corporate Group rule does: it dictates that corporate groups cannot receive more than $4 million in Second Draw loans collectively, and thus means that individual businesses will not receive the amounts needed to cover their payroll costs if their affiliated businesses already happen to have received certain amounts. That stricter formula flouts Congress's design, and is especially inapt as applied to hotels and other NAICS 72 entities, given that Congress went out of its way to write a unique formula for those businesses to maximize their loan relief.

*Fifth*, applying the Single Corporate Group limitation to Hotel Californian was "incongruous with … statutory purposes and design." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006). The broad purpose of the CARES Act was "to help businesses weather the pandemic," *Air Excursions LLC*, 66 F.4th at 275, and the PPP sought "to provide support to as many displaced American workers as possible," *DV Diamond Club of Flint, LLC*, 960 F.3d at 746. Congress took

special care to achieve these goals for businesses in the hospitality industry, which experienced perhaps the most significant disruption and heaviest losses of any industry during the pandemic. *See supra*, at 5-7.  Congress's intent to maximize loan relief for these businesses, including hotels, is clear from both the Affiliation Waiver and the higher multiplier (3.5) that Congress told the SBA to use when calculating Second Draw loan amounts for NAICS 72 entities.

The statute's legislative history, moreover, reinforces that protecting workers in the hospitality industry was top of mind for Congress.  *See, e.g.*, 166 Cong. Rec. S1976-03, S1995 (Mar. 24, 2020) (Sen. McSally) ("The legislation also allows larger employers that provide jobs for people in each of our States to take out loans to keep people on the payroll as their revenues plummet.  Take … Best Western Hotels … these businesses and others like them provide jobs for our neighbors, and those are at risk too."); 166 Cong. Rec. S1929-01, S1949 (Mar. 23, 2020) (Sen. Murkowski) ("[the] most significant hotel in our capital city [is] laying off 45 hotel positions"); *id.* at S1946 (Sen. Cruz) ("One hotel owner described how we currently had 6 percent occupancy rates.  You can't keep a hotel running with 6 percent occupancy rates.").  The Congress that enacted the PPP would be surprised to learn that the SBA was going out of its way to restrict loan access for individual hotels.

The best reading of the statute, *Loper Bright Enters.*, 2024 WL 3208360, at *16, is that the Affiliation Waiver expressly prohibits applying the Single Corporate Group rule to Hotel Californian.  *See supra*, at 21-28.  But if Congress was silent on the matter, that silence does not work in the agency's favor here.  Applying the Single Corporate Group rule to Hotel Californian was inconsistent with the statute's text, structure, and purposes, and the Court should vacate that unlawful decision.

**C.    The Perplexing Manner In Which The SBA Applied The Limitation To Hotel Californian Confirms That Its Denial Of Loan Forgiveness Here Cannot Be Consistent With The Statute**

Throughout the lengthy review process, the SBA applied the Single Corporate Group rule to Hotel Californian and the other affiliated hotels in a manner that was arbitrary and unequal.  The agency's self-contradictory decisions—and its failure even to consider Hotel Californian's serious reliance interests—reinforce that its denial of forgiveness in Hotel Californian's case was contrary to the Affiliation Waiver and otherwise inconsistent with the statute.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

In the SBA's initial August 25, 2022 decision, the agency applied the Single Corporate Group rule in an illogical way.  At the time, the other affiliated hotels had each received a $2 million Second Draw loan, but none had yet received forgiveness.  SBA_000001; SBA_000083-84.  The agency correctly informed Hotel Californian that Pine & Powell's loan was "eligible for full forgiveness," but its reason was that Pine & Powell's loan was coincidentally the "first" loan to be disbursed.  SBA_000001.  The agency then stated that the next two loans to be disbursed—Hotel Californian's and Newport's—were "*both* … ineligible" for forgiveness because they were "each funded on the same day."  SBA_000001 (emphasis added).  But that conclusion cannot be right, since it directly contradicts the agency's own $4 million cap for corporate groups.  If this decision had stood, then Hotel Californian and its affiliated hotels would have collectively received no more than *$2* million in forgiveness (the maximum amount that Pine & Powell could have received), not $4 million.

The SBA ultimately backtracked from this position, but its new March 28, 2023 decision in Hotel Californian's case was if anything more arbitrary.  Leading up to March 28, the agency correctly granted forgiveness in the amount of $839,792.88 for Pine & Powell's Second Draw loan, SBA_000162, and correctly granted forgiveness on Newport's Second Draw loan in the full

amount of $2 million, SBA_000157.  But even though the circumstances of Hotel Californian's Second Draw loan were materially identical to Newport's Second Draw loan, SBA_000085-86; SBA_000092, the SBA refused to grant any relief to Hotel Californian just three weeks after forgiving Newport's loan in full, SBA_000095.  It appears the SBA's justification for this inconsistency was that Hotel Californian's Second Draw loan was by chance approved a mere 18 minutes after Newport's Second Draw loan was approved.  SBA_000281; SBA_000283.  An agency reviewer explained that although Newport's and Hotel Californian's $2 million Second Draw loans were "disbursed on the same day at the same time," Newport's loan "was approved at 11:49:41" on February 8, 2021 whereas Hotel Californian's loan "was approved at 12:07:52" on that same date, SBA_000283; *see* SBA_000095; SBA_000159.  "Based on the time stamp" of Hotel Californian's approval, the reviewer concluded, Hotel Californian's loan had been approved "after" the group "hit the corporate max" of $4 million, SBA_000281; SBA_000283, and therefore Hotel Californian was not eligible for any forgiveness, SBA_000280; SBA_000095.

