## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| 35 STATE STREET HOTEL PARTNERS, LLC (d/b/a Hotel Californian), | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:24-cv-00747 (JDB) |
| ISABEL GUZMAN, in her official capacity as Administrator of the United States Small Business Administration, and UNITED STATES SMALL BUSINESS ADMINISTRATION, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

### DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants United States Small Business Administration ("SBA") and Isabella Casillas Guzman, in her official capacity as Administrator of the SBA (together, "Defendants") by and through undersigned counsel, respectfully cross-move for summary judgment under Federal Rule of Civil Procedure 56. The grounds for this motion are set forth in the accompanying memorandum and declaration and the administrative record underlying this action.

Dated:  August 21, 2024                    Respectfully submitted,


                                           BRIAN M. BOYNTON
                                           *Principal Deputy Ass't Attorney General*

                                           BRIAN D. NETTER
                                           *Deputy Assistant Attorney General*

                                           JOSEPH E. BORSON
                                           *Assistant Branch Director*

                                           INDRANEEL SUR (DC #978017)
                                           *Senior Counsel*

                                            */s/ Ross M. Slaughter*
                                           ROSS SLAUGHTER (NC #58086)
                                           *Trial Attorney*
                                           U.S. Department of Justice
                                           Civil Division
                                           Federal Programs Branch
                                           1100 L St. NW
                                           Washington, D.C. 20005
                                           (202) 616-8185
                                           Ross.M.Slaughter@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| 35 STATE STREET HOTEL PARTNERS, LLC (d/b/a Hotel Californian),<br><br>     Plaintiff,<br><br>     v.<br><br>ISABEL GUZMAN, in her official capacity as Administrator of the United States Small Business Administration, and UNITED STATES SMALL BUSINESS ADMINISTRATION,<br><br>     Defendants. | No. 1:24-cv-00747 (JDB) |

**COMBINED MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

I.     Legal Framework ..................................................................................................... 2

        A.     SBA's § 7(a) Loan Program .................................................................... 2

        B.     The CARES Act and the PPP .................................................................. 3

        C.     The Economic Aid Act ........................................................................... 6

        D.     The Corporate Group Rule ...................................................................... 8

        E.     Forgiveness of PPP Loans ...................................................................... 9

II.    Factual Background and Procedural History ......................................................... 10

STANDARD OF REVIEW ................................................................................................ 12

ARGUMENT ..................................................................................................................... 13

I.     The CARES Act and Economic Aid Act Afforded SBA Broad Discretion to Adopt the Corporate Group Rule. ........................................................................... 13

II.    The Corporate Group Rule Does Not Conflict with the Affiliation Waiver. ...................... 16

III.   The Economic Aid Act Ratified the Corporate Group Rule and its Application to NAICS Code 72 Businesses ................................................................................... 21

IV.   State Street's "Statutory Silence" Argument Fails. .............................................. 23

V.    SBA Did Not Arbitrarily Apply the Corporate Group Rule to State Street. ...................... 27

        A.     SBA Properly Applied the Corporate Group Rule to Deny State Street Forgiveness. ........................................................................................ 28

        B.     State Street's Contrary Arguments Are Meritless. ................................ 30

        C.     Even if SBA had Applied the Rule Arbitrarily to State Street, it Would Not Demonstrate the Rule Itself is Unlawful. ................................................ 32

VI.   State Street's Reliance Argument is Forfeited and Meritless. ............................. 33

VII.  State Street Is Not Entitled to Declaratory or Injunctive Relief. ......................... 35

**CONCLUSION** ............................................................................................................ 37

## **TABLE OF AUTHORITIES**

## **Cases**

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023) ............................................................... 26

*Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Service*,
64 F.4th 1354 (D.C. Cir. 2023) ........................................................ 36, 37

*Ass'n of Priv. Sector Colls. & Univs. v. Duncan*,
110 F. Supp. 3d 176 (D.D.C. 2015), *aff'd,* 640 F. App'x 5 (D.C. Cir. 2016) ........................ 31

*Atl. Cleaners & Dyers v. United States*,
286 U.S. 427 (1932) ........................................................................ 20

*Baptist Mem'l Hosp. v. Sebelius*,
603 F.3d 57 (D.C. Cir. 2010) ............................................................... 13

*Becerra v. Empire Health Found.*,
597 U.S. 424 (2022) ........................................................................ 25

*Biden v. Texas*,
597 U.S. 785 (2022) .................................................................... 13, 30

*Bostock v. Clayton Cnty., Ga.*,
590 U.S. 644 (2020) .................................................................... 27, 28

*Bruckner Truck Sales, Inc. v. Guzman*,
No. 2:23-CV-097-Z, 2023 WL 8606761 (N.D. Tex. Dec. 12, 2023), *reconsideration denied*,
2024 WL 903441 (N.D. Tex. Feb. 27, 2024) .............................................. 22, 23

*Calcutt v. Fed. Deposit Ins. Corp.*,
598 U.S. 623 (2023) ........................................................................ 36

*City of Waukesha v. EPA*,
320 F.3d 228 (D.C. Cir. 2003) ......................................................... 25, 34

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
583 U.S. 416 (2018) ........................................................................ 26

*D.V. Diamond Club of Flint, LLC v. SBA*,
960 F.3d 743 (6th Cir. 2020) ............................................................... 26

*Davis v. Mich. Dep't of Treasury*,
489 U.S. 803 (1989) ........................................................................ 19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
 140 S. Ct. 1891 (2020) ................................................................. 34

*DSE, Inc. v. United States,*
 169 F.3d 21 (D.C. Cir. 1999) ......................................................... 3

*Duncan v. Furrow Auction Co.,*
 564 F.2d 1107 (4th Cir. 1977) ..................................................... 37

*Expedient Servs., Inc. v. Weaver,*
 614 F.2d 56 (5th Cir. 1980) ......................................................... 37

*FCC v. AT & T Inc.,*
 562 U.S. 397 (2011) ................................................................... 23

*FEC v. Akins,*
 524 U.S. 11 (1998) ..................................................................... 35

*Gentiva Health Servs., Inc. v. Becerra,*
 31 F.4th 766 (D.C. Cir. 2022) ................................................ 34, 35

*Gordon Coll. v. U.S. Small Bus. Admin.,*
 No. 23-cv-614, 2024 WL 3471261 (D.D.C. July 18, 2024) ............... 4, 10

*Hikvision USA, Inc. v. Fed. Commc'ns Comm'n,*
 97 F.4th 938 (D.C. Cir. 2024) ...................................................... 21

*\*In re Gateway Radiology Consultants, P.A.,*
 983 F.3d 1239 (11th Cir. 2020) .............................................. *passim*

*In re Hidalgo Cnty. Emergency Serv. Found.,*
 962 F.3d 838 (5th Cir. 2020) ....................................................... 37

*In re Lan Assocs. XI, L.P.,*
 192 F.3d 109 (3d Cir. 1999) ........................................................ 14

*INS v. Orlando Ventura,*
 537 U.S. 12 (2002) ..................................................................... 35

*J.C. Driskill, Inc. v. Abdnor,*
 901 F.2d 383 (4th Cir. 1990) ....................................................... 37

*LIT Ventures, LLC v. Carranza,*
 457 F. Supp. 3d 906 (D. Nev. 2020) .............................................. 15

*Loper Bright Enter.s v. Raimondo,*
 144 S. Ct. 2244 (2024) ............................................... 12, 13, 15, 33

*Lorillard v. Pons*,
   434 U.S. 575 (1978) .................................................................................................. 21, 22

*Mingo Logan Coal Co. v. Env't Prot. Agency*,
   829 F.3d 710 (D.C. Cir. 2016) ......................................................................................... 34

*Montefiore Med. Ctr. v. Loc. 272 Welfare Fund*,
   No. 14-CV-10229 (RA), 2017 WL 1194704 (S.D.N.Y. Mar. 31, 2017),
   *aff'd*, 712 F. App'x 104 (2d Cir. 2018) ......................................................................... 14

*N. Haven Bd. of Educ. v. Bell*,
   456 U.S. 512 (1982) .................................................................................................. 21, 22

*Nat. Res. Def. Council, Inc. v. Env't Prot. Agency*,
   301 F. Supp. 3d 133 (D.D.C. 2018) ................................................................................ 14

*NLRB v. SW Gen., Inc.*,
   580 U.S. 288 (2017) ........................................................................................................ 27

*Palisades Gen. Hosp. Inc. v. Leavitt*,
   426 F.3d 400 (D.C. Cir. 2005) ................................................................................... 35, 36

*Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*,
   990 F.3d 217 (2d Cir. 2021) ...................................................................................... 23, 26

*Roberts v. United States*,
   883 F. Supp. 2d 56 (D.D.C. 2012), *aff'd*, 741 F.3d 152 (D.C. Cir. 2014) ................... 12

*SBA v. McClellan*,
   364 U.S. 446 (1960) ........................................................................................................ 15

*Schneider v. Kissinger*,
   412 F.3d 190 (D.C. Cir. 2005) ................................................................................... 25, 34

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ........................................................................................................ 30

*Sierra Club v. FERC*,
   97 F.4th 16 (D.C. Cir. 2024) .......................................................................................... 12

*Sims v. Apfel*,
   530 U.S. 103 (2000) .................................................................................................. 33, 34

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) .................................................................................................. 32, 33

*Smith v. Berryhill,*
    587 U.S. 471 (2019) ......................................................................................... 36, 37

*Smith v. United States,*
    508 U.S. 223 (1993) ............................................................................................... 20

*Solenex LLC v. Bernhardt,*
    962 F.3d 520 (D.C. Cir. 2020) .............................................................................. 35

*Springfield Hosp., Inc. v. Guzman,*
    28 F.4th 403 (2d Cir. 2022) ............................................................................. 23, 31

*State of N.C. v. FERC,*
    112 F.3d 1175 (D.C. Cir. 1997) ............................................................................ 30

*Taggart v. Lorenzen,*
    587 U.S. 554 (2019) ............................................................................................... 23

*Telesat Canada v. Fed. Commc'ns Comm'n,*
    999 F.3d 707 (D.C. Cir. 2021) .............................................................................. 27

*Tex. Med. Ass'n v. U.S. Dep't of Health & Human Servs.,*
    No. 22-cv-450, 2023 WL 5489028 (E.D. Tex. Aug. 24, 2023) ............................. 14

*Tierney v. Schweiker,*
    718 F.2d 449 (D.C. Cir. 1983) .............................................................................. 36

*United States v. Modes, Inc.,*
    17 C.I.T. 627 (Ct. Int'l Trade 1993) ..................................................................... 14

*Utility Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ............................................................................................... 16

*Widerman Malek P.L. v. Carranza,*
    No. 20-cv-665, 2020 WL 6748083 (M.D. Fla. June 22, 2020) ............................. 15

*Wilton v. Seven Falls Co.,*
    515 U.S. 277 (1995) ............................................................................................... 37

*Yates v. United States,*
    574 U.S. 528 (2015) ............................................................................................... 20

## **Statutes**

5 U.S.C. § 553(b) ............................................................................................................ 5

5 U.S.C. § 706(2)(A) ..................................................................................................... 12

11 U.S.C. § 525 ................................................................................................ 23

15 U.S.C. § 632 .................................................................................................. 3

*15 U.S.C. § 634 ....................................................................................... *passim*

*15 U.S.C. § 636 ....................................................................................... *passim*

15 U.S.C. § 636m ......................................................................................... 9, 10

15 U.S.C. § 9009(e)(3) ..................................................................................... 15

15 U.S.C. § 9012 ................................................................................................ 5

CARES Act,
    Pub. L. No. 116-136, 134 Stat. 281 (2020) .......................................... *passim*

Paycheck Protection Program and Health Care Enhancement Act,
    Pub. L. No. 116-139, § 101(a)(1), 134 Stat. 620 (2020) ........................... 6

Act of July 4, 2020,
    Pub. L. No. 116-147, 134 Stat. 660 (2020) ................................................ 6

Consolidated Appropriations Act, 2021,
    Div. N, Title III, Pub. L. No. 116-260, 134 Stat. 1182 (2020) ............... 6, 7

American Rescue Plan Act of 2021,
    Pub. L. No. 117-2, § 5001(d)(1), 135 Stat. 4 (2021) ............................... 7, 8

## **Regulations**

13 C.F.R. § 120.100(d) ...................................................................................... 3

13 C.F.R. § 121.103 .......................................................................... 3, 5, 16, 24

13 C.F.R. § 121.201 ........................................................................................... 3

13 C.F.R. § 121.301 ................................................................................. *passim*

13 C.F.R. § 134.1201(d) .................................................................................. 34

Business Loan Program Temporary Changes; paycheck protection Program,
    85 Fed. Reg. 20,811, (Apr. 15, 2020) ................................................... 4, 6

*Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—
Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders,
    85 Fed. Reg. 26,324 (May 4, 2020) ..................................................... *passim*

Express Loan Programs; Affiliation Standards – Rescission,
85 Fed. Reg. 80,581 (Dec. 14, 2020) ................................................................ 3

Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by
Economic Aid Act,
86 Fed. Reg. 3692 (Jan. 14, 2021) ...................................................9, 11, 32

Business Loan Program Temporary Changes; Paycheck Protection Program
Second Draw Loans,
86 Fed. Reg. 3712 (Jan. 14, 2021) ............................................................ 9, 28

Business Loan Program Temporary Changes; Paycheck Protection Program—Loan Forgiveness
Requirements and Loan Review Procedures as Amended by Economic Aid Act,
86 Fed. Reg. 8,283 (Feb. 5, 2021) ............................................................. 10

Affiliation and Lending Criteria for the SBA Business Loan Programs,
88 Fed. Reg. 21,074 (April 10. 2023) ........................................................ 3

## **Other Authorities**

*Maximum*, Webster's Third New International Dictionary 1396 (1993) .......................................14

*Maximum*, Oxford Eng. Dictionary Online (Mar. 2024 update) ...................................................14

Office of Management and Budget, North American Industry Classification
System at 557 (2017),
https://www.census.gov/naics/reference_files_tools/2017_NAICS_Manual.pdf ................. 4, 5

SBA Press Release No. 20-30,
https://www.sba.gov/article/2020/apr/03/sbas-paycheck-protection-program-small-businesses-
affected-coronavirus-pandemic-launches ............................................................................. 6

SBA Press Release No. 20-32,
https://www.sba.gov/article/2020/apr/16/statement-secretary-mnuchin-administrator-carranza-
paycheck-protection-program-economic-injury ....................................................................... 6

# INTRODUCTION

To meet extraordinarily high demand among small businesses for Paycheck Protection Program ("PPP") loans at the height of the coronavirus pandemic, the Small Business Administration ("SBA") exercised its authority under the Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act") to adopt its Corporate Group Rule, which made PPP loans more broadly available by capping the total amount that borrowers with a common owner could receive. After Congress reauthorized the PPP and empowered SBA to issue "second-draw" loans to certain businesses in late 2020, SBA extended the Rule to those loans as well, setting a maximum aggregate loan amount of $ 4 million per corporate group.

Plaintiff 35 State Street Hotel Partners, LLC ("State Street") contests SBA's decision not to forgive its second-draw loan. SBA denied forgiveness because at the time State Street received its loan, State Street's corporate group had already received the maximum amount in second-draw PPP loans authorized by the Corporate Group Rule. State Street, a hotel business, argues that (1) applying the Corporate Group Rule to it conflicts with a provision of the CARES Act that waived SBA's pre-existing affiliation-based eligibility rules for businesses in the accommodation and food services industries ("the Affiliation Waiver"); (2) SBA otherwise lacked the statutory authority to issue the Corporate Group Rule or apply it to hotels; and (3) SBA applied the Corporate Group Rule in an arbitrary manner.

These arguments lack merit. *First*, the CARES Act, Economic Aid Act, and Small Business Act all give SBA ample authority to adopt the Corporate Group Rule and apply it to all second-draw loans. By situating the PPP within SBA's existing § 7(a) loan program and setting only the *maximum* amount in PPP loans that SBA was permitted, but not required, to guarantee, Congress gave SBA discretion to set a lower aggregate ceiling for borrowers with common

1

ownership. *Second*, the Corporate Group Rule does not conflict with the Affiliation Waiver. The Corporate Group Rule limits the total amount in loans related eligible borrowers can receive, while the Affiliation Waiver concerns whether a borrower is eligible to receive a loan in the first place. And Congress ratified the Corporate Group Rule and its application to businesses like State Street when it made detailed revisions to the PPP without disturbing SBA's authority to cap the total amount in loans it would authorize for related borrowers. *Third*, SBA's application of the Rule to State Street was not arbitrary. SBA uses a consistent method to determine when a corporate group reached the maximum amount in loans authorized by the Rule, and it correctly applied that method to State Street. Accordingly, Defendants are entitled to judgment as a matter of law.

In any event, even if there were some material error in the SBA's reasoning, the proper remedy would be to remand State Street's forgiveness application for further agency proceedings. By statute, Congress has barred injunctive relief against the SBA, and the Court should not declare State Street entitled to full forgiveness before SBA has had an opportunity to consider the issue on remand.

# BACKGROUND

## I.    Legal Framework

### A.  SBA's § 7(a) Loan Program

Section 7(a) of the Small Business Act ("§ 7(a)") "empower[s]" SBA to guarantee general-purpose loans to small businesses. 15 U.S.C. § 636(a). The Small Business Act also broadly authorizes SBA to "make such rules and regulations" as the agency "deems necessary" to implement the loan program, and to "take any and all actions" the agency "determines . . . are necessary or desirable in making, servicing, compromising, modifying, liquidating, or otherwise dealing with or realizing on loans[.]" 15 U.S.C. § 634(b)(6), (b)(7).

The Small Business Act does not prescribe a formula for the exact amount of a § 7(a) loan, but states that § 7(a) loans shall be no greater than $5,000,000 in total, and the amount guaranteed by SBA no greater than $3,750,000. 15 U.S.C. § 636(a)(3)(A). Typically, SBA guarantees loans by private lenders rather than disbursing funds directly. *See In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1248 (11th Cir. 2020).

Ordinarily, to qualify for a § 7(a) loan, an applicant must meet the size standards for a "small" business set forth in the Act and SBA regulations. 15 U.S.C. § 632(a)(1), (2)(A); 13 C.F.R. §§ 120.100(d), 121.201. The Small Business Act "grants the SBA broad authority to craft general criteria for establishing which entities qualify as small business concerns, as well as to make particularized size assessments." *DSE, Inc. v. United States*, 169 F.3d 21, 25 (D.C. Cir. 1999). Those criteria include "affiliation rules" that determine when an applicant is affiliated with another entity, such that the two are properly regarded as a single, larger entity (in terms of number of employees or revenue) for the purpose of determining whether the applicant qualifies as an eligible "small" business. *See* 13 C.F.R. §§ 121.103; 121.301(f).[1]

## B.    The CARES Act and the PPP

In March 2020, Congress passed the CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020), to provide emergency assistance to individuals, families, businesses, and health-care

---

[1] SBA revised its affiliation rules in early 2020, but those revisions were rescinded by the CARES Act. *See* CARES Act § 1102(e), 134 Stat 281, 294; *see also* Express Loan Programs; Affiliation Standards – Rescission, 85 Fed. Reg. 80581, 80581 (Dec. 14, 2020). The version of the affiliation rules that appears in the 2020 edition of the Code of Federal Regulations (available at https://www.govinfo.gov/content/pkg/CFR-2020-title13-vol1/pdf/CFR-2020-title13-vol1.pdf) was in effect during the Paycheck Protection Program. The SBA significantly revised its affiliation rules again in 2023, after the PPP ended. *See* Affiliation and Lending Criteria for the SBA Business Loan Program, 88 Fed. Reg. 21074. The revised affiliation rules are not at issue in this case.

providers coping with the coronavirus pandemic. *See* Business Loan Program Temporary Changes; paycheck protection Program, 85 Fed. Reg. 20,811, 20,811–12 (Apr. 15, 2020). One of the Act's many measures was the PPP, CARES Act § 1102, which was enacted to extend relief to small businesses experiencing economic hardship due to the pandemic. *See id.*

CARES Act § 1102(a)(2) temporarily expanded SBA's business-loan authority by adding a new paragraph to § 7(a), 15 U.S.C. § 636(a)(36). *See Gateway,* 983 F.3d at 1249 ("[T]he PPP was not created as a standalone program; instead it was added into § 7(a)[.]"); *accord Gordon Coll. v. U.S. Small Bus. Admin.*, No. 23-cv-614, 2024 WL 3471261, at *2 (D.D.C. July 18, 2024). Section 636(a)(36)(B) states that "[e]xcept as otherwise provided in [section 636(a)(36)], the [SBA] *may* guarantee [PPP] loans," issued by private lenders, "under the same terms, conditions, and processes as [other] loan[s] made under" § 7(a). 15 U.S.C. § 636(a)(36)(B) (emphasis added); *see id.* § 636(a)(36)(F)(ii). The statute then detailed the ways in which PPP loans were to differ from other § 7(a) loans. *Id.* § 636(a)(36)(D)–(W).

Among those differences, the CARES Act relaxed size limitations to allow businesses with as many as 500 employees (or more, in certain industries) to receive assistance, *id.* § 636(a)(36)(D)(i)(I), and expanded access to loans by waiving, "with respect to eligibility for a covered loan," SBA's pre-existing affiliation-based eligibility rules for certain categories of businesses and non-profits. *Id.* § 636(a)(36)(D)(iv).

As relevant here, subparagraph 636(a)(36)(D)(iv) ("the Affiliation Waiver") waived SBA's affiliation rules for determining the eligibility of business concerns with (1) 500 or fewer employees and (2) a North American Industry Classification System ("NAICS") code beginning in 72. *Id.* § 636(a)(36)(D)(iv)(I). That range of NAICS codes covers businesses in the accommodation and food services industries, like hotels and restaurants. *See* Office of

4

Management and Budget, North American Industry Classification System at 557 (2017).[2]  Those rules otherwise require SBA to look at the size of both the applicant and "all of its domestic and foreign affiliates" when determining whether an applicant is small enough to be eligible for a § 7(a) loan.  *See* 13 C.F.R. § 121.301(f)(6) (2020); *see also id.* § 121.103(a)(8).

In addition, the CARES Act enlarged the $5,000,000 cap applicable to other § 7(a) loans, providing that the "*maximum amount*" of a PPP loan was to be "*the lesser of*" (1) the borrower's average monthly payroll costs for the preceding year, multiplied by 2.5, plus the balance of the borrower's eligible SBA disaster loans (hereinafter, the "payroll-based formula," or "amount"); or (2) $10,000,000.  15 U.S.C. § 636(a)(36)(E) (emphasis added).

Congress initially authorized SBA to guarantee up to $349 billion in PPP loans by June 30, 2020.  CARES Act § 1102(b)(1); 15 U.S.C. § 636(a)(36)(A)(ii)–(iii),  (B).  To ensure that SBA could make such an enormous sum available to small businesses in so short a time, Congress instructed SBA to issue rules implementing the PPP "[n]ot later than 15 days after" the CARES Act's enactment, 15 U.S.C. § 9012, described as "warp speed for regulatory action," *Gateway*, 983 F.3d at 1262.  To make that feat possible, Congress also instructed SBA to issue these rules without regard to APA notice-and-comment procedures.   15 U.S.C. § 9012 (citing 5 U.S.C. § 553(b)).  Congress also directed that additional non-§ 7(a) lenders be allowed to participate in the PPP and mandated that all PPP lenders be given "delegated authority" to make and approve PPP loans without prior SBA review.  *Id.* § 636(a)(36)(F)(ii)(I),  (iii).

---

[2] Available at https://www.census.gov/naics/reference_files_tools/2017_NAICS_Manual.pdf.

SBA launched the PPP on April 3, 2020.  SBA Press Release No. 20-30.[3]  In light of Congress's clear intent and the needs of small businesses for immediate assistance,  SBA also established a highly streamlined PPP loan-origination process based on borrower self-certifications of eligibility.  *See* 85 Fed. Reg. at 20,812, 20,814–16; SBA Form 2483 (Ex. B, hereto).  Because borrowers' applications and supporting documentation were maintained by lenders, not sent to SBA, *see* 85 Fed. Reg. at 20,814, SBA did not (and as a practical matter could not) make independent determinations regarding borrower eligibility or compliance with program rules at the loan-origination stage.

Although the program's termination date was June 30, 2020, the demand for PPP financing was so great that the entire $349 billion authorized by Congress was exhausted in less than two weeks' time, by April 16, 2020.  *Compare* CARES Act § 1102(b) *with* SBA Press Release No. 20-32.[4]  Congress authorized another $310 billion in PPP loans on April 24, 2020.  *See* Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, § 101(a)(1), 134 Stat. 620 (2020).

**C.  The Economic Aid Act**

The PPP expired on August 8, 2020, *see* Act of July 4, 2020, Pub. L. No. 116-147, 134 Stat. 660, but the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, (Consolidated Appropriations Act, 2021, Div. N, Title III, Pub. L. No. 116-260, 134 Stat. 1182, 1993–2052) (Dec. 27, 2020)) (the "Economic Aid Act," or "EAA"), reauthorized and extended the

---

[3] Available at https://www.sba.gov/article/2020/apr/03/sbas-paycheck-protection-program-small-businesses-affected-coronavirus-pandemic-launches.

[4]     Available     at     https://www.sba.gov/article/2020/apr/16/statement-secretary-mnuchin-administrator-carranza-paycheck-protection-program-economic-injury.

program to March 31, 2021, and added another $147.5 billion in loan authority. EAA § 323(a)(1). The EAA also made changes concerning eligibility and uses of loan proceeds,[5] and prescribed a "maximum loan amount" calculation for PPP loans issued to farmers and ranchers, similar to the payroll-based formula under § 636(a)(36)(E). *Id.* § 313(a)(2) (adding 15 U.S.C. § 636(a)(36)(V)).

The EAA also added a new section to the § 7(a) program, 15 U.S.C. § 636(a)(37), that authorized SBA to guarantee so-called "second-draw" PPP loans to certain businesses that had already received "first-draw" PPP loans under the CARES Act, EAA § 311(a), under the same terms and conditions as first-draw loans, except as the EAA otherwise provided. 15 U.S.C. § 636(a)(37)(B). The EAA established a "[m]aximum loan amount" for second-draw loans based on the CARES Act's payroll-based formula for first-draw loans, but with a smaller cap of $2,000,000. *Id.* § 636(a)(37)(C). For NAICS code 72 businesses, the EAA increased the multiplier for the payroll-based formula from 2.5 to 3.5, subject to the $2,000,000 cap. *Id.* § 636(a)(37)(C)(iv). The EAA also specified that the Affiliation Waiver applicable to first-draw loans would also apply to second-draw PPP loans, "for purposes of determining eligibility[,]" though it lowered the number of employees a NAICS Code 72 business could have while qualifying for the Waiver from 500 to 300 employees. *Id.* § 636(a)(37)(E).

Like the CARES Act, the EAA gave SBA "emergency rulemaking authority" and directed SBA issue regulations implementing the EAA "[n]ot later than 10 days after" the EAA's enactment, without regard to the notice-and-comment requirements of § 553(b). EAA § 303. Ultimately Congress authorized SBA to guarantee more than $813 billion in PPP loans, American Rescue

---

[5] *See* EAA § 304(a), (b)(2) (adding to the permissible uses of loan proceeds); *id.* § 310 (clarifying and adding to limitations on borrower eligibility); *id.* §§ 316–18 (extending eligibility to housing cooperatives, news organizations, and destination marketing organizations; *id.* § 319 (prohibiting use of loan proceeds for lobbying activities).

Plan Act of 2021, Pub. L. No. 117-2, § 5001(d)(1), 135 Stat. 4, and nearly 12 million PPP loans were approved.

### D.  The Corporate Group Rule

On May 4, 2020, SBA published the Corporate Group Rule.  Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders, 85 Fed. Reg. 26,324 (May 4, 2020).  Under the Rule, "businesses that are part of a single corporate group shall in no event receive more than $20,000,000 of PPP loans in the aggregate."  *Id.* at 26,325.  The Rule defined a "corporate group" as businesses "owned, directly or indirectly, by a common parent."  *Id.*  The Rule advised borrowers that loans received in disregard of its terms "will not be eligible for forgiveness."  *Id.*

SBA explained the Rule's purpose was to "preserve the limited resources available to the PPP . . . in light of the previous lapse of PPP appropriations and the high demand for PPP loans[.]"  *Id.*  SBA "determined that limiting the amount of PPP loans that a single corporate group may receive [would] promote the availability of PPP loans to the largest possible number of borrowers, consistent with the CARES Act."  *Id.*  SBA concluded that it had authority to issue an "aggregate limitation" on the amount of PPP loans issued to a single corporate group, because the terms of the CARES Act "specify a 'maximum'—but not a minimum—loan amount" for each borrower that SBA "may" guarantee.  *Id* .at n. 1 (citing 15 U.S.C. § 636(a)(36)(B), (E)).

SBA noted that its "affiliation rules, which relate to an applicant's *eligibility* for PPP loans" as well as "any waiver of those rules under the CARES Act" would  "continue to apply *independent* of this [aggregate] limitation."  *Id.* at 26,325 (emphasis added).  Conversely, applicants were subject to the Corporate Group Rule "even if the businesses are eligible for the waiver-of-affiliation provision under the CARES Act or are otherwise not considered to be affiliates under

SBA's affiliation rules." *Id.* In other words, the Rule applied to all eligible borrowers, regardless of whether SBA considered affiliation in determining those borrowers' eligibility to participate in the program. After Congress passed the EAA, SBA extended the Corporate Group Rule to second-draw loans to "promote the availability of PPP loans to the largest possible number of borrowers[.]" Business Loan Program Temporary Changes; Paycheck Protection Program Second Draw Loans, 86 Fed. Reg. 3712, 3716 (Jan. 14. 2021). Consistent with the lower maximum individual loan amount authorized by the EAA for second-draw loans, SBA capped the total amount a single corporate group could receive in second-draw loans at $4,000,000. *Id.* at 3716, 3720.

Under the Corporate Group Rule, PPP applicants were responsible for notifying lenders "if the applicant has applied for or received PPP loans in excess of the amount permitted" by the Rule and for withdrawing or requesting cancellation "of any pending PPP loan application or approved PPP loan not in compliance with the limitation set forth in this rule." Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act, 86 Fed. Reg. 3692, 3702 (Jan. 14, 2021); *see also* 86 Fed. Reg. at 3713 (specifying that second-draw loans are subject SBA's consolidated interim final rule for first-draw loans unless otherwise specified). Failure do so would "be regarded as a use of PPP funds for unauthorized purposes." 86 Fed. Reg. at 3702.

### E.    Forgiveness of PPP Loans

CARES Act § 1106 provides for the forgiveness of PPP loans. It provides that "[a]n eligible recipient" of a PPP loan "shall be eligible for forgiveness" "in an amount equal to" the sum of its covered payroll costs and other allowable expenses, 15 U.S.C. § 636m(b), but not to exceed the principal amount of the loan, *id.* § 636m(d)(1). Except as otherwise provided by the EAA, eligible

recipients of second-draw loans are eligible for forgiveness "in in the same manner as an eligible recipient" of a first-draw loan. *Id.* § 636(a)(37)(J)(ii).

To obtain forgiveness, an eligible borrower submits an application and supporting documentation to its lender, which then determines if the borrower is entitled to forgiveness under the Act, and, if so, submits a request for payment to SBA. 15 U.S.C. § 636m(g); *see* Business Loan Program Temporary Changes; Paycheck Protection Program—Loan Forgiveness Requirements and Loan Review Procedures as Amended by Economic Aid Act, 86 Fed. Reg. 8,283, 8,287–88 (Feb. 5, 2021). SBA then remits the appropriate amount to the lender—subject, however, to any SBA review of the loan. 15 U.S.C. § 636m(c)(3); 86 Fed. Reg. at 8,288.

The simplified PPP loan application process, combined with the large number of first-time SBA borrowers and lenders lacking familiarity with SBA rules, created a heightened risk of loans being erroneously sought and approved. To maintain the PPP's fiscal integrity, SBA implemented a system of PPP loan review. *See Gordon Coll.*, 2024 WL 3471261, at *2. If SBA determines during a review that "an action by the borrower has resulted in its receipt of a PPP loan that did not meet program requirements," it denies forgiveness of the loan. 86 Fed. Reg. at 8,285.

## II.    Factual Background and Procedural History

State Street operates a hotel known as Hotel Californian. SBA_000098. State Street's majority owner, Michael Rosenfeld, is also the majority owner of three other hotel businesses: Pine & Powell Partners, LLC, ("Pine & Powell"); WRC Newport, LLC ("Newport"); and WRC Huntington, LLC ("Huntington"). SBA_000083; SBA_000084 n.2.

On January 20, 2021, Rosenfeld applied for $8 million in second-draw loans on behalf of his corporate group: one $2 million loan for each of his four businesses. *See* SBA_000098, 0113, 0119, 0125; SBA_000083–84. Pine & Powell's second-draw loan was approved on January 28,

2021, and disbursed on February 5, 2021; Newport's and State Street's second-draw loans were approved at 11:49 a.m. and 12:07 p.m., respectively, on February 8, 2021, and disbursed on February 16, 2021; and Huntington's second-draw loan was approved on March 16, 2021, and disbursed on March 25, 2021. SBA_000281.

State Street applied for forgiveness of its second-draw loan on June 7, 2022. SBA_00084. SBA ultimately denied forgiveness on March 28, 2023, concluding that State Street was part of a corporate group that had received more than $4 million in second-draw PPP loans.[6] SBA_095. State Street appealed that denial to SBA's Office of Hearings and Appeals ("OHA"), arguing that (1) the Corporate Group Rule conflicted with the CARES Act's Affiliation Waiver or otherwise violated the statute and (2) SBA's decision to deny State Street's loan while forgiving Newport's loan was arbitrary. *See* SBA_000082–92.

OHA rejected State Street's appeal on August 18, 2023. SBA_004381. The ALJ explained that the Affiliation Waiver "waives the affiliation rules only 'with respect to eligibility for a covered loan.'" SBA_004388 (quoting 15 U.S.C. § 636(a)(36)(D)(iv)(I)). Accordingly, the Corporate Group Rule, which does not restrict *eligibility* for loans, but rather the total amount of money that could be loaned, continued to apply "even if the affiliated 'businesses are eligible for the waiver-of-affiliation provisions under the CARES Act.'" *Id.* (quoting 86 Fed. Reg. 3692, 3702). The ALJ further concluded that OHA lacked authority to consider the validity of the Corporate Group Rule. SBA_004389. OHA also rejected State Street's argument that SBA arbitrarily denied forgiveness to State Street while granting it to Newport. *Id.* OHA denied reconsideration and the Administrator declined to review its decision. SBA_004420, 004487.

---

[6] SBA issued an initial decision denying forgiveness on August 25, 2022, but withdrew that decision to conduct further review of State Street's loan. *See* SBA_000001, SBA_000075.

After the Administrator declined to review OHA's decision, State Street filed this lawsuit, alleging that SBA's decision not to forgive its second-draw loan violated the APA. Complaint, ECF No. 1. It now moves for summary judgment, arguing that applying to the Corporate Group Rule to it (1) conflicts with the Affiliation Waiver, (2) otherwise exceeds the SBA's statutory authority, and (3) was, in any event, arbitrarily applied to it. Mem. 21–38 (ECF No. 17). State Street asks the Court to vacate SBA's decision denying it forgiveness for its second-draw loan, declare it entitled to full forgiveness of the loan, enjoin SBA from requiring it to make additional payments on the loan, and order SBA to "ensure" State Street receives back the amounts it has already repaid on the loan.

## STANDARD OF REVIEW

Under the APA, "[a] court will set aside agency action when it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Sierra Club v. FERC*, 97 F.4th 16, 23 (D.C. Cir. 2024) (quoting 5 U.S.C. § 706(2)(A)). The function of the reviewing court is to decide "as a matter of law" whether "the evidence in the administrative record permitted the agency to make the decision it did." *Roberts v. United States*, 883 F. Supp. 2d 56, 62 (D.D.C. 2012), *aff'd*, 741 F.3d 152 (D.C. Cir. 2014).[7] "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* In doing so, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enter.s v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). When the relevant

---

[7]  Internal citations and quotation marks are omitted throughout this brief unless noted.

statute confers discretionary authority on the agency, a court "fulfill[s] [its] obligations under the APA" by "identify[ing] and respect[ing]" that delegation. *Id.* at 2268; *see also id.* at 2273.

# ARGUMENT

## I.    The CARES Act and Economic Aid Act Afforded SBA Broad Discretion to Adopt the Corporate Group Rule.

The plain terms of the CARES Act and Economic Aid Act provide ample authority for SBA to adopt a regulation that, like the Corporate Group Rule, sets the maximum loan amount an eligible borrower may receive.

SBA's authority to guarantee first- and second- draw PPP loans is located in 15 U.S.C. § 636(a)(36)(B) and (37)(B). Section 636(a)(36)(B) provides that SBA "*may* guarantee [first-draw PPP] loans under the same terms [and] conditions" as other § 7(a) loans, "[e]xcept as otherwise provided" in the other subparagraphs of § 636(a)(36) (emphasis added). Section 636(a)(37)(B) similarly provides that SBA "*may* guarantee [second-draw PPP] loans under the same terms [and] conditions" as first-draw PPP loans, "excepted as otherwise provided" in the other subparagraphs of § 636(a)(37) (emphasis added).

In both cases, "the most natural reading of [the] provision is the one that is most obvious: 'may' is permissive rather than obligatory." *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 63 (D.C. Cir. 2010); *see also Biden v. Texas*, 597 U.S. 785, 802 (2022) ("[T]he word 'may' *clearly* connotes discretion."). Thus, just as SBA is generally "empowered"—but not required—to make or guarantee § 7(a) loans, 15 U.S.C. § 636(a), the CARES Act and EAA authorize, but do not require, SBA to guarantee PPP loans meeting the CARES Act's and Economic Aid Act's criteria. *See Gateway*, 983 F.3d at 1257 (citation omitted) (holding that "the permissive word 'may' [in § 636(a)(36)(B)] vests the SBA with discretionary authority.").

13

Among those criteria are § 636(a)(36)(E) and (37)(C), which provide the methods for calculating the "maximum" loan amount for first- and second- draw PPP loans. Neither section requires PPP loans to *equal* the maximum amount authorized by statute. Rather, "[a] 'maximum' is 'an upper limit allowed by law or other authority' or 'the greatest quantity or value attainable in a given case.'"[8] *Nat. Res. Def. Council, Inc. v. Env't Prot. Agency*, 301 F. Supp. 3d 133, 141 (D.D.C. 2018) (quoting *Maximum*, Webster's Third New International Dictionary 1396 (1993)); *see also Montefiore Med. Ctr. v. Loc. 272 Welfare Fund*, No. 14-CV-10229 (RA), 2017 WL 1194704, at *5 (S.D.N.Y. Mar. 31, 2017) (maximum "is a relative term, suggesting the most of several alternatives"), *aff'd*, 712 F. App'x 104 (2d Cir. 2018). Accordingly, a statute setting a maximum award does not of its own force mean that such an award must always be made or even presumed correct. *See, e.g.*, *In re Lan Assocs. XI, L.P.*, 192 F.3d 109, 116 (3d Cir. 1999) (cap on bankruptcy trustee compensation "is not to be construed as an entitlement to the maximum fee specified" (citation omitted)); *see also United States v. Modes, Inc.*, 17 C.I.T. 627, 635 (Ct. Int'l Trade 1993) (construing civil penalty statute that "establishes only a *maximum* penalty, but makes no provision for a minimum penalty"). As SBA correctly observed, § 636(a)(36)(E) "specif[ied] a 'maximum'—*but not a minimum*—[PPP first-draw] loan amount." 85 Fed. Reg. at 26,325 n.1 (emphasis added). The same is true for § 636(a)(37)(C), which applies to second-draw loans.

Read together, these provisions set a ceiling—not a floor—on the size of PPP loans that SBA is permitted—but not required—to authorize for eligible borrowers. The statute thus conferred on SBA discretion to use its extensive rulemaking authority to set a lower aggregate

---

[8] *See also Tex. Med. Ass'n v. U.S. Dep't of Health & Human Servs.*, No. 22-cv-450, 2023 WL 5489028 at *8 (E.D. Tex. Aug. 24, 2023) ("A[] '[m]aximum' means the 'highest value or extreme limit,' . . . or the 'highest *possible* magnitude or quantity of something . . .'") (quoting *Maximum*, Oxford Eng. Dictionary Online (Dec. 2022 ed.)) (emphasis added).

ceiling for borrowers constituting a single corporate group. *Cf. Widerman Malek P.L. v. Carranza*, No. 20-cv-665, 2020 WL 6748083 at *4 (M.D. Fla. June 22, 2020) (agreeing with *LIT Ventures, LLC v. Carranza*, 457 F. Supp. 3d 906, 911 (D. Nev. 2020), that the CARES Act, by using the phrase "shall be not more than" "in prescribing the amount of an EIDL grant" gave the SBA "discretion in awarding these advances" because "Congress only prescribed a cap on the amount rather than . . . a specific amount") (citing 15 U.S.C. § 9009(e)(3)).

15 U.S.C. § 634(b)(6) and (7) reinforce this conclusion. As noted above, § 634(b)(7) vests SBA with authority to "take any and all actions" it "determines . . . are necessary or desirable in making . . . or otherwise dealing with" § 7(a) loans, which include loans made under the PPP. *See Gateway,* 983 F.3d at 1256 (because "the PPP was not created as a standalone program but was added into the existing § 7(a) program," it is "subject[ ] . . . [to] existing SBA authority" under § 7(a)). And Congress broadly granted SBA the power to "make such rules and regulations as [the Administrator] deems necessary to carry out" its authority over the § 7(a) program. 15 U.S.C. § 634(b)(6). By situating the PPP within § 7(a), the CARES Act contemplated that SBA would exercise substantial discretion in "making" or "otherwise dealing with" PPP loans, and that it would make "such rules" as it "deem[ed] necessary" to do so. *Id.* § 634(b)(6), (7).

The CARES Act, EAA and Small Business Act thus clearly "authorized [SBA] to exercise a degree of discretion" in administering the PPP program. *Loper Bright*, 144 S. Ct. at 2263. The terms "may" and "maximum" both gave SBA "flexibility" to determine how best to allocate the PPP's limited funds. *Id.* And by providing SBA with significant rulemaking authority, Congress "empower[ed]" SBA to "fill up the details" of the PPP. *Id.*; *see also SBA v. McClellan*, 364 U.S. 446, 447 (1960) (noting that Congress conferred "extraordinarily broad powers" on SBA). Indeed,

in adopting the Corporate Group Rule, SBA explicitly invoked its discretion under the CARES act and its broad rulemaking powers.  85 Fed. Reg. at 26,325 n.1.

SBA's decision to "promote the availability of PPP loans to the largest possible number of borrowers," 86 Fed. Reg. at 3716, by imposing a limit on the total amount in loans that a single corporate group could receive fell easily within the discretion Congress conferred in § 636(a)(37)(B) and (C) and § 634(b)(7).  The Rule reflects an "unremarkable" exercise of discretion to "adopt policies to prioritize [agency] expenditures within the bounds established by Congress."  *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014).

## II.    The Corporate Group Rule Does Not Conflict with the Affiliation Waiver.

State Street's primary argument is that applying the Corporate Group Rule to NAICS code 72 businesses conflicts with the provision of the CARES Act that waives SBA's affiliation-based eligibility rules for those businesses.  Mem. 21–28.  That is mistaken.  SBA's Corporate Group Rule and its affiliation rules perform different functions.  SBA's affiliation rules—and the partial waiver of those rules in the CARES Act—concern whether an entity is *eligible* for a § 7(a) a loan in the first place.  The Corporate Group Rule, by contrast, sets a cap on the total amount that related entities may receive, without categorically prohibiting any entity from participating in the PPP.

Section 636(a)(36)(D)(iv)(I) of the CARES Act waives, for NAICS code 72 businesses like State Street, "the provisions applicable to affiliations under" 13 C.F.R. § 121.103 "or any successor regulation" "with respect to eligibility for a covered loan." 15 U.S.C. § 636(a)(36)(D)(iv)(I).  Section 121.103 outlines SBA's "general principles of affiliation" and specifies that the size standards and bases for affiliation applicable to § 7(a) loans are set out in § 121.301. *See* 13 C.F.R. § 121.103(a)(6), (8).  Section 121.301 in turn provides that in determining an entity's size—and thus its eligibility for a § 7(a) loan—SBA considers the size (based on receipts, employees, or

16

applicable alternate size standard) of the applicant "and all of its domestic and foreign affiliates[.]" 13 C.F.R. § 121.301(f)(6) (2020). In other words, the affiliation provisions ensure that SBA loans go to businesses that are, in fact, small. By waiving those regulations for certain categories of entities "with respect to eligibility," 15 U.S.C. § 636(a)(36)(D)(iv) makes entities that would otherwise be too large to participate in the § 7(a) program eligible for PPP loans.

The Corporate Group Rule does not conflict with the Affiliation Waiver because the Rule does not restrict eligibility. It did not close the door to participation in the PPP: it simply required owners of multiple eligible businesses to exercise judgment about how to allocate the loans SBA made available among their businesses. Consider this analogy: PPP loans, like rooms at a hotel, were a finite resource. *See* p. 6, *supra*. Congress gave SBA discretion regarding how many rooms groups could be assigned, and those groups were responsible for determining who would room together within that overall cap. *See* pp. 13–16, *supra*. That does not render any applicant ineligible, just as a guest who qualifies for a free night at a hotel has not been rendered ineligible simply because the hotel does not offer that guest the honeymoon suite.

State Street fails to grasp the distinction between a limit on loan amount (like the Corporate Group Rule) and a limit on eligibility (like SBA's affiliation rules). Had SBA's normal affiliation rules applied, none of the hotels in Rosenfeld's corporate group would have been eligible to receive any second-draw PPP loan because the hotels collectively employed more than 300 employees. *Compare* SBA_000098, 000113, 000119, 000125 *with* 15 U.S.C. § 636(a)(37)(A)(iv)(I)(aa) (limiting entities eligible for second-draw loans to those with 300 or fewer employees). As the OHA decision explained, State Street and the other members of Rosenfeld's corporate group "remained eligible for a Second Draw PPP loan" "[d]espite [collectively] having more than 300 employees" "*because of the Affiliation Waive*r." SBA_004389 (emphasis added). Had Rosenfeld

17

requested $1 million in loans for each of his businesses (instead of $2 million), all four would have been "potentially eligible for full forgiveness[.]"  *Id.*  Put another way, the difference between SBA's affiliation-based eligibility rules (none of which applied to State Street or its corporate group) and a limit on aggregate loan amount (which did) is four million dollars.

State Street's counterarguments are meritless.  State Street's extended effort to depict the Corporate Group Rule as an "affiliation-based limitation" (Mem. 23–25) is beside the point.  While two entities that are part of the same corporate group may—or may not[9]—be treated as "affiliates" for the purposes of determining size eligibility, the rules serve different purposes.  SBA uses the affiliation rules to determine whether an entity is eligible to participate in the § 7(a) program at all, while the Corporate Group Rule simply caps the total amount that eligible entities with a common owner can receive.  That is why, as the Rule's preamble states, "SBA's affiliation rules, which relate to an applicant's eligibility for PPP loans, and any waiver of those rules under the CARES Act, continue to apply *independent* of th[e] [Corporate Group] limitation."  85 Fed. Reg. at 26,325 (emphases added).

Moreover, contrary to State Street's contention (Mem. 24), when SBA explained the distinction between the two rules, it did not "necessarily recognize[] that the new rule applied the same affiliation principles as [the] existing [affiliation] rules." *Id.* Quite the opposite: the Rule highlighted the difference between the affiliation rules and the loan amount limit by noting that

---

[9] While some facts are relevant to both affiliation and corporate group membership, the concepts are distinct.  SBA's affiliation rules during the PPP looked at several alternative bases for affiliation, including ownership, shared management,  and identity of interest between close relatives.  *See* 13 C.F.R. § 121.301(f)(1)–(5) (2020).  It was therefore possible for entities to be considered affiliates but *not* part of the same corporate group.  Conversely, two businesses may be members of the same corporate group but *not* be treated as affiliates for the purpose of determining size eligibility—most obviously, when two businesses share an owner but are exempted from the affiliation rules by the CARES Act.

18

businesses were subject to the Corporate Group Rule "even if the businesses are eligible for the waiver-of-affiliation provision under the CARES Act or are otherwise not considered to be affiliates under SBA's affiliation rules." 85 Fed. Reg. at 26,325. To treat SBA's explanation of the interaction of two distinct but related concepts as a concession that the two concepts are the same would rebuke SBA for speaking clearly.

State Street is also incorrect in presuming that all statutorily eligible borrowers are entitled to the maximum amount in loans authorized by the statute. *See* Mem. 25 (arguing that "eligible" means "entitled to something"). To be eligible for something does not usually mean one is entitled to it. Not every Duke student who meets the NCAA's eligibility requirements will make the school's basketball team. Not every eligible receiver will get the pass. And not every American eligible to be President will hold that office. Rather, as these examples suggest, eligible often simply means "fulfilling the necessary criteria or qualifications *to be considered* for a particular benefit." Eligible, Oxford English Dictionary (Mar. 2024 update) (emphasis added). So too here.

Indeed, the statute forecloses State Street's interpretation of the Affiliation Waiver. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)("It is a fundamental canon of statutory interpretation that the words of a statute must be read in their context."). Section 636(a)(37)(B) and (C) provide that SBA "may" guarantee second-draw loans to eligible entities up to a *maximum* of the borrower's payroll-based amount or $2 million, whichever is less. 15 U.S.C. § 636(a)(77)(B)–(C). Thus, even when an entity is eligible for a guaranteed loan, the SBA retains discretion to decide whether to provide it, and in what amount. The Corporate Group Rule is merely an exercise of that discretion.

By the same token, a borrower that obtained a loan in violation of the Corporate Group Rule is ineligible *for loan forgiveness* because it broke the program rules, not because the borrower

19

was ineligible to participate in the program at all. State Street argues that because SBA used the word "eligible" and "eligibility" in the Corporate Group Rule and in its forgiveness decision, the Rule must be a restriction on eligibility to participate in the program. Mem. 27. But language "cannot be interpreted apart from context," *Smith v. United States*, 508 U.S. 223, 229 (1993), and State Street's interpretation ignores that context in which those words are used. *See also Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality op.) ("[T]he same words, placed in different contexts, sometimes mean different things."); *accord Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932).

As SBA explained when adopting the Corporate Group Rule, loans issued in excess of the limit set by the Rule "will not be eligible *for forgiveness*" because such loans would "regarded as a use of PPP funds for unauthorized purposes." 85 Fed. Reg. at 26,325; *see also* SBA_000095 (concluding that State Street "[did] not meet eligibility requirements *for forgiveness*") (emphasis added). SBA made clear that it would not guarantee more than $4 million in loans to a single corporate group. It is unsurprising that it would characterize a borrower who violated that rule by receiving more in loans than SBA authorized as "ineligible for forgiveness" even though the borrower was eligible to participate in the program at the outset.

State Street attempts to recast the Corporate Group Rule as "a wholesale exclusion from the Second Draw program" by treating the denial of its forgiveness application as an unavoidable consequence of the Corporate Group Rule. *See* Mem. 28. In reality, denial of forgiveness was the avoidable result of State Street's owner's failure to comply with PPP rules. State Street does not just "happen[] to be affiliated" with other businesses "that have taken out separate loans." *Id.* State Street's owner, Michael Rosenfeld, submitted four applications for a combined $8 million in loans *on the same day*, in direct contravention of the Corporate Group Rule. SBA_000098,

000113, 000119, 000125.  Had Rosenfeld simply exercised some judgment about how to allocate the loans among his businesses instead of ignoring the Corporate Group Rule completely, State Street could have received a loan and (assuming it complied with other PPP rules) had that loan forgiven.  That failure of restraint does not transform the Corporate Group Rule into an eligibility restriction in conflict with the Affiliation Waiver.

### III.    The Economic Aid Act Ratified the Corporate Group Rule and its Application to NAICS Code 72 Businesses.

Even if the CARES Act left any question about SBA's authority to implement the Corporate Group Rule or apply it to NAICS Code 72 businesses, Congress confirmed the Rule's validity in the Economic Aid Act.  "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see also N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) ("Where 'an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.'" (citation omitted)); *accord Hikvision USA, Inc. v. Fed. Commc'ns Comm'n*, 97 F.4th 938, 946 (D.C. Cir. 2024).

The *Lorillard* presumption disposes of State Street's arguments here.  As discussed above, SBA first issued the Corporate Group Rule on May 4, 2020.  On December 27, 2020, the EAA re-authorized (and refunded) the PPP, which had expired in August 2020.  EAA § 323(a)(1).  In doing so, the EAA made a number of amendments to the CARES Act affecting borrower eligibility and permissible uses of loan proceeds, *see supra* at 6 n.2, but did nothing to unsettle the SBA's authority to provide less than the maximum loan amount authorized by the CARES Act.  To the contrary,

the EAA added maximum loan amount calculations for loans to farmers and ranchers, and for second-draw PPP loans, that are both modeled on the same payroll-based formula as in § 636(a)(36)(E). EAA §§ 311, 313 (adding 15 U.S.C. § 636(a)(36)(V), (37)(B)). Yet at the same time the EAA in no way "purport[ed] to restrict SBA's authority" to impose an aggregate corporate-group limit on any of these categories of loans. On that point, "the SBA's approach was left completely untouched." *Cf. Bruckner Truck Sales, Inc. v. Guzman*, No. 2:23-CV-097-Z, 2023 WL 8606761 at *5 (N.D. Tex. Dec. 12, 2023) ("*Bruckner I*") (similar analysis as to SBA's loan-forgiveness rule), *reconsideration denied*, 2024 WL 903441 (N.D. Tex. Feb. 27, 2024) ("*Bruckner II*").

Moreover, the EAA made specific changes to both the maximum loan calculation for NAICS Code 72 business and the affiliation waiver applicable to those businesses, but it did nothing to prohibit SBA from applying the corporate group rule to those businesses. The EAA increased the multiplier for calculating the *maximum* allowable second-draw loan for NAICS Code 72 businesses and decreased the total number employees such businesses could have while qualifying for the Affiliation Waiver, which continued to apply only "for purposes of determining eligibility." *See* EAA § 311 (adding 15 U.S.C. § 636(a)(37)(B) and (37)(E)). Again, it made these adjustments without "purport[ing] to restrict SBA's authority" to cap the amount in loans an eligible NAICS Code 72 business could receive, or to consider the relationship between such businesses in setting that cap. *Bruckner I*, 2023 WL 8606761 at *5

The appropriate inference under *Lorillard*, 434 U.S. at 580, and *Bell*, 456 U.S. at 535, is that the EAA "represents Congress's affirmative decision to ratify the SBA's conclusion that it had statutory authority" to impose the Corporate Group Rule on all PPP loan applicants. *Bruckner I*, 2023 WL 8606761 at *5 (EAA provision limiting the documentation SBA could require from

22

forgiveness applicants with loans under $150,000 ratified SBA's authority to conduct forgiveness-stage review loans for entities with larger loans); *see also Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 426–27 (2d Cir. 2022) (by amending 11 U.S.C. § 525 "to expressly bar discrimination based on bankruptcy status in the provisioning of certain CARES Act benefits," but *not* PPP loans, Congress confirmed that SBA could exclude bankruptcy debtors from the PPP without violating § 525).

Furthermore, because Congress used the same discretionary language to describe SBA's loan-making authority with respect to second-draw loans that is used to describe SBA's first-draw authority, Congress' ratification of the Corporate Group Rule with respect to first-draw loans also establishes that SBA had the authority to extend the Rule to second-draw loans. *See FCC v. AT & T Inc.*, 562 U.S. 397, 408 (2011) ("[I]dentical words and phrases within the same statute should normally be given the same meaning."); *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) ("When a statutory term is obviously transplanted from another legal source, it brings the old soil with it."); *Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 227 (2d Cir. 2021) ("We presume that Congress legislates against the backdrop of existing law."). Any doubt that the Corporate Group Rule could coexist with the Affiliation Waiver evaporated when Congress enacted the EAA without rescinding or limiting the scope of the Corporate Group Rule.

## IV.    State Street's "Statutory Silence" Argument Fails.

State Street next argues (Mem. 28) that SBA's authority to enact the Corporate Group Rule "must come, if at all, from statutory silence." But that argument overlooks the plain terms of the SBA, CARES Act, and EAA, which expressly confer broad discretion and rulemaking authority on the SBA. *See* pp. 13–16, *supra*. None of the "five features of the statutory scheme" that State

Street relies on comes close to negating the broad grants of authority that permitted SBA to issue the Corporate Group Rule.

***First***, State Street argues (Mem. 29) that § 636(a)(36)(D)(vi), which extends SBA's affiliation rules to entities made eligible for § 7(a) loans by the CARES Act,[10] implies that Congress did not authorize SBA "to apply affiliation-based limitations to . . . hotels." But subsection (D)(vi) does not support that inference. Subsection (D)(vi) simply extends SBA's pre-existing affiliation rules to newly eligible entities. It does not restrict SBA's pre-existing rulemaking authority. Rather, it reaffirms that authority by clarifying that any "successor" regulation will also apply to entities made eligible for § 7(a) loans by the CARES Act (unless exempted by the Affiliation Waiver).

Indeed, State Street quickly turns away from subsection (D)(iv), instead arguing that "in expressly removing certain affiliation-based barriers for hotels" through the Affiliation Waiver, Congress was not "silently authorizing SBA to add new affiliation-based barriers." Mem. 29. But, as explained above, the source of authority for the Corporate Group Rule is not the Affiliation Waiver—it is the discretion conferred on SBA by § 36(a)(36)(B) and (37)(B) to guarantee loans at an amount lower that the statutory maximum, and by its pre-existing § 7(a) authorities, including the agency's broad rulemaking powers, that serve as the foundation for the PPP. *See* pp. 12–15, *supra*.

---

[10] 15 U.S.C. § 636(a)(36)(D)(vi) provides that "[t]he provisions applicable to affiliations under [13 C.F.R. § 121.103], or any successor thereto, shall apply with respect to a nonprofit organization[,] a business concern or organization made eligible for a loan under [§ 636(a)(36)(D)(vii)], [] a housing cooperative, [and] a veterans organization in the same manner as with respect to a small business concern."

***Second***, State Street argues that the Corporate Group Rule conflicts with the provisions of the CARES Act and EAA that extend § 7(a) eligibility to additional business concerns and organizations, on the theory that the term "business concern" refers to "individual, distinct legal entities" while the Corporate Group Rule impermissibly considers the connections between "groups" of entities.  Mem. 30 (citing 15 U.S.C. § 636(a)(36)(D)(i) and (37)(A)(iv)).  State Street devotes two cursory sentences to this argument, so the Court need not consider it.  *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (a party forfeits argument by failing to develop it); *accord City of Waukesha v. EPA*, 320 F.3d 228, 251 n.22 (D.C. Cir. 2003).  But even on its own terms, this argument is a nonstarter.  Section 636(a)(36)(D)(vi)—the provision on which State Street's preceding argument is based, Mem. 29–30—expressly contemplates that SBA's affiliation rules will apply to many PPP applicants, including "business concern[s]" made eligible by the CARES Act itself.  Similarly, the Affiliation Waiver on which State Street primarily relies would have no function to fulfill if the general eligibility provisions of the CARES Act and EAA implicitly prohibited the SBA from considering the links between "distinct legal entities."  Mem. 30.  It would be strange indeed to take Congress's use of the term "business concern," which has coexisted with SBA's affiliation rules for decades, to restrict SBA's rulemaking authority in the manner State Street posits.  If Congress had intended that result, "it would simply have said so." *Becerra v. Empire Health Found.*, 597 U.S. 424, 440 (2022).

***Third***, State Street argues that "SBA has no authority to create new restrictions on PPP eligibility that are not found in the Statute."  Mem. 31.  But as explained above, the Corporate Group Rule is not a restriction on eligibility.  The Rule helped allocate limited PPP funds among eligible businesses by capping the total amount that entities with common ownership could receive.  It did not prohibit any otherwise eligible entity from participating in the program.  *See*

pp. 16–21, *supra*.  And, in any event, the Second and Eleventh Circuits have correctly rejected similar arguments about SBA's authority concerning eligibility rules as "not tenable" and "illogical."  *Pharaohs*, 990 F.3d at 227; *Gateway*, 983 F.3d at 1258.[11]

*Fourth*, State Street contends (Mem. 32–33) that Congress's "specific instructions for how to calculate PPP loan amounts" "leave[] the SBA with no authority to . . . set maximums unrelated to payroll costs."  But again, State Street's argument overlooks the difference between a "maximum" permissible amount and an entitlement to the maximum permissible amount, and neglects § 636(a)(36)(B) and (37)(B), which expressly confer broad discretion on SBA to administer the PPP, and § 634(b)(6) and (7), which confer equally broad authority to issue rules and to take actions SBA deems "necessary or desirable" to promote the program's purposes.  It is on that authority that SBA based the Corporate Group Rule, not congressional "silence."

*Fifth*, State Street falls back on the "broad purpose of the CARES Act" and "legislative history" to invent a restriction on SBA's authority where none exists.  Mem. 33–34.  To be sure, one purpose of the CARES Act was "to help businesses weather the pandemic."  *Air Excursions LLC v. Yellen*, 66 F.4th 272, 275 (D.C. Cir. 2023).  But the Supreme Court "has long rejected the notion that whatever furthers the statute's primary objective must be the law."  *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 434 (2018).  Implementing the PPP required SBA to determine how best to further the purposes of the Act given the limited funds available to it.  Congress anticipated SBA would make such determinations when it conferred discretion and

---

[11] State Street does not even cite those decisions, much less attempt to refute their reasoning.  Instead, State Street relies on an interlocutory ruling by a divided Sixth Circuit motions panel in *D.V. Diamond Club of Flint, LLC v. SBA*, 960 F.3d 743 (6th Cir. 2020).  Mem. 31.  But the contrary decisions of the Second and Eleventh Circuits more thoroughly addressed the proper understanding of § 636(a)(36)(D)(i).  Indeed, State Street does not cite a single case that postdates *Pharaohs* or *Gateway* in support of its argument.  *See id.*

rulemaking authority on the agency. *See* pp. 13–16, *supra*. The Corporate Group Rule reflects one such determination.

The isolated floor statements cited by State Street cannot undercut SBA's authority to determine whether and in what amount to guarantee loans to eligible borrowers. To begin, "[f]loor statements by individual legislators rank among the least illuminating forms of legislative history." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017). But the statements cited by State Street are not merely unilluminating, they are totally irrelevant. None of the cited statements say anything about SBA's authority to limit the amount of loans it will guarantee to a single group of related hotels. Courts cannot rely on legislative history that is not "directed to any particular statutory language," much less the specific question at issue. *Telesat Canada v. Fed. Commc'ns Comm'n*, 999 F.3d 707, 711 (D.C. Cir. 2021). And even if one overlooked those problems, legislative history "is meant to clear up ambiguity, not create it." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 674 (2020). The statements State Street quotes cannot create an atextual limit on SBA's discretion.

## V.    SBA Did Not Arbitrarily Apply the Corporate Group Rule to State Street.

Additionally, State Street argues that the "arbitrary" manner in which SBA applied the Corporate Group Rule to it "reinforce[s]" that the Rule's application "was contrary to the Affiliation Waiver and otherwise inconsistent with the statute." Mem. 35. Not so. SBA employs a consistent method to determine when a corporate group has received the maximum amount in loans authorized by the Rule, and it properly applied that method to State Street. Moreover, even

27

if SBA applied had applied the Corporate Group Rule arbitrarily in this case, it would not follow

that the Rule itself exceeded SBA's authority.

### A. SBA Properly Applied the Corporate Group Rule to Deny State Street Forgiveness.

The Corporate Group Rule for Second Draw loans provides that "businesses that are part

of a single corporate group shall in no event *receive* more than $4,000,000 of Second Draw PPP

Loans in the aggregate."  86 Fed. Reg. at 3716 (emphasis added).  As Martin Andrews, the

Deputy Director of SBA's Office of Financial Program Operations explains, to determine when a

corporate group has received $4,000,000—and thus reached its limit under the Rule, SBA

"generally uses the date of loan disbursement."   *See* Ex. A., Declaration of Martin F. Andrews

("Andrews Decl.") ¶ 6; *see also* SBA_000281, 283.  Once $4,000,000 have been disbursed to the

group, that group has received $4,000,000 in loans, regardless of when (or if) the entities that

received those loans apply for or receive forgiveness.

SBA does not, however, have access to the exact times at which loans were disbursed.

*See* Andrews Decl. ¶ 7.  As noted above, SBA relied on private lenders to disburse PPP loans, so

SBA is limited to the information those lenders provide.  *Id.*  And "[w]hen reporting loans to

SBA, lenders provided only the disbursement date, not the time of disbursement."  *Id.*

Accordingly, when a lender (or lenders) disbursed multiple loans to members of a single

corporate group on the day that group reached the limit set by the Rule, SBA uses the date and

time when SBA approved its guarantee on the loan to determine when exactly the corporate group reached its limit.[12] *Id.* ¶ 8; *see also* SBA_000283.

That is what happened here. After Pine & Powell's lender disbursed a $2 million loan to it on February 5, 2021, Rosenfeld's corporate group was eligible to receive up to $2 million more in second-draw PPP loans. SBA_000281. But Rosenfeld applied for more in loans than the Rule authorized. As a result, lenders disbursed $2 million loans to both Newport and State Street on February 16, and disbursed a fourth $2 million loan to Huntington on March 25. *Id.* Under the Corporate Group Rule, Rosenfeld's group was only authorized to receive the first of these three loans. *Id.* To determine which loan was received first (and was thus authorized under the rule), SBA looked at the date and time at which SBA approved its guarantee of Newport's and State Street's loans. *Id.* Because SBA guaranteed Newport's $2 million loan first, SBA determined that Rosenfeld's corporate group had received the maximum authorized loan amount before State Street received its loan. *Id.* State Street's loan therefore violated the Corporate Group Rule and SBA denied forgiveness on that basis. SBA_000165. SBA's rationale was thus consistent with its process for determining when a corporate group had received the maximum amount

---

[12] As discussed above, p. 6, *supra*, SBA did not (and could not) manually review loan applications at the time it approved its guarantee. Instead, lenders requested SBA's guarantee by entering information about the borrower and loan into SBA's loan system. Andrews Decl. ¶ 9. As long as the submission did not result in any validation errors, SBA's loan system automatically generated an SBA Loan Number reflecting SBA's guarantee of the loan. *Id.*

authorized by the Rule, which itself was a reasonable response to the practical limitations on SBA's access to information about private lender operations.

**B. State Street's Contrary Arguments are Meritless.**

Against that background, State Street's arbitrary enforcement argument is unavailing.

***First***, State Street emphasizes a line in the SBA's first forgiveness decision suggesting that neither State Street's nor Newport's loans would be eligible for forgiveness. Mem. 35. But SBA withdrew that decision, and it is not under review here. "A final agency order is not rendered arbitrary and capricious simply because preliminary agency decisions contained errors." *State of N.C. v. FERC*, 112 F.3d 1175, 1192 (D.C. Cir. 1997); *see also Biden,* 597 U.S. at 813 ("It is black-letter law that an agency that takes superseding action . . . is entitled to "reexamine[ ] the problem, recast its rationale and reach[ ] the same result.") (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). In addition, whether Newport's loan could be forgiven was not the subject of the first forgiveness decision. SBA_000001. SBA ultimately forgave Newport's loan because SBA concluded—consistent with the reasoning underlying State Street's denial—that Newport's loan did not violate the Corporate Group Rule. SBA_000085, 0157; *see also* Andrews Decl. ¶ 14.

***Second***, State Street faults SBA for basing forgiveness decisions on "unpredictable factors that applicants cannot control." Mem. 36. But applicants have complete control over the amount they request in loans. No one forced Rosenfeld to apply for double the amount authorized by the Corporate Group Rule. His decision to do so, coupled with the streamlined system for issuing PPP loans, required SBA to determine after the fact when his corporate group reached the maximum amount authorized by the statute. Denial of forgiveness for half of those loans was an entirely predictable outcome of the choices Rosenfeld made. Moreover, to the

30

extent that State Street's complaint is over which of the Corporate Group's specific loans were forgiven, that is a function of the timing of receipt which, as discussed above, is a reasonable response to a significant administrability problem. *See Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176, 195 (D.D.C. 2015), *aff'd,* 640 F. App'x 5 (D.C. Cir. 2016) ("The APA does not demand the perfect at the expense of the achievable.").

*Third*, State Street argues that the March 28 decision was wrong because "[a]t the time, the agency had granted far less than $4 million in forgiveness" to State Street's corporate group. Mem. 36. But that argument misconceives the Corporate Group Rule and the PPP. The PPP is "a loan guaranty program, not a grant program," *Springfield Hosp.*, 28 F.4th at 423, and the Corporate Group Rule set a maximum amount of *loans* that a single corporate group could *receive*, *see* 86 Fed. Reg. at 3720 ("Businesses that are part of a single corporate group shall in no event receive more than $4,000,000 of Second Draw PPP Loans in the aggregate."). It is thus immaterial whether any of the loans to Rosenfeld's corporate group were forgiven. Once Rosenfeld's group received $4 million in loans, the group could not receive more.

*Fourth*, State Street points out that after SBA denied forgiveness on its second-draw loan, the agency granted forgiveness to Huntington, which also received its loan after Rosenfeld's group had reached the corporate group limit. Mem. 37–38. That decision appears to have been in error. As Deputy Director Andrews explains, now that SBA has noticed the potential error, SBA intends to conduct a post-payment forgiveness review of Huntington's loan. Andrews Decl. ¶ 17; *see also* Business Loan Program Temporary Changes; Paycheck Protection Program—SBA Loan Review Procedures and Related Borrower and Lender Responsibilities, 85 Fed. Reg. 33,010, 33,012 (June 1, 2020) (noting that "SBA may undertake a [PPP loan] review at

any time"). SBA's initial, potentially erroneous decision to forgive Huntington's loan does not render its proper application of the Corporate Group Rule to State Street arbitrary.

*Fifth*, State Street argues that when "applying for and accepting a Second Draw loan of $2 million, State Street "could not have predicted" that SBA "would change the rules of the game midstream" by denying forgiveness based on State Street's violation of the Corporate Group Rule. Mem. 38. But SBA did not change its approach to corporate groups after State Street applied for its second-draw loans. SBA issued the Corporate Group Rule on May 4, 2020, 85 Fed. Reg. at 26,325, and it extended the Rule to second-draw loans on January 14, 2021, 86 Fed Reg. at 3716, *before* State Street applied for a second-draw loan on January 20, 2021. SBA_000098–0100. Moreover, SBA's regulations required State Street to "withdraw or request cancellation of any pending PPP loan application or approved PPP loan not in compliance with" the Corporate Group Rule. 86 Fed. Reg. at 3702. SBA did not "change the rules of the game midstream," and State Street, whose owner and manager Michael Rosenfeld submitted all four loan applications on behalf of his corporate group, had every reason to know that its loan might be denied. SBA's decision to deny State Street forgiveness was rational, consistent with the Rule, and entirely foreseeable.

## C. Even if SBA had Applied the Rule Arbitrarily to State Street, it Would Not Demonstrate the Rule Itself is Unlawful.

State Street frames its arbitrary enforcement argument as implicating SBA's statutory authority to apply the Corporate Group Rule to hotels. *See* Mem. 35, 38. It invokes *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), to argue that SBA's actions "reinforce" its argument that applying the Corporate Group Rule to it violated the statute. Mem. 35. But a claim that an agency arbitrarily applied a rule to a challenger because it failed to *enforce* the rule against other, similarly

situated entities is distinct from a claim that the agency lacks statutory authority to *adopt* that rule in the first place. While the "the interpretations of those responsible for implementing particular statutes," may assist courts in deciding, based on their independent judgment, "whether an agency has acted within its statutory authority," *Loper Bright*, 144 S. Ct. at 2262, 2273; *see also Skidmore*, 323 U.S. at 140, nothing in *Skidmore* or *Loper Bright* suggests that an agency can actively erode its statutory authority to enact a rule by applying it inconsistently. While inconsistency in application can potentially lead to an arbitrary and capricious challenge in a specific instance, it cannot change the meaning of the statute itself.

In any event, SBA's understanding of its authority to issue the Corporate Group Rule is the type of consistent interpretation that may be "especially useful in determining the statute's meaning." *Loper Bright*, 144 S. Ct. at 2262. Respect for the Executive's interpretation of a statute is "especially warranted" when the agency adopted it "roughly contemporaneously with enactment of the statute and remained consistent over time." *Id.* at 2247. That is the case here. SBA has understood the CARES Act and EAA to permit it to set limits on the amount in loans it will issue to eligible borrowers for as long as those Acts have been law. *See supra*, pp. 8–9.

## VI.    State Street's Reliance Argument is Forfeited and Meritless.

In two conclusory sentences (Mem. 39), State Street asserts that SBA's failure to address State Street's "serious reliance interests" is an "independent ground for vacatur." That argument is doubly forfeited—and incorrect.

First, State Street forfeited this argument by failing to raise it before the agency. When an agency's regulations require a party to raise arguments in the administrative appeals process before presenting them in court, "courts reviewing agency action regularly ensure against the bypassing of that requirement by refusing to consider unexhausted issues." *Sims v. Apfel*, 530

33

U.S. 103, 108 (2000). SBA's administrative review scheme provides that an appellant "must" appeal to OHA "before judicial review of a final SBA loan review decision may be sought in Federal district court," 13 C.F.R. § 134.1201(d), and that in doing so, they must provide a "full and specific statement as to why the final SBA loan review decision is alleged to be erroneous, together with all factual information *and legal arguments* supporting the allegations." *Id.* § 134.1204(a)(2) (emphasis added). State Street did not argue that SBA failed to consider its reliance interests in its appeal to OHA, SBA_000082–092, so it cannot make that argument now. *See Mingo Logan Coal Co. v. Env't Prot. Agency*, 829 F.3d 710, 719 (D.C. Cir. 2016) (challenger forfeited reliance argument because it "failed to make the argument to" the agency).

Second, State Street forfeited this argument again by failing to develop it in their opening brief. State Street simply asserts that it had serious reliance interests and that it is entitled to vacatur on that basis. Mem. 39. That is not enough. An argument that is "raised in the opening brief only summarily, without explanation or reasoning, . . . is waived." *City of Waukesha*, 320 F.3d 228, 251 n.22; *see also Schneider*, 412 F.3d 190, 200 n.1 ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."). Because State Street made this argument only in passing, the Court need not consider it.

Third, even if this argument were preserved for review in this Court, State Street had no legitimate reliance interests that SBA was required to consider. Of course, "[w]hen an agency *changes course* . . . it must be cognizant that *longstanding* policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (emphasis added). But that requirement has no application here, because SBA did not change course or abandon a longstanding policy. *See Gentiva Health Servs., Inc. v. Becerra*, 31 F.4th 766, 780 (D.C. Cir. 2022) (rejecting plaintiff's

34

reliance argument because there had been "no change in agency policy at all."). Rather, as explained above, SBA has consistently maintained that members of the same corporate group may not receive more than the limit set for first- and second- draw loans. Moreover, those limits were in place before State Street applied for the second-draw loan at issue in this case, so State Street's "reliance" on its own erroneous understanding of the CARES Act and EAA was not reasonable. *See Solenex LLC v. Bernhardt,* 962 F.3d 520, 529 (D.C. Cir. 2020) (to make a reliance argument, "the harm occasioned must be specifically identified [and] reasonably incurred"). SBA did not fail to address State Street's "serious reliance interests" because State Street had none.

**VII.    State Street Is Not Entitled to Declaratory or Injunctive Relief.**

State Street asks the Court to (1) vacate SBA's forgiveness decision, (2) declare that State Street is entitled to full forgiveness of its second-draw PPP loan, (3) enjoin the SBA from requiring State Street to make additional payments, and (4) order SBA to "ensure" that [State Street] receives back the amounts it has already repaid on its second-draw loan. Mem. 40–41. But declaratory is not appropriate and injunctive relief is neither appropriate nor available against the SBA. If the Court determines that SBA's decision cannot be sustained, the proper course is to remand the case to the agency.

Where (as here) statutes place the matter for decision "primarily in agency hands[,]" a reviewing court "is not generally empowered to conduct a de novo inquiry into the matter … and to reach its own conclusions[.]" *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002). Rather, except in rare situations, "it [must] set aside the agency's action and remand the case—even though the agency . . . might later . . . reach the same result for a different reason." *FEC v. Akins*, 524 U.S. 11, 25 (1998); *see also Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005)

35

("[W]hen a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards.").

Here, the appropriate remedy would be, at most, a remand. Because SBA determined that State Street violated the Corporate Group Rule, the agency had no occasion to determine whether State Street was eligible for the amount it received or had used those funds for authorized purposes. *See* Andrews Decl. ¶ 15. The result of that determination is hardly "foreordained." *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 630 (2023). For example, in appealing SBA's forgiveness decision, State Street stated that it had misrepresented the number of employees it had at the time of its second-draw loan application. SBA_0000083 n.1 (noting that State Street claimed to have 173 employees when in fact it had only 63). Whether that or other facts render State Street ineligible for complete forgiveness, *see* SBA_004382 n.1 (suggesting as much), is properly addressed by the agency in the first instance. It would therefore be premature for the Court to decide whether, as State Street claims (Mem. 21–22), it is entitled to full forgiveness of its second-draw loan. "Fundamental principles of administrative law . . . teach that a federal court generally goes astray if it decides a question that has been delegated to an agency if that agency has not first had a chance to address the question." *Smith v. Berryhill*, 587 U.S. 471, 488 (2019); *accord Calcutt*, 598 U.S. at 630.

The cases State Street cites do not suggest otherwise. Neither *Tierney v. Schweiker*, 718 F.2d 449 (D.C. Cir. 1983) nor *Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Service*, 64 F.4th 1354 (D.C. Cir. 2023) address declaratory relief for an agency's error of law. Rather, *Anatol* reaffirms that the "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience

36

concerning the functions and extent of federal judicial power." 64 F.4th at 1367 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995)). Here, those teachings confirm that remand—not declaratory or injunctive relief—is the proper course. *See Smith*, 587 U.S. at 488.

Moreover, injunctive relief would not only be inappropriate, but contrary to the Small Business Act, which provides that "no … injunction . . . or other similar process … shall be issued against the [SBA] or [its] property." 15 U.S.C. § 634(b)(1). The Fourth and Fifth Circuits have both applied this provision according to its plain terms, concluding that "courts have no jurisdiction to award injunctive relief against the SBA." *J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383 (4th Cir. 1990) (citing *Duncan v. Furrow Auction Co.*, 564 F.2d 1107, 1109 (4th Cir. 1977)); *see also Expedient Servs., Inc. v. Weaver*, 614 F.2d 56, 57 58 (5th Cir. 1980) (15 U.S.C. § 634(b)(1) prohibits all relief against SBA that is "injunctive in nature"); *In re Hidalgo Cnty. Emergency Serv. Foun.*, 962 F.3d 838, 841 (5th Cir. 2020) (applying precedent against anti-SBA injunctions in PPP context). Hence, even if the Court were to remand State Street's application to SBA, under 15 U.S.C. § 634(b)(1), the Court should deny State Street's request for an injunction ordering SBA to forgive its loan and "ensure" that it receives back the payments it has already made.

## CONCLUSION

Defendants' motion for summary judgment should be granted, Plaintiff's motion denied, and judgment entered for Defendants as a matter of law.


Dated: August 21, 2024                                    Respectfully submitted,

                                                          BRIAN M. BOYNTON
                                                          Principal Deputy Assistant Attorney General

                                                          BRIAN D. NETTER
                                                          Deputy Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Ross Slaughter*
ROSS SLAUGHTER (NC Bar No. 58086)
Trial Attorney
INDRANEEL SUR (DC Bar No. 978017)
Senior Counsel
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
(202) 616-8185
Ross.M.Slaughter@usdoj.gov

*Counsel for Defendants*

38