## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| 35 STATE STREET HOTEL PARTNERS, LLC (d/b/a Hotel Californian), <br><br> Plaintiff, <br><br> v. <br><br> ISABEL GUZMAN, in her official capacity as Administrator of the United States Small Business Administration, and UNITED STATES SMALL BUSINESS ADMINISTRATION, <br><br> Defendants. | No. 1:24-cv-00747 (JDB) |

## DEFENDANTS' REPLY IN SUPPORT OF
## CROSS-MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

I.    Congress Delegated SBA Ample Authority to Adopt the Corporate Group Rule. ............. 2

    A.    State Street's Narrow Construction of § 636(a)(36)(B) and (37)(B) is Untenable. ......................................................................... 3

    B.    State Street's Interpretation of "Maximum" is Implausible. ................................... 4

    C.    State Street's Attempts to Cabin SBA's § 7(a) Authorities Fail. ............................. 6

    D.    State Street Fails to Identify an Implicit Limit on SBA's Authority Elsewhere in the Statute. ...................................................................... 7

II.    The Corporate Group Rule Does Not Conflict with the Affiliation Waiver. ..................... 9

III.    State Street's *Chenery* Argument is Meritless. ............................................................... 12

IV.    State Street Failed to Rebut the Inference that the EAA Ratified the Corporate Group Rule. .................................................................................................... 15

V.    SBA Reasonably Applied the Corporate Group Rule to State Street. ............................... 19

VI.    Remand to the Agency is the Only Appropriate Remedy. ................................................ 22

CONCLUSION ........................................................................................................................... 25

i

## TABLE OF AUTHORITIES

**CASES**

*Abramski v. United States*,
　573 U.S. 169 (2014) ............................................................................................ 13, 14

*Air Line Pilots Ass'n, Int'l v. U.S. Airways Grp., Inc.*,
　609 F.3d 338 (4th Cir. 2010) ............................................................................... 3

*Alpharma, Inc. v. Leavitt*,
　460 F.3d 1 (D.C. Cir. 2006) ................................................................................. 23

*Am. Express Co. v. Italian Colors Restaurant*,
　570 U.S. 228 (2013) ............................................................................................. 8

*Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*,
　64 F.4th 1354 (D.C. Cir. 2023) ........................................................................... 23, 24

*Baptist Mem'l Hosp. v. Sebelius*,
　603 F.3d 57 (D.C. Cir. 2010) ............................................................................... 3

*Bartenwerfer v. Buckley*,
　598 U.S. 69 (2023) ............................................................................................... 9

*Borden v. United States*,
　593 U.S. 420 (2021) ............................................................................................. 7

*Bragdon v. Abbott*,
　524 U.S. 624 (1998) ............................................................................................. 16

*Brogan v. United States*,
　522 U.S. 398 (1998) ............................................................................................. 25

*Calcutt v. Fed. Deposit Ins. Corp.*,
　598 U.S. 623 (2023) ............................................................................................. 22, 23

*Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*,
　439 F.3d 715 (D.C. Cir. 2006) ............................................................................. 13

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
　511 U. S. 164 (1994) ............................................................................................ 16

*Chiquita Brands Int'l Inc. v. S.E.C.*,
　805 F.3d 289 (D.C. Cir. 2015) ............................................................................. 13

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
　140 S. Ct. 1891 (2020) ......................................................................................... 22

*Dubin v. United States,*
   599 U.S. 110 (2023) ................................................................................ 12

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ................................................................................ 17

*Garland v. Aleman Gonzalez,*
   596 U.S. 543 (2022) ................................................................................ 24

*Humane Soc'y of U.S. v. Zinke,*
   865 F.3d 585 (D.C. Cir. 2017) ................................................................. 7

*In re Gateway Radiology Consultants, P.A.,*
   983 F.3d 1239 (11th Cir. 2020) ............................................................ 2, 3

*Jackson v. Modly,*
   949 F.3d 763 (D.C. Cir. 2020) .......................................................... 16, 17

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
   591 U.S. 657 (2020) .................................................................................. 9

*Loper Bright Enterprises, Inc. v. Raimondo,*
   45 F.4th 359 (D.C. Cir. 2022) .................................................................. 6

*Loper Bright Enters. v. Raimondo,*
   144 S. Ct. 2244 (2024) ............................................................ 4, 15, 19, 21

*Mingo Logan Coal Co. v. EPA,*
   829 F.3d 710 (D.C. Cir. 2016) ............................................................... 21

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,*
   522 U.S. 479 (1998) .............................................................................. 5, 6

*NRDC v. EPA,*
   301 F. Supp. 3d 133 (D.D.C. 2018) ......................................................... 7

*Oklahoma Aerotronics, Inc. v. United States,*
   661 F.2d 976 (D.C. Cir. 1981) ............................................................... 24

*Prohibition Juice Co. v. U.S. Food & Drug Admin.,*
   45 F.4th 8 (D.C. Cir. 2022) .................................................................... 15

*Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.,*
   332 F.3d 654 (D.C. Cir. 2003) .......................................................... 16, 18

*Rudisill v. McDonough,*
   601 U.S. 294 (2024) .................................................................................. 3

*Sault Ste. Marie Tribe of Chippewa Indians v. Haaland,*
   659 F. Supp. 3d 33 (D.D.C. 2023) ................................................... 13

*Schneider v. Kissinger,*
   412 F.3d 190 (D.C. Cir. 2005) ...................................................... 22

*SEC v. Chenery Corp.,*
   318 U.S. 80 (1943) ...................................................................... 1

*Sierra Club v. FERC,*
   827 F.3d 36 (D.C. Cir. 2016) ....................................................... 15

*Small Bus. Admin. v. McClellan,*
   364 U.S. 446 (1960) ..................................................................... 7

*Smith v. Berryhill,*
   587 U.S. 471 (2019) ................................................................... 23

*Solid Waste Agency v. U.S. Army Corps of Eng'rs,*
   531 U.S. 159 (2001) ................................................................... 18

*Soundboard Ass'n v. Fed. Trade Comm'n,*
   888 F.3d 1261 (D.C. Cir. 2018) ................................................... 23

*Springfield Hosp., Inc. v. Guzman,*
   28 F.4th 403 (2d Cir. 2022) ....................................................... 20

*Tierney v. Schweiker,*
   718 F.2d 449 (D.C. Cir. 1983) ............................................... 23, 24

*Truck Trailer Manufacturers Ass'n, Inc v. EPA,*
   17 F.4th 1198 (D.C. Cir. 2021) ................................................... 12

*Ulstein Mar., Ltd. v. United States,*
   833 F.2d 1052 (1st Cir. 1987) ..................................................... 25

*Valley Forge Flag Co. v. Kleppe,*
   506 F.2d 243 (D.C. Cir. 1974) ..................................................... 24

**STATUTES**

5 U.S.C. § 706 ................................................................................ 15

15 U.S.C. § 634 ........................................................................ 3, 6, 24

15 U.S.C. § 636(a) ................................................................... *passim*

15 U.S.C. § 636(c) ........................................................................... 5

15 U.S.C. § 636m ........................................................................................................ 14

15 U.S.C. § 9012 .......................................................................................................... 3

Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act,
Pub. L. No. 116-260, 134 Stat. 1182, 1993–2052 (Dec. 27, 2020) .................................... 17, 18

**REGULATIONS**

13 C.F.R. 120.110(k) (2020) ........................................................................................ 17

13 C.F.R. § 134.1201(b) .............................................................................................. 23

13 C.F.R. § 134.1204(a)(2) ......................................................................................... 21

Business Loan Program Temporary Changes; Paycheck Protection Program as
Amended by Economic Aid Act,
86 Fed. Reg. 3692 (Jan. 14, 2021) ............................................................................. 11, 19, 21

Business Loan Program Temporary Changes; Paycheck Protection Program as
Amended by Economic Aid Act,
86 Fed. Reg. 3712 (Jan. 14, 2021) ............................................................................. 7, 8, 20

**OTHER AUTHORITES**

Maximum, Webster's Third New International Dictionary 1396 (1993) ........................................ 7

# INTRODUCTION

State Street's response fails to resuscitate its challenge to the Corporate Group Rule.

*First*, SBA had ample authority to adopt the Corporate Group Rule and apply it to hotels. The plain terms of the CARES Act, Economic Aid Act (EAA), and Small Business Act give SBA discretion to guarantee loans for less than the maximum amount permitted by statute, and Congress delegated SBA rulemaking authority with which to exercise that discretion. State Street's attempts to create an implicit limit on SBA's discretion are unpersuasive.

*Second*, the Corporate Group Rule does not conflict with the CARES Act's Affiliation Waiver. The Affiliation Waiver waives SBA's pre-existing affiliation rules "with respect to eligibility" for hotel businesses like State Street. It thus permits hotels that would otherwise be too large to receive a small business loan to participate in the PPP. The Corporate Group Rule, by contrast, does not prohibit any eligible entity from participating in the PPP. It simply limits the total amount that entities with the same common owner can receive. Plaintiff's attempts to convert a limit on loan amount into an eligibility restriction run headfirst into the statutory scheme.

*Third*, State Street cannot breathe new life into its statutory argument by invoking *SEC v. Chenery Corp.*, 318 U.S. 80 (1943). SBA's position—that the Corporate Group Rule is a limit on loan amount rather than a restriction on eligibility—is the same as it ever was. What's more, *Chenery* does not apply to questions of statutory interpretation, which the Court must decide for itself. And even it did, any *Chenery* violation would be harmless because a correct understanding of the law would produce the same result: denial of State Street's forgiveness application.

*Fourth*, Congress ratified SBA's authority to promulgate the Corporate Group Rule when it reauthorized and expanded the PPP through the EAA. The pandemic emergency that Congress

1

authorized the PPP to address itself supplies ample reason to assume Congress was aware of the Corporate Group Rule when Congress subsequently enacted the EAA.

**Fifth**, SBA reasonably applied the Corporate Group Rule to State Street, and State Street lacks any basis for its paradoxical argument that an agency's misapplication of a rule can somehow prove the agency lacks the power to adopt the rule in the first place. In addition, State Street's reliance argument is both forfeited and meritless.

**Sixth**, State Street is not entitled declaratory or injunctive relief. The record shows that SBA has not yet made a final determination on any issue other than State Street's failure to comply with the Corporate Group Rule. Any declaratory or injunctive relief regarding State Street's entitlement to complete forgiveness would thus violate the remand rule. And in any event, the plain terms of the Small Business Act bar injunctive relief against SBA.

## ARGUMENT

## I.    Congress Delegated SBA Ample Authority to Adopt the Corporate Group Rule.

In creating the first- and second- draw loan programs, Congress provided that SBA "may"—but was not required to—guarantee loans "under the same terms [and] conditions" as other § 7(a) loans, except as otherwise provided by 15 U.S.C. § 636(a)(36) and (37). By using the word "may," Congress "vest[ed] the SBA with discretionary authority." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1257 (11th Cir. 2020). And Congress enacted formulas for determining the "maximum"—but not minimum—loan amount SBA could guarantee to eligible borrowers. *See* § 636(a)(36)(E), (37)(C). By setting only a ceiling on loan amounts, Congress thus authorized SBA to exercise its discretion to guarantee loans for less than that amount. Moreover, Congress situated the PPP within the existing § 7(a) loan program, making it "subject[ ] . . . [to] existing SBA authority," *Gateway*, 983 F.3d at 1256, including SBA's extensive rulemaking

powers and its authority to "take any and all actions" it deems "necessary or desirable in making . . . or otherwise dealing with" § 7(a) loans.  15 U.S.C. § 634(b)(6), (7).  In doing so, Congress empowered SBA to adopt rules that would channel its broad discretionary authority regarding how much to guarantee to eligible borrowers.  The Corporate Group Rule was an appropriate exercise of that power.  Defs.' Mem. 13–16.  State Street's efforts to undo Congress's handiwork are unpersuasive.

### A.  State Street's Narrow Construction of § 636(a)(36)(B) and (37)(B) is Untenable.

State Street argues that § 636(a)(36)(B) and (37)(B) refer not to "*whether* the SBA will guarantee PPP loans, but instead [to] *which* terms, conditions, and processes will apply."  Pl.'s Opp. 15 (ECF No. 24).  But if SBA "may" guarantee PPP loans "under the same terms, conditions, and processes" as a typical § 7(a) loan, § 636(a)(36)(B), it also *may not*.  *See Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 63 (D.C. Cir. 2010) ("'[M]ay' is permissive rather than obligatory."); *Air Line Pilots Ass'n, Int'l v. U.S. Airways Grp., Inc.*, 609 F.3d 338, 342 (4th Cir. 2010) ("'[M]ay' typically indicates authorization without obligation" and "sometimes means 'won't.'").[1]  If SBA exercised its discretion *not* to apply the same terms, condition, and processes as other § 7(a) loans, it would have to establish others to fulfill Congress's mandate to "issue regulations to carry out" the PPP.  15 U.S.C. § 9012.  The distinction between discretion to determine *whether* to guarantee loans and discretion to determine *what conditions* to place on that guarantee lacks substance: a decision not to guarantee a loan at all because those loans do not satisfy specific criteria and not to guarantee a loan unless certain criteria are satisfied leads to the same result.  Either way, the word "may" "*clearly* connotes discretion" about whether and on what terms to guarantee PPP loans.  *Rudisill v. McDonough*, 601 U.S. 294, 310 (2024); *see also Gateway*, 983 F.3d at 1257.

---

[1] Internal citations and quotation marks are omitted throughout this brief unless noted.

Confronted with this clear delegation of discretionary authority over whether and on what terms to guarantee PPP loans, State Street grasps at straws.  First, it suggests that SBA must mechanically guarantee 100% of any loan made to an eligible borrower.  Pl.'s Opp. 14.  But that provision only applies when there is "an agreement" by SBA "to participate in a [PPP] loan."  15 U.S.C. § 636(a)(2)(F). State Street's interpretation of that provision is also inconsistent with *any* form of discretion, and even State Street concedes that Congress gave SBA discretion over the conditions, terms, and processes under which SBA guarantees PPP loans.  Pl.'s Opp. 15.  Section 636(a)(2)(F) simply incentivized robust lender participation in the PPP by ensuring that such loans, when agreed to by SBA, would be fully guaranteed by the Government.  It does not mean that SBA is on the hook for every loan, whether or not the borrower complied with program rules.

Second, State Street tries to downplay the significance of SBA's discretion to guarantee loans by focusing on the distinction between making and guaranteeing loans.  Pl.'s Opp. 15.  But as State Street acknowledges, SBA typically guarantees loans through private lenders rather than making loans itself.  *Id.*  Thus, in conferring discretion to determine whether and on what terms to provide that guarantee, Congress gave SBA significant authority over the PPP.  Defs.' Mem. 13.

**B.  State Street's Interpretation of "Maximum" is Implausible.**

State Street's treatment of the word "maximum" is equally flawed.  To begin, State Street's efforts to read the maximum loan provisions in isolation (Pl's. Opp. 12) flout the bedrock principle that "statutes can be sensibly understood only 'by reviewing text in context.'" *Loper Bright Enters v. Raimondo*, 144 S. Ct. 2244, 2261 n.4 (2024).  Here, context makes clear that SBA retains discretion to guarantee loans in amounts lower than the statutorily permitted maximum.  The provisions establishing maximum loan formulas for first- and second- draw loans are proceeded by the provisions providing that SBA "may" guarantee first- and second-draw loans.  *See* 15 U.S.C.

§ 636(a)(36)(B), (37)(B).  The maximum loan amounts are therefore just that—*maximum*s, subject to SBA's discretionary authority to guarantee PPP loans in the first place.

State Street's interpretation of the maximum loan formulas is further undermined by the PPP's place within the § 7(a) loan program.  Before creation of the PPP, the § 7(a) program set only an upper dollar limit on the amount that SBA could guarantee.  *See, e.g., id.* § 636(a)(3)(A) ("No loan shall be made under this subsection . . . if the total amount outstanding and committed (by participation or otherwise) . . . would exceed $3,750,000").  No one would argue that this provision required SBA to provide a $3,750,000 loan to every eligible small business.  Instead, it reflects SBA's pre-existing discretion to determine how much to guarantee to borrowers.  Against this backdrop, the maximum loan formulas are best understood as simply raising the maximum authorized loan amount available to PPP borrowers through the § 7(a) program, not silently eliminating SBA's discretion to determine the appropriate amount of § 7(a) loans.

Moreover, State Street's assertion that the "maximum" loan amounts simply set "an upper limit on the amount that a borrower can seek" (Pl.'s Opp. 12) cannot be reconciled with the other uses of the phrase "maximum" in the statute.  Elsewhere in § 636, the terms "maximum loan amount" and "maximum amount" refer to flat dollar amounts.  *See, e.g.*, 15 U.S.C. § 636(a)(31)(D)("The maximum loan amount under the Express Loan Program is $500,000"); (a)(31)(H)(ii)(I)("[T]the maximum loan amount [for recovery opportunity loans] is $150,000"); (c)(5)(B)(the "maximum amount of a [disaster assistance] loan . . . shall be $2,000,000").  It can't be that everyone who applies for these loans is entitled to the maximum statutorily authorized amount.  Instead, the more natural reading of the word "maximum" in § 636 is as setting an upper limit, not creating an entitlement to that amount.  And because "similar language contained within the same section of a statute must be accorded a consistent meaning," *Nat'l Credit Union Admin.*

*v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 501 (1998), State Street's interpretation must be wrong.

### C.  State Street's Attempts to Cabin SBA's § 7(a) Authorities Fail.

Contrary to State Street's assertion (Pl's. Opp. 16),  SBA is not invoking its general powers under the Small Business Act to "claim implicitly delegated authority beyond its regulatory lane or inconsistent with statutory limitations or directives."  *Loper Bright Enterprises, Inc. v. Raimondo*, 45 F.4th 359, 368 (D.C. Cir. 2022), *vacated and remanded*, 144 S. Ct. 2244.  Rather, SBA has invoked these authorities to exercise the discretion Congress explicitly conferred when it provided that SBA "may" guarantee PPP loans subject only to a statutory "maximum" loan amount.  The cases State Street cites are therefore inapposite.

State Street also takes too cramped a view of SBA's authority under § 634(b)(7).  That provision empowers the Administrator to "take any and all actions" she determines "are necessary or desirable in making, servicing, compromising, modifying, liquidating, or otherwise dealing with or realizing on loans."  15. U.S.C. § 634(b)(7).  The terms "making," "modifying," and "otherwise dealing with" loans do not suggest merely the ministerial aspects of running a loan program.  Rather,  the statute confers broad authority to "take any and all actions" deemed "necessary or desirable" to "mak[e]" or "deal[] with" loans.  That includes "dealing with" PPP loans by limiting the total amount SBA will guarantee to borrowers with a shared owner.

With no meaningful response to this delegation of authority, State Street resorts to strawmen, conjuring up a world where SBA used its discretion to "entirely negate" the PPP.  Pl.'s Opp. 11; *see also id.* 13 (asserting that "SBA had no power to nullify an entire emergency relief program").  But that counterfactual is not the world we live in.  SBA used is "extraordinarily broad powers" as Congress intended: to "aid" and "assist" eligible borrowers "in order to . . . strengthen

the overall economy of the Nation," *Small Bus. Admin. v. McClellan*, 364 U.S. 446, 447 (1960),

by "promot[ing] the availability of PPP loans to the largest possible number of borrowers," 86 Fed.

Reg. 3712, 3716. SBA's exercise of congressionally conferred discretion is plainly in keeping with

"an emergency loan program designed to assist struggling businesses."[2]  (Pl.'s Opp. 1.)

### D. State Street Fails to Identify an Implicit Limit on SBA's Authority Elsewhere in the Statute.

State Street's efforts to conjure an implicit limit on SBA's authority from other parts of the

statute also fail. First, State Street reiterates its erroneous assertion that every eligible borrower is

entitled to the maximum loan amount authorized by statute. Pl.'s Opp. 8. But that argument

ignores Congress's choice to enact only formulas for calculating the "maximum" loan amount.

Defs.' Mem. 26. "A 'maximum' is 'an upper limited allowed by law,'" not the amount that each

eligible borrower is entitled to. *NRDC v. EPA*, 301 F. Supp. 3d 133, 141 (D.D.C. 2018) (Bates, J.)

(quoting *Maximum*, Webster's Third New International Dictionary 1396 (1993)). In arguing that

it was entitled to the maximum loan amount simply because it was eligible to participate in the

program, State Street impermissibly asks this Court to read "maximum" out of the statute. A party

"does not get to delete inconvenient language . . . to yield the [its] preferred meaning." *Borden v.

United States*, 593 U.S. 420, 436 (2021) (plurality op.).

Nor does it matter that the maximum loan amount authorized by statute is determined in

part by a borrower's payroll costs. Pl.'s Opp. 8. Again, the provisions that determine an eligible

borrower's maximum loan amount do just that: determine its *maximum* loan amount. The fact that

Congress tied a borrower's maximum potential loan to its payroll costs does not mean that payroll

---

[2] Moreover, the theoretical possibility that SBA might abuse its discretionary authority is not a basis for concluding that SBA lacks that authority in the first place. *See Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 600 (D.C. Cir. 2017) (distinguishing between legal authority to take an action and whether that authority was properly exercised).

costs are the *only* permissible consideration for determining how much to guarantee for a particular borrower. State Street also fails to respond to SBA's longstanding consideration of the connections between "business concern[s]" in administering the § 7(a) program. And the CARES Act and EAA expressly contemplate that SBA will consider such connections. Defs.' Mem. 8.

If anything, the maximum loan formulas Congress enacted demonstrate that the program was *not* designed to cover each individual borrowers' payroll expenses "at all costs." *Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 234 (2013). Rather, the maximum payroll formulas reflect Congress's recognition that, given the finite amount of money appropriated to the PPP, each borrower's' needs would have to be balanced against the needs of others. That is why, for example, Congress made the maximum loan amount for second-draw loans "the lesser of" the payroll-based formula *or* $2,000,000. 15 U.S.C. § 636(a)(37)(C). SBA's decision to "promote the availability of PPP loans to the largest possible number of borrowers" by implementing the Corporate Group Rule, 86 Fed. Reg. at 3716, is entirely consistent with competing policy goals reflected in Congress's maximum loan formulas.

Second, State Street rehashes its assertion that because Congress chose to extend SBA's affiliation rules to other entities made eligible by the CARES Act, Congress implicitly prohibited SBA from considering the connection between hotels when determining loan amounts. Pl's. Opp. 9. But this argument is just a reformulation of SBA's Affiliation Waiver argument, and it fails for the same reasons. Defs.' Mem. 16–21, 24. Section § 636(a)(36)(D)(vi), like the Affiliation Waiver, simply concerns whether SBA will apply its affiliation rules to determine an entity's eligibility to participate in the PPP. *See id.* 3, 16–17. It has nothing to say about how SBA exercises its discretion to determine how much to loan to eligible businesses.

8

Third, State Street points to the statute's separate eligibility provisions as "evidence of the SBA's limited discretion in administering the PPP." Pl.'s Opp. 9. But as Defendants have thoroughly explained, Defs. Mem 16–21, *see* pp. 9–12, *infra*, the Corporate Group Rule is not an eligibility restriction, so these provisions do not conflict with, let alone override, the discretion Congress conferred elsewhere in the statute to guarantee less than the maximum loan amount.

State Street's efforts to impose an implicit limit on SBA's discretion flow from its position that because Congress "went out of its way to provide relief to" hotels and hotel workers by expanding eligibility to participate in the PPP, it must have meant to foreclose any discretionary action that would prevent any hotel business from reaping the maximum possible benefit from the PPP. Pl.'s Opp. 10. But "[n]o statute pursues a single policy at all costs," and courts may not "rewrite" statutes as if they did. *Bartenwerfer v. Buckley*, 598 U.S. 69, 81 (2023). To the contrary, the principle that "absent provision[s] cannot be supplied by the courts" prohibits "imposing limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020).

## II.    The Corporate Group Rule Does Not Conflict with the Affiliation Waiver.

State Street's response fails to rectify the fatal flaw in its primary argument: The Corporate Group Rule does not conflict with the Affiliation Waiver because the Corporate Group Rule is not a restriction on eligibility. Defs.' Mem. 16–21. An entity is "eligible" to receive a PPP loan if it meets the criteria for participating in the program. But *eligibility* to receive a loan is not *entitlement* to a particular loan amount. The Corporate Group Rule merely limits the amount an eligible recipient may receive. It is not a restriction on eligibility to participate in the PPP.

State Street incorrectly asserts that the distinction between an eligibility rule and a limit on loan amount is merely a "labelling exercise." Pl.'s Opp. 4. But the distinction between eligibility

9

for a loan in the first instance and the appropriate loan amount for an eligible entity is embedded in the statute itself, which explicitly confers discretion on SBA to determine whether and how much to guarantee each eligible borrower. Defs.' Mem. 13–16; pp. 3–6, *supra*. If Congress meant to require SBA to guarantee a specific loan amount to each eligible entity, it could have said so. Instead, it provided that SBA "may" guarantee covered loans and set out formulas for calculating "the *maximum* amount of a covered loan made to an eligible entity." 15 U.S.C. § 636(a)(37)(B), (C) (emphasis added); *see also id.* § 636(a)(36)(B), (E).

Simply put, the Corporate Group Rule has nothing to do with State Street's eligibility for a PPP loan. State Street could have received a second-draw loan for up to $2 million—the maximum amount permitted by statute—if its owner had simply made different decisions about how to allocate the $4 million in loans that SBA permitted his corporate group to receive. Defs.' Mem. 17–18. State Street's contrary argument relies on temporal slight of hand, conflating (1) State Street's position after the other members of its corporate group had received the maximum amount in loans authorized by the Corporate Group Rule with (2) its position at the time the second-draw loan program began. With respect to the Corporate Group Rule, each of Rosenfeld's hotels was equally "eligible" to receive second-draw loans; Rosenfeld simply exhausted the amount available to his hotels before State Street received its loan. Defs.' Mem. 20–21. It is State Street, not SBA, that "defies reality" in arguing otherwise. Pl.'s Opp. 4.[3]

---

[3] State Street's complaints about compliance difficulties (Pl.'s Opp. 5) have no bearing on whether the Corporate Group Rule conflicted with the Affiliation Waiver. In any event, State Street's assertion that it lacked the capacity to coordinate with the other hotels in its corporate group is not supported by the record. Michael Rosenfeld was the majority owner of each hotel in the group. *See* SBA_000084 n.2. He signed all four second-draw loan applications on the same day. SBA_000100, 115, 121, 127. On two of those applications, including State Street's, Rosenfeld identified himself as the business's manager. *See* SBA_000100, 115. Rosenfeld clearly had significant control over all four businesses and was able to coordinate their loan applications. His

State Street also misapprehends the hypothetical offered by OHA to explain the distinction between an eligibility requirement and an aggregate limit on loan amount. The point is not that State Street "should" have applied for a loan of only $1 million, Pl.'s Opp. 5, it is that there were many possible arrangements that would have permitted each member of Rosenfeld's corporate group to obtain a second-draw loan that complied with the overall cap, including requesting $1 million for each business. Defs.' Mem. 17–18 (quoting SBA_004389). By the same token, State Street could have validly received a $2 million second-draw loan had the other entities in Rosenfeld's group received a combined total of $2 million or less. The Corporate Group Rule set an aggregate cap on the total amount in PPP loans a single corporate group could receive. It did not dictate how much should go to each entity within the group.

More fundamentally, State Street continues to conflate eligibility to participate in the PPP in the first place with entitlement to the maximum loan amount. In responding to Defendants' examples of the many situations in which eligibility is a necessary, but not sufficient, condition to receive a benefit, State Street accuses Defendants of eliding "*two* different sets of eligibility requirements." Pl.'s Opp. 6. These are not two sets of eligibility criteria. No ordinary person would say that the last person cut from Duke's basketball team was cut because he was "ineligible" to play. But even setting that aside, State Street's facile attempts to recast every condition as an "eligibility requirement" underscore that the word "eligible" means little when shorn of context. Defs.' Mem. 19–20. Just as an aspiring player cut from Duke's team for lack of talent cannot

---

failure to exercise that control more prudently does not excuse State Street's non-compliance with the Corporate Group Rule. *See* Defs.' Mem. 10, 20–21. Moreover, the Corporate Group Rule does not presume that borrowers with common ownership are "a collective entity." Pl.'s Opp. 5. It applies to borrowers that are "majority owned . . . by a common parent," 86 Fed. Reg. at 3702, regardless of whether those borrowers coordinate their day-to-day business operations.

protest his exclusion by pointing to his eligibility under NCAA rules, State Street cannot challenge SBA's discretionary decision to guarantee less than the maximum loan amount simply by pointing to its eligibility to participate in the PPP.

The plain terms of the CARES Act and EAA foreclose State Street's interpretation of the Affiliation Waiver. Defs.' Mem. 19. Whatever meaning "eligibility" may be capable of in the abstract, it cannot mean (as State Street argues) that every entity that meets the PPP's eligibility requirements is entitled to the maximum possible loan amount. As the Supreme Court has repeatedly emphasized, "a statute's meaning does not always turn solely on the broadest imaginable definitions of its component words." *Dubin v. United States,* 599 U.S. 110, 120 (2023); *see also Truck Trailer Manufacturers Ass'n, Inc v. EPA*, 17 F.4th 1198, 1205 (D.C. Cir. 2021) ("[T]he meaning of a word may be broad in the abstract, but unambiguously narrower in context."). Section 636(a)(37)(B) gives SBA discretion to guarantee second-draw PPP loans and § 636(a)(37)(C) sets only an upper limit on the size of those loans. State Street's reading of the Affiliation Waiver would undo Congress's explicit choice to delegate discretionary authority to the agency to determine how best to distribute a finite amount of taxpayer money during a national emergency.

## III. State Street's *Chenery* Argument is Meritless.

State Street also argues that SBA's March 2023 loan decision shows that SBA treated the Corporate Group Rule as a restriction on program eligibility and that the *Chenery* doctrine now prohibits SBA from arguing otherwise. Pl.'s Opp. 6–7. This argument fails for three reasons. First, SBA correctly denied State Street forgiveness because State Street's corporate group had already received more $4 million at the time State Street received its loan, not because State Street was ineligible to participate in the PPP. Second, the *Chenery* doctrine does not prohibit the Court

from deciding as a matter of law that the Corporate Group Rule does not violate the Affiliation Waiver. And third, even if there were a *Chenery* error, it would be harmless.

First, there is no *Chenery* problem because SBA denied State Street forgiveness for the same reason it advances now: State Street was "part of a corporate group" that "ha[d] received more than $4,000,000 of 2nd draw PPP loans in the aggregate." SBA_000095; *see also* SBA_000282 (rejecting Affiliation Waiver argument because "this is not an affiliation issue but a corporate max issue"). As OHA recognized, SBA's decision was based on State Street's failure to comply with the Corporate Group Rule, not on a belief that State Street was ineligible to participate in the PPP by virtue of its affiliation with Rosenfeld's other hotels. *See* SBA_004388–89.

State Street's emphasis on the use of the word "eligibility" in SBA's March 2023 forgiveness decision (Pl.'s Opp. 6) fails. As a general matter, "an agency's decision need not be a model of analytic precision to survive a challenge." *Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 659 F. Supp. 3d 33, 50 n.18 (D.D.C. 2023), *aff'd*, No. 23-5076, 2024 WL 3219481 (D.C. Cir. June 28, 2024). Courts must uphold decisions "of less than ideal clarity" so long as "the agency's path may reasonably be discerned." *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006). SBA's forgiveness decision clearly rested on State Street's failure to comply with the Corporate Group Rule, not its eligibility to participate in the program. SBA_000095. SBA's briefing simply expands on that critical distinction. "*Chenery* does not bar an agency's counsel from merely elaborating on the consistent stance the agency articulated below." *Chiquita Brands Int'l Inc. v. S.E.C.*, 805 F.3d 289, 299 (D.C. Cir. 2015).

Moreover, State Street's *Chenery* argument depends on the same false equivalence that dooms its statutory argument. Defs.' Mem. 19–20. As discussed above, the term eligibility cannot be understood "in a vacuum." *Abramski v. United States*, 573 U.S. 169, 179 (2014). Here, context

makes clear that the word "eligibility" in SBA's forgiveness decision does not refer to State Street's eligibility to participate in the PPP. SBA concluded that State Street did not "meet eligibility requirements *for forgiveness*" because it had received a loan amount that SBA had not authorized. SBA_000095 (emphasis added). That reasoning does not conflict with the Affiliation Waiver. The Affiliation Waiver made NAICS Code 72 businesses that would otherwise be too large eligible to participate in the PPP, but it did not require SBA to guarantee every eligible business the maximum possible loan.[4] *See* Defs.' Mem. 16–21.

Indeed, the statute itself distinguishes between eligibility to participate in the PPP and eligibility for forgiveness. For issuance purposes, "the term 'eligible recipient' means an individual or entity that is eligible to receive a covered loan." 15 U.S.C. § 636(a)(36)(A)(iv). For forgiveness purposes, by contrast, " the term 'eligible recipient' means *the recipient* of a covered loan")). *Id.* § 636m(a)(10) (emphasis added). And "covered loan" in the forgiveness context "means a loan *guaranteed* under section 636(a)(36)." *Id.* § 636m(a)(1) (emphasis added). SBA chose not to guarantee more than $4 million in loans to members of the same corporate group, so while State Street was "eligible" to participate in the PPP, it was not "eligible" for forgiveness.

---

[4]    State Street also continues to criticize the language of SBA's withdrawn August 2022 loan decision. Pl.'s Opp. 6–7. But that decision is not under review here. Defs.' Mem. 30. State Street cites no case for the proposition that an earlier, withdrawn decision can undermine the grounds on which the agency ultimately relied. State Street's criticism of the August 2022 decision is therefore a red herring. In any event, that criticism relies on the same flawed reasoning State Street uses to dispute the March 2023 decision. The August 2022 decision said that State Street was "ineligible for the PPP *loan amount*." SBA_000001 (emphasis added). That is quite different from saying that State Street was ineligible to participate in the program in the first place. Both the August and March decisions correctly grasped that State Street's loan should not be forgiven because its corporate group had already received more than $4 million in second-draw loans, not because State Street was ineligible to participate in the PPP at all. *Id.*; *see also* SBA_000095.

Second, even if SBA had improperly characterized the Corporate Group Rule as an "eligibility restriction," the Court should still reject State Street's challenge because, as a matter of law, the Corporate Group Rule does not conflict with the Affiliation Waiver. The *Chenery* doctrine does not prohibit a court from upholding an agency decision "based on another ground within the power of the [reviewing] court to formulate." *Sierra Club v. FERC*, 827 F.3d 36, 48–49 (D.C. Cir. 2016). Put another way, *Chenery* "applies only to 'determinations specifically entrusted to an agency's expertise,' not 'legal principles.'" *Id.* Instead, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 144 S. Ct. at 2273. Thus, regardless of how SBA characterized the Corporate Group Rule below, *Chenery* does not prevent this Court from holding that the Corporate Group Rule does not conflict with the Affiliation Waiver.

Third, any *Chenery* error was harmless. The APA requires a reviewing court to take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. The party challenging the agency's action must prove that it was prejudiced by the error. *See Prohibition Juice Co. v. U.S. Food & Drug Admin.*, 45 F.4th 8, 24 (D.C. Cir. 2022). State Street cannot do so. For the reasons explained above and in SBA's opening brief, Defs.' Mem. 16–21, the Corporate Group Rule does not conflict with the Affiliation Waiver. Thus, even if SBA had erroneously characterized the Corporate Group Rule as a restriction on State Street's eligibility to participate in the PPP (which it did not), that error would be of no moment because a correct understanding of the law would produce the same result: denial of State Street's forgiveness application.

## IV. State Street Failed to Rebut the Inference that the EAA Ratified the Corporate Group Rule.

The CARES Act and § 7(a) of the Small Business Act foreclose Plaintiff's challenge to the agency's authority to issue the Corporate Group Rule, Defs.' Mem. 13–16; pp. 2–9, *supra*, and it

15

suffices to "adhere to the statutory text in resolving" that challenge, *see Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U. S. 164, 188 (1994).  But in any event, even if those provisions left any question on the point, the EAA—the same statute that provides for the second-draw PPP loan for which State Street sought forgiveness—is properly understood as ratifying the Rule and authorizing its application to second-draw loans.  Defs.' Mem. 21–23.

The pertinent precedent teaches that "[w]hen administrative and judicial interpretations have settled the meaning of an existing statutory provision," here, the CARES Act, "repetition of the same language in a new statute," here, the EAA, "indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."  *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998).  To be sure, for that indication to "carry any weight," the Court of Appeals has explained, "there must be 'some evidence of (or reason to assume)' that the Congress is familiar 'with the . . . interpretation at issue.'"  *Jackson v. Modly*, 949 F.3d 763, 773 n.11 (D.C. Cir. 2020) (quoting *Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 668 (D.C. Cir. 2003)).  It is beyond dispute that, to address the economic consequences of the COVID-19 pandemic in enacting the PPP, Congress vested SBA with emergency rulemaking authority and directed the agency to use that authority to enable lenders to make *hundreds of billions* of dollars in loans to *millions* of distinct small businesses within the span of a *few short months*.  Defs.' Mem. 3–6.  The size and speed directives reflect legislative understanding that it was important for SBA to quickly provide large amounts of emergency economic assistance to ameliorate the effects of the COVID-19 pandemic.  The subsequent EAA reflected the continuing importance of those objectives.  That statute, after all, authorized additional PPP loan applications through March 31, 2021 (including second-draw PPP loans), and made certain amendments to the CARES Act applicable to the first draw PPP loans.  *See* Economic Aid to Hard-Hit Small Businesses,

Nonprofits, and Venues Act ("EAA"), Pub. L. No. 116-260, 134 Stat. 1182, 1993–2052 (Dec. 27, 2020); Defs.' Mem 6–8.  The EAA also granted SBA emergency rulemaking powers to administer the EAA.  EAA § 303.  The exigent circumstances that gave rise to the PPP—and whose continuing economic harms the EAA plainly sought to address—supply ample "reason to assume," *Jackson*, 949 F. 3d at 773 n.11, that Congress remained tuned in to SBA's administration of the PPP, including its adoption of the Corporate Group Rule.

Indeed, State Street's arguments against ratification give the 116th Congress, which enacted both the CARES Act and the EAA in 2020, hardly any credit.  According to State Street, the *same* Congress that crafted a special eligibility expansion for the hospitality industry in the CARES Act then did an about face and looked away when SBA acted to promote wider distribution of limited PPP funds by imposing a cap on the value of loans to business entities with a common parent (including in the hospitality industry) via the Corporate Group Rule.  State Street's notion that Congress should not be presumed to have grasped the significance of the Corporate Group Rule is at least in tension with, if not flatly contradicted by, its insistence that Congress expected throughout the CARES Act and the EAA that the hospitality industry would receive special treatment in *every* aspect of PPP loan implementation, including as to borrowers with a common parent under the Corporate Group Rule.  Such an incoherent version of events should be rejected, because it does not "make sense" of the CARES Act "in combination" with the EAA.  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000).

Rather, where Congress directed through the EAA that SBA change how it implemented the PPP under the CARES Act, Congress made that direction explicit.  For example, Congress expressly provided in EAA § 311(c)(2) that "[t]he prohibition on eligibility established by" 13 C.F.R. 120.110(k) (2020)—barring § 7(a) loans to "[b]usinesses principally engaged in teaching,

17

instructing, counseling or indoctrinating religion or religious beliefs"—"shall not apply" to a first-draw loan under the PPP. 134 Stat. 2007. The express reference in EAA § 311(c)(2) to § 120.110 provides clear evidence that Congress in the EAA was aware of SBA's application of § 120.110 exclusions to the PPP and that with the sole exception of faith-based businesses, Congress endorsed SBA's decision to exclude particular types of businesses from PPP eligibility. So even if State Street were somehow correct (and it is not) that the Corporate Group Rule erroneously imposes an *eligibility* restriction to hospitality industry borrowers, if Congress had agreed with Plaintiff, Congress would have corrected its application through the EAA. It did not.

The cases on which Plaintiff relies are inapposite. Because SBA adopted the Corporate Group Rule through formal Federal Register publication, the rule carried prominence, unlike the pronouncement "buried deep within" an agency manual whose ratification the D.C. Circuit rejected in *Public Citizen*, 332 F.3d at 669. And SBA has consistently maintained the validity of the Corporate Group Rule; at no time did SBA take the "*opposite* view" from its contention in this Court. *See id.* at 669–70 (agency had vacillated). Nor is the ratification inference here based on the text of bills that *failed* to become law. *See also Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169–70 (2001).

To be sure, the inference of ratification might be stronger if SBA had more time to exhibit "a long pattern of enforcement" of the Corporate Group Rule. *See* Pl. Opp. 22–23. But because the EAA followed quickly in December 2020 on the heels of the Corporate Group Rule's issuance in May 2020 (itself rapidly following the CARES Act in March 2020), SBA had no time to develop such a "long pattern." Nor did Congress have time in those months of 2020, while the pandemic persisted, to conduct "[e]xhaustive hearings," *id.*, on the PPP, let alone the Corporate Group Rule in particular. *See Solid Waste Agency*, 531 U.S. at 169 n.5. State Street points to no precedent for

18

declining to follow the indication of ratification here simply because the time between the Corporate Group Rule and the EAA was not, in its view, long enough.

## V.    SBA Reasonably Applied the Corporate Group Rule to State Street.

SBA correctly applied the Corporate Group Rule to deny State Street forgiveness. Defs.' Mem. 29–31. State Street's attempts to fault SBA for administrability problems that flowed from State Street's non-compliance with the Rule do not undermine that decision, much less show that SBA lacked authority to adopt the Rule in the first place.

First, State Street's objection that "nothing in the statute" indicates that forgiveness may turn on the timing of a borrower's loan (Pl.'s Opp. 18) is doubly misguided. The timing of State Street's loan only mattered because State Street failed to comply with the Corporate Group Rule. Defs.' Mem. 30–31. Moreover, the precise method for determining when a borrower received a loan—and thus whether that loan exceeded the amount that SBA had, in its discretion, authorized—is the kind of "detail" that Congress intended SBA to "fill up" when it gave SBA authority to administer the PPP. *Loper Bright*, 144 S. Ct. at 2263; *see* Defs.' Mem. 2–8.

Second, State Street's claim that it was acting "in good-faith reliance" on the Affiliation Waiver (Pl.'s Opp. 19) is beside the point. *See* Defs.' Mem. 32, 34–35. The Corporate Group Rule made clear that it applied "even if the businesses are eligible for the waiver-of-affiliation provision under the CARES Act." 86 Fed. Reg. at 3702. SBA's failure to "countermand" the disbursement is equally irrelevant. The burden was on State Street to "notify the lender" that it had "received loans in excess of the amount permitted" by the Rule. *Id.* Indeed, the entire PPP depended on the ability of private lenders to quickly make loans without SBA involvement on the front end. Attempting to enforce the Corporate Group Rule before borrowers applied for forgiveness would have been wasteful, inefficient, and contrary to Congress's command to get these funds distributed

19

as quickly as possible. In the face of SBA's clear and repeated instructions that (1) the Affiliation Waiver did not excuse compliance with the Corporate Group Rule and (2) the borrower was responsible for identifying and rectifying violations of the Rule, State Street's "inference" (Pl.'s Opp. 19) that the Rule did not apply to it was objectively unreasonable.

Third, State Street errs in disputing the coherence of SBA's explanation for why the Corporate Group Rule is based on amounts disbursed rather than amounts forgiven. Pl.'s Opp. 20. The reason is obvious: the PPP is a *loan* program not a *grant* program. *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 423 (2d Cir. 2022); Defs.' Mem 31. In adopting the Corporate Group Rule, SBA exercised its authority to guarantee less than the maximum loan amount authorized by statute; the Rule was necessarily tied to the amount of the loan rather than the quantity of forgiveness sought. And SBA's approach is entirely consistent with its goal of "promot[ing] the availability of PPP *loans* to the largest possible number of borrowers."[5] 86 Fed. Reg. at 3716 (emphasis added).

Fourth, State Street's criticisms of SBA's errors in other cases (Pl.'s Opp. 21)—which SBA has corrected or intends to correct—cannot show that SBA acted arbitrarily in denying State Street forgiveness. SBA's method for determining when a corporate group has received the maximum amount permitted by the Corporate Group Rule is reasonable given the agency's constraints and can be reasonably discerned from the record. *See* SBA_000281, 283. That is all the APA requires.

---

[5] Nor is State Street correct in arguing that, in the absence of $4 million in forgiveness, it and the other members of Rosenfeld's group "have effectively not 'received'" $4 million in PPP loans. Pl.'s Opp. 20. Low interest PPP loans provided immediate and substantial benefits to borrowers who received them, even if those borrowers are ultimately required to pay them back. Each of Rosenfeld's businesses received a $2 million loan with a fixed one percent annual interest rate. *See, e.g.,* SBA_000292; *see also* 86 Fed. Reg. at 3709 (outlining the favorable terms of second-draw loans). State Street cannot argue that that it or the other members of its corporate group did not "receive" loans simply because they are not entitled to complete forgiveness.

Moreover, even if State Street—"a distinct and legally independent business" (Pl.'s Opp. 5)—could show error and prejudice based on mistakes SBA made in other loan forgiveness decisions, it would not follow that SBA lacked the authority to adopt the Corporate Group Rule or apply it to State Street. Defs.' Mem. 32–33. SBA never intimated that State Street's loan was proper and consistently informed borrowers, in documents published in the Federal Register, that the Affiliation Waiver does not excuse compliance with the Corporate Group Rule. *See* 86 Fed. Reg. at 3702. Isolated errors in applying that Rule do not change the fact that SBA's understanding of its authority to adopt the Rule and apply it to hotels "was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Loper Bright*, 144 S. Ct. 2244.

Additionally, State Street's cursory reliance argument can be disregarded. State Street forfeited this argument by failing to make it to the agency. Defs.' Mem. 33–34. State Street points to a single sentence where it said, "imposing new affiliation barriers on loan eligibility severely harms the many hotels and restaurants that relied in good faith on Congress's waiver of the affiliation rules." SBA_000082. But that sentence was not sufficient to preserve any reliance contention for this Court's review. SBA's rules require an appeal petition to include "[a] full and specific statement as to why the final SBA loan review decision is alleged to be erroneous, *together with all factual information and legal arguments supporting the allegations*." 13 C.F.R. § 134.1204(a)(2) (emphasis added). State Street's appeal did not provide any factual basis for State Street's allegedly "good faith" reliance, nor did it make any legal arguments regarding why that alleged reliance rendered SBA's forgiveness decision erroneous. SBA_000082–92. State Street's other record citations (Pl.'s Opp. 20) do not come from the relevant appeal petition and plainly fail to make the reliance argument State Street now advances. A single rhetorical flourish is not sufficient to administratively exhaust an argument. *See Mingo Logan Coal Co. v. EPA*, 829

21

F.3d 710, 720 (D.C. Cir. 2016) ("[P]arties must forcefully present their arguments at the time appropriate under agency practice or else waive the right to raise those arguments on appeal").[6]

Regardless, this argument has no merit.  *See* Defs.' Mem. 34–35.  An agency is only required to consider "serious" reliance interests that may have developed from "longstanding" policies when it "changes course."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).  None of those conditions exist here.  SBA did not "change course" or deviate from a "longstanding" policy. And State Street's asserted reliance interests are not "serious" because they flew in the face of a policy SBA announced before State Street applied for its second-draw loan.  State Street makes no effort to respond to these points.  Pl.'s Opp. 20.

## VI.    Remand to the Agency is the Only Appropriate Remedy.

State Street's attempts to circumvent the remand rule and the statutory bar on injunctive relief against SBA are fruitless.  First, remand is required unless "'[t]here is not the slightest uncertainty as to the outcome of the agency's proceedings on remand."  *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 630 (2023).  This case does not fit the "narrow circumstances" of that exception.  *Id.*  State Street's primary contention is that SBA finally determined that, but for the Corporate Group Rule, State Street was entitled for full forgiveness.  Pl.'s Opp. 26.  But in the decision under review, SBA came to only one conclusion: that State Street received its loan in violation of the Corporate Group Rule.  SBA_000095.  State Street points to a checklist in the administrative record where an initial reviewer clicked "yes" to several questions concerning

---

[6] State Street also forfeited this argument by failing to develop it in its opening brief.  Defs.' Mem. 34.  Plaintiff cites to nine pages scattered throughout their brief, Pl.'s Opp. 20, but a review of those pages reveals only three conclusory references to State Street's supposed reliance interests. *See* Pl.'s Mem. 15, 18, 39.  Nowhere does State Street attempt to develop the factual or legal basis for its reliance argument in more than a "skeletal" way.  *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005).  That is not enough.

SBA's loan amount.  Pl.'s Opp. 26–27.  But these answers do not "mark . . . the consummation of the agency's decision-making process."  *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018).  Only the agency's *final* loan review decision is "properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue." *Id.*; *see also* 13 C.F.R. § 134.1201(b) (defining an appealable final loan review decision).

Indeed, SBA *did not* verify that State Street properly calculated its total eligible costs. *Compare* SBA_000275–76 *with* SBA_000269 (leaving the "SBA verified" fields blank).  A comparison of this threadbare checklist with the extensive notes and concurrences that underly SBA's actual rationale shows the tentative nature of the remarks on which State Street relies.  *See* SBA_000280–285.[7]  And State Street's attempt to litigate the impact of its misrepresentation on its eligibility for complete forgiveness (Pl.'s Opp. 27–28) only reinforces "that a federal court generally goes astray if it decides a question that has been delegated to an agency if that agency has not first had a chance to address the question."  *Smith v. Berryhill*, 587 U.S. 471, 488 (2019).

State Street also misapprehends what distinguishes a case like this from *Tierney v. Schweiker*, 718 F.2d 449, 450 (D.C. Cir. 1983) and *Anatol Zukerman & Charles Krause Reporting, LLC v. United States Postal Serv.*, 64 F.4th 1354, 1358 (D.C. Cir. 2023).  Pl.'s Opp. 28–29.  In APA cases, "the function of the reviewing court ends when an error of law is laid bare."  *Calcutt*, 598 U.S. at 629.  Here, State Street seeks not merely a declaration that the Corporate Group Rule cannot be applied to it, but that it is "entitled to full forgiveness for its second draw loan."  Pl.'s Mem. 41. But declaring anything more than the particular legal error the Court identifies would violate the

---

[7] For the same reason, the Andrews Declaration does not violate the *Chenery* doctrine.  *Contra* Pl.'s Opp. 28.  It merely amplifies a point that is evident from the record itself.  *See Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006).

remand rule.   Neither *Tierney* nor *Anatol* counsel otherwise.   *See Tierney*, 718 F.2d at 457 (declaration that IRS's reliance on particular forms for a particular purpose was unlawful was appropriate); *Anatol*, 64 F.4th at 1367 (declaratory relief "establishing that the Postal Service's conduct *on this record* constituted viewpoint discrimination" was appropriate) (emphasis added).

Nor is injunctive relief available. Defs.' Mem. 37. 15 U.S.C. § 634(b)(1) plainly bars "injunction[s] . . . or other similar process" from issuing "against the [SBA] or [its] property."  And State Street's reliance on *Valley Forge Flag Co. v. Kleppe*, 506 F.2d 243 (D.C. Cir. 1974), is misplaced.   There, the D.C. Circuit affirmed the denial of a preliminary injunction against SBA. *Id.* at 245.   It correctly noted that § 634(b)(1) is "a section of the Small Business Act" that "prohibits injunctive relief against 'the Administrator or his property.'"  *Id.*   It then said "[s]ince we believe the actions of the Administrator . . . were clearly within the scope of his authority, the District Judge was right in denying injunctive relief."  *Id.*   Because SBA's action was lawful, the D.C. Circuit had no occasion to decide whether a meritorious plaintiff could obtain injunctive relief despite the statutory bar.  *Id.*   The district court decisions on which Plaintiff relies have read *Valley Forge* too broadly.  Pl.'s Opp. 29.[8]

State Street's effort to cabin § 634(b)(1) by drawing on the section's preamble is equally unavailing.  Pls' Opp. 30.  A bar on injunctive relief concerning "the performance of" and "with respect to" the functions, powers, and duties of the Administrator naturally covers both valid and invalid exercises of that power. *Cf. Garland v. Aleman Gonzalez*, 596 U.S. 543, 552 (2022)

---

[8] *Oklahoma Aerotronics, Inc. v. United States*, 661 F.2d 976 (D.C. Cir. 1981) actually cuts against State Street's position by reaffirming that remand to the agency—not injunctive relief—is the proper remedy for APA violations.  *Id.* at 977–78.

24

(rejecting the argument that "'the operation' of the covered immigration provisions means the operation of those provisions 'as *properly* interpreted'").

*Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052 (1st Cir. 1987), is also unpersuasive. There, the First Circuit limited § 634(b)(1) to the specific problem it thought Congress was trying to address. *Id.* at 1056. But courts may not "restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy." *Brogan v. United States*, 522 U.S. 398, 403 (1998). If the Court reaches the issue, it should follow the Fourth and Fifth Circuits and apply § 634(b)(1) according to its terms. Defs.' Mem. 37.

## CONCLUSION

Defendants' motion for summary judgment should be granted, Plaintiff's motion denied, and judgment entered for Defendants as a matter of law.

Dated: October 9, 2024                    Respectfully submitted,

                                          BRIAN M. BOYNTON
                                          Principal Deputy Assistant Attorney General

                                          BRIAN D. NETTER
                                          Deputy Assistant Attorney General

                                          JOSEPH E. BORSON
                                          Assistant Branch Director

                                          */s/ Ross Slaughter*
                                          ROSS SLAUGHTER (NC Bar No. 58086)
                                          Trial Attorney
                                          INDRANEEL SUR (DC Bar No. 978017)
                                          Senior Counsel
                                          U.S. Department of Justice, Civil Division
                                          Federal Programs Branch
                                          1100 L St. NW, Washington, D.C. 20005
                                          (202) 616-8185
                                          Ross.M.Slaughter@usdoj.gov

                                          *Counsel for Defendants*