This reasoning is problematic for several reasons.  For one, it is arbitrary that loan forgiveness would depend on the precise timing—down to the minute or even second—of when loans are approved.  All the affiliated hotels submitted their Second Draw loan applications on the same day—January 20, 2021.  SBA_000083-84.  Once loan applications have been submitted, the timing of approval and disbursement depends on how quickly the lender processes the application. *See* 15 U.S.C. § 636(a)(36)(F)(ii)-(iii), (a)(37)(K).  There is nothing in the statute indicating that Congress intended the SBA to make forgiveness decisions based on unpredictable factors that applicants cannot control.

In addition, the SBA's March 28, 2023 decision again contradicted its own $4 million maximum for corporate groups.  At the time, the agency had granted far less than $4 million in

forgiveness for the group—only $2,839,792.88 ($839,792.88 for Pine & Powell and $2 million for Newport)—yet the SBA granted Hotel Californian $0 in forgiveness. The agency's rationale seems to have been that, because the *disbursement* of Hotel Californian's $2 million loan back in February 2021 put Hotel Californian's corporate group above its collective $4 million maximum, Hotel Californian should never have received that disbursement in the first place, and therefore was not eligible for any forgiveness two years later despite having used its $2 million loan for authorized purposes. SBA_000281; *see* SBA_000095. But it makes little sense to consider amounts that were *disbursed* when determining, for purposes of forgiveness, whether a corporate group has exceeded a $4 million maximum. By that metric, even if Pine & Powell and Newport had obtained $0 in forgiveness, Hotel Californian still would not have obtained any forgiveness, merely because its $2 million loan was approved after Pine & Powell's and Newport's $2 million loans were approved. But a corporate group that has collectively obtained $0 in forgiveness—and thus must pay back all the loans it received—has hardly "receive[d] … $4,000,000." 86 Fed. Reg. at 3720.

Moreover, five months after its March 2023 decision refusing to grant forgiveness for Hotel Californian, the SBA correctly granted forgiveness for Huntington, which had received its $2 million Second Draw loan after Hotel Californian had received its Second Draw loan. SBA_004433-34. The agency granted the vast majority of the $1,040,183.77 in forgiveness that Huntington sought, SBA_000138; SBA_004434; Compl. ¶ 44; Answer ¶ 44, and correctly did not purport to apply the Single Corporate Group rule to deny forgiveness of Huntington's loan, SBA_004434. Hotel Californian brought that decision to the SBA Administrator's attention when seeking review, SBA_004434, but the Administrator denied review without acknowledging the disparate treatment, SBA_004487. What is more, the total amount of forgiveness for the affiliated

hotels *still* has not reached $4 million, since Pine & Powell received $839,792.88 in forgiveness, SBA_000162, Newport received $2 million, SBA_000157, and Huntington received no more than $1,040,183.77, SBA_000138; Compl. ¶ 44; Answer ¶ 44.  Yet Hotel Californian still has received $0 in forgiveness (and was forced to begin making repayments on its loan).

Congress did not intend for the SBA to make its loan decisions in these contradictory and unpredictable ways.  It designed a system for PPP loans that is simple and provides certainty: each eligible individual business receives a loan amount set by the applicable statutory formula.  This system is even simpler for hotels, because Congress went out of its way to ensure that affiliation-based limitations would not get in the way of loan disbursement or forgiveness for those entities.  Congress thus did not intend for forgiveness to turn on whether affiliated hotels happen to have received their loans on the same day.  Nor did it intend that a hotel would be ineligible for forgiveness merely because its loan was approved 18 minutes after an affiliate's loan was approved.  Yet the SBA's decision to apply the Single Corporate Group rule to Hotel Californian led the agency to make these arbitrary distinctions.  That is a powerful sign the agency strayed far from Congress's design here in applying that rule at all.

Furthermore, in applying for and accepting a Second Draw loan of $2 million—with no hint from the SBA that Hotel Californian was ineligible for that loan, much less because of an affiliation-based limitation—Hotel Californian rightly assumed it was eligible for forgiveness of that loan once it had complied with the requirements for forgiveness.  Hotel Californian could not have predicted that the SBA, after permitting the loan, would change the rules of the game midstream and apply a limitation that effectively bulldozed the important benefits the loan had provided in the first place.  The SBA's bait-and-switch further reinforces the statutory violation here:  Congress certainly did not intend for the agency to interject eleventh-hour limitations on

loan forgiveness for struggling businesses still weathering the effects of the pandemic. And the SBA, in denying forgiveness, did not even make an effort to address Hotel Californian's serious reliance interests. SBA_000095-96. That failure is itself an independent ground for vacatur of the agency's decision. *See Fox Tel. Stations, Inc.*, 556 U.S. at 515 (agency action that "ignore[s]" "serious reliance interests" is "arbitrary or capricious"); *NAACP v. Trump*, 315 F. Supp. 3d 457, 473 (D.D.C. 2018) (Bates, J.) (agency decision that "demonstrates no true cognizance of the serious reliance interests at issue []—indeed, [that] does not even identify what those interests are"—is "arbitrary and capricious"), *aff'd sub nom.*, *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 36 (2020).

## III. The Court Should Vacate The SBA's Decision, Declare That Hotel Californian Is Entitled To Full Loan Forgiveness, And Award Other Appropriate Relief

The SBA's unlawful decision denying forgiveness should be vacated. The APA directs that courts "*shall* … hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory … authority." 5 U.S.C. § 706(2)(A), (C) (emphasis added). Accordingly, the APA's plain text requires that "[i]n *all* cases," unlawful agency action "must be set aside." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) (emphasis added). In the D.C. Circuit, "[v]acatur is the 'normal remedy' for 'unsustainable agency action.'" *Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 179 (D.C. Cir. 2022) (citation omitted).

There is no "reason to depart from that standard course of action" here. *Ky. Mun. Energy Agency*, 45 F.4th at 179 (citation omitted). Because the statute "umambiguous[ly]" forecloses the SBA from applying the Single Corporate Group rule to Hotel Californian—the agency's sole basis for denying full forgiveness—there is no way the agency could "rehabilitate" its decision "on remand." *Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022). Nor would

vacatur be "disruptive" to the agency or third parties, *id.*—it would simply mean that Hotel Californian receives the loan forgiveness to which it is entitled.

The Court should also enter a declaratory judgment that the SBA violated the statute when it denied forgiveness of Hotel Californian's Second Draw loan, and that Hotel Californian is entitled to full forgiveness of that loan. The Court should further declare that Hotel Californian is not required to make any further repayments on its Second Draw loan, and that Hotel Californian is entitled to receive back the repayments it has already made. The Declaratory Judgment Act empowers this Court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights ... of any interested party ... whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). This case presents an actual controversy within the Court's jurisdiction, and Hotel Californian plainly has an interest in full forgiveness of its Second Draw loan.

A declaratory judgment, moreover, would "serve a useful purpose in clarifying the legal relations in issue" and would "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to th[is] proceeding." *Tierney v. Schweiker*, 718 F.2d 449, 456 (D.C. Cir. 1983) (citation omitted). Despite being straightforwardly entitled to loan forgiveness, *see supra*, at 20-21, Hotel Californian faced a long, drawn-out process that culminated in denial of forgiveness. Along the way, the SBA's decisionmaking took several twists and turns, and the agency treated Hotel Californian differently from materially identical applicants. A declaratory judgment is warranted to "put an end" to the significant "uncertainty and insecurity" that Hotel Californian has experienced for the past two years. *Tierney*, 718 F.2d at 456. It would also "ensur[e] that the [SBA] cannot engage in similar" unlawful conduct toward Hotel Californian "or anyone else in the future." *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1366-67 (D.C. Cir. 2023).

In addition, the Court should enjoin the SBA from requiring Hotel Californian to make additional repayments on its Second Draw loan.  This relief will prevent any further irreparable harm to Hotel Californian from the SBA's unlawful conduct, and will serve the public interest by effectuating Congress's statutory scheme.  "[T]o award complete relief," moreover, the Court should order the SBA to ensure that Hotel Californian receives back the amounts that it was forced to repay on its Second Draw loan.  *Bowen v. Massachusetts*, 487 U.S. 879, 909-12 (1988).

## CONCLUSION

The Court should enter summary judgment for Hotel Californian and vacate the SBA's decision denying forgiveness of Hotel Californian's Second Draw loan.  The Court should also enter a declaration that the denial violated the statute, that Hotel Californian is entitled to full forgiveness of its Second Draw loan, that Hotel Californian is not required to make any further repayments on its Second Draw loan, and that Hotel Californian is entitled to receive back the amounts it has already repaid on its Second Draw loan.  In addition, the Court should enjoin the SBA from requiring Hotel Californian to make any further repayments on its Second Draw loan, and order the SBA to ensure that Hotel Californian receives back the amounts it has already repaid on its Second Draw loan.

Dated:  July 15, 2024

Respectfully submitted,

*/s/ Robert A. Batista*
Robert A. Batista (D.C. Bar No. 1618522)
Douglas Colby (D.C. Bar No. 1735932)
Christian Dibblee (D.C. Bar No. 90002557)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9672
rbatista@gibsondunn.com
dcolby@gibsondunn.com
cdibblee@gibsondunn.com

*Attorneys for 35 State Street Hotel Partners, LLC*
*(d/b/a Hotel Californian)*