**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **35 STATE STREET HOTEL PARTNERS, LLC (d/b/a Hotel Californian),** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  24-747 (JDB)** |
| **KELLY LOEFFLER,[1] Administrator of the United States Small Business Administration, et al.,** | |
| **Defendants.** | |

**<u>MEMORANDUM OPINION</u>**

At the start of the COVID-19 pandemic, Congress enacted the Coronavirus Aid, Relief and Economic Security ("CARES") Act, Pub. L. No. 116-136, 134 Stat. 281 (2020).  Among other things, the CARES Act created the Paycheck Protection Program ("PPP"), which empowered the Small Business Administration ("SBA") to give loans to a broader swath of businesses and to forgive those loans.  The plaintiff here, the Hotel Californian (or "the Hotel"), took advantage of the PPP and received a $2 million loan in both "draws" that Congress authorized.  Its first loan was forgiven.  But its second loan was not.  For second draw PPP loans, SBA implemented a regulation that capped the amount in loans that a "single corporate group" could receive at $4 million.  Interim Final Rule, <u>Business Loan Program Temporary Changes; Paycheck Protection Program Second Draw Loans</u> ("Second SCG Rule"), 86 Fed. Reg. 3712, 3720 (Jan. 14, 2021). The Hotel Californian shares a common majority owner with three other hotels and, together, the

---

[1] SBA Administrator Kelly Loeffler has been automatically substituted for Isabella Casillas Guzman as defendant.  <u>See</u> Fed. R. Civ. P. 25(d).

four hotels received $8 million in loans.  For that reason, SBA denied the Hotel's request for loan forgiveness on its second, $2 million loan.

The Hotel Californian asserts that SBA violated the Administrative Procedure Act ("APA") by denying its forgiveness request because either applying the single corporate group rule to the Hotel is contrary to the governing statutes or SBA's application of the rule was arbitrary and capricious.  After these arguments failed in front of SBA, the Hotel Californian sought judicial review in this Court.  Albeit for different reasons than the Hotel posits, the Court agrees that SBA's denial violated the APA.  It thus grants the Hotel Californian's motion for summary judgment, denies SBA's cross-motion, vacates SBA's denial, and remands to the agency.[2]

## BACKGROUND

This case involves a web of statutes and regulations.  So before moving to the factual and procedural history, the Court explains SBA's authority to give loans under the Small Business Act, how the CARES Act altered that authority for PPP loans, and the relevant regulations SBA has promulgated.

### I.    Legal Background

#### a.  Section 7(a) of the Small Business Act

"The Small Business Act of 1953 created the Small Business Administration to 'aid, counsel, assist, and protect insofar as is possible the interests of small-business concerns in order to preserve free competitive enterprise . . . and to maintain and strengthen the overall economy of the Nation.'"  SBA v. McClellan, 364 U.S. 446, 447 (1960) (quoting 15 U.S.C. § 631(a)).  One of the "extraordinarily broad powers" the Act gives SBA is to lend money.  Id.  That power is granted

---

[2] The Hotel Californian requested the Court hold oral argument on its motion for summary judgment.  See Pl.'s Mot. Summ. J. [ECF No. 17].  For the reasons that follow, the Court concludes that oral argument is not necessary to resolve either the Hotel's motion or SBA's cross-motion, and thus denies the Hotel's request.

in part by § 7(a) of the Act, which states <u>inter alia</u> that SBA "is empowered to the extent and in such amounts as provided in advance in appropriation Acts . . . to make loans to any qualified small business concern."  15 U.S.C. § 636(a).

To carry out its power under § 7(a)—or any power Congress grants it—SBA can "make such rules and regulations as [it] deems necessary."  <u>Id.</u> § 634(b)(6).  SBA has thus fleshed out the eligibility requirements for business loans.  <u>See</u> <u>id.</u> § 632(a)(2)(A) (permitting SBA to "specify detailed definitions or standards by which a business concern may be determined to be a small business concern").  A business is only eligible for a § 7(a) loan if, among other requirements, it is "small under the size requirement of part 121 of this chapter."  13 C.F.R. § 120.100(d) (2025).  Part 121 goes on to explain that size requirements are based either on number of employees or annual receipts and vary by industry.  <u>Id.</u> § 121.201 (listing size requirements); § 121.101(a).

Part 121 also contains the so-called "affiliation rules."  "[I]n certain circumstances," SBA takes into account "other entities ('Affiliates') owned by the applicant or an owner of the applicant" to "determin[e] the size of the applicant."  <u>Id.</u> § 121.301; <u>id.</u> § 120.100(d) (explaining that a business must be "small . . . including affiliates").  Businesses in the same industry are affiliated if, as relevant here, one individual owns more than 50 percent of each business.  <u>See</u> <u>id.</u> § 121.301(f)(1)(iii); <u>see also</u> <u>id.</u> § 121.103(a)(2) ("SBA considers . . . ownership . . . in determining whether affiliation exists.").  For § 7(a) loans, the affiliation rules mean an entity is eligible if it does "not exceed the size standard" for its industry either alone or when "combined with its affiliates."  <u>Id.</u> § 121.301(a)(1)–(2).  If a business fails either requirement, it can still be eligible if, "[i]ncluding its affiliates," it has a "tangible net worth" of $20 million or less and an "average net income" of $6.5 million or less over the past two fiscal years.  § 121.301(b)(1)–(2).

Generally, "[t]he SBA prefers to guarantee private loans rather than to disburse funds directly." United States v. Kimbell Foods, Inc., 440 U.S. 715, 719 n.3 (1979); Gordon Coll. v. SBA, Civ. A. No. 23-614 (BAH), 2024 WL 3471261, at *1 (D.D.C. July 18, 2024). Accordingly, the regulations permit loan applicants to apply either to a qualified private lender or to SBA directly. See 13 C.F.R. § 120.190.

The Small Business Act does not provide much detail on the permissible amount of a § 7(a) loan. The only specific guardrail is that a borrower cannot receive in aggregate more than a specified dollar amount in SBA loans. 15 U.S.C. § 636(a)(3).

### b. The CARES Act and the PPP

In March 2020, Congress enacted the CARES Act in part "to help businesses weather the pandemic." Air Excursions LLC v. Yellen, 66 F.4th 272, 275 (D.C. Cir. 2023). Section 1102 of the Act established the PPP to "provid[e] small businesses with the funds necessary to meet their payroll and operating expenses and therefore keep workers employed." Springfield Hosp., Inc. v. Guzman, 28 F.4th 403, 409 (2d Cir. 2022); see also Interim Final Rule, Business Loan Program Temporary Changes; Paycheck Protection Program ("Apr. 15, 2020 IFR"), 85 Fed. Reg. 20811, 20811 (Apr. 15, 2020) (PPP aimed to help the "many small businesses nationwide . . . experiencing economic hardship as a direct result" of COVID-19). Rather than create a loan program from scratch, the CARES Act established the PPP as a temporary amendment to § 7(a) of the Small Business Act. See Springfield Hosp., 28 F. 4th at 409; 15 U.S.C. § 636(a)(36); see also id. § 636(a)(36)(B) ("Except as otherwise provided . . . [SBA] may guarantee covered loans under the same terms, conditions, and processes as a loan made under" § 7(a)). Broadly, the PPP altered SBA's standard small-business loan program in two ways: it expanded the pool of eligible loan

recipients and it allowed borrowers to apply for, and SBA to grant, loan forgiveness. <u>See</u> <u>Springfield Hosp.</u>, 28 F.4th at 409–10; § 636(a)(36)(D); § 636m(b).

The PPP made more businesses eligible for loans by relaxing certain § 7(a) eligibility criteria and waiving others. These included criteria related to size. "[A]ny business concern" became "eligible to receive a covered loan if" it had not more than 500 employees or the applicable industry employee size standard, whichever was larger. § 636(a)(36)(D)(i)(I)–(II). And, for small businesses in certain industries, the number of employees did not have to include affiliates. Congress expressly provided that "the provisions applicable to affiliations under [13 C.F.R. § 121.103], or any successor regulation, [wer]e waived with respect to eligibility for" businesses in the accommodation and food services industry with 500 employees or fewer (the "Affiliation Waiver").[3] 15 U.S.C. § 636(a)(36)(D)(iv)(I).

Like § 7(a), the PPP specified a maximum amount in loans a business could receive under the program. Rather than set a universal cap, the statute made an entity's maximum loan amount a function of the entity's average month payroll costs, multiplied by 2.5. <u>Id.</u> § 636(a)(36)(E). But in no event could the amount exceed $10 million. <u>Id.</u> § 636(a)(36)(E)(ii).

On the back end, the PPP allowed a recipient to apply to have its loan forgiven. The CARES Act made a "covered loan" eligible for forgiveness up to the sum of certain costs—such as payroll costs—the recipient incurred during the covered period, <u>id.</u> § 636m(b), so long as the recipient used at least 60 percent of the loan for payroll costs, <u>id.</u> § 636m(d)(8). The Act also

---

[3] The statute says the affiliation rules are waived for "business concern[s] . . . assigned a North American Industry Classification System code beginning with 72." 15 U.S.C. § 636(a)(36)(D)(iv)(I). Businesses with codes starting with 72 all are within the Accommodation and Food Services industry. 13 C.F.R. § 121.201. These businesses include hotels, bed and breakfasts, caterers, full-service restaurants, and more. <u>Id.</u>

capped forgiveness at the amount of the loan principal, id. § 636m(d)(1), and decreased it by, among other things, the recipient's number of employees, see id. § 636m(d)(2)–(3).

While the CARES Act provided this general structure for the PPP, Congress saw that the program's details would need to be ironed out—and fast. So it mandated that SBA "issue regulations to carry out" the PPP "[n]ot later than 15 days" after the Act's enactment "without regard to the notice requirements" under the APA. Id. § 9012. SBA complied. The resulting regulations largely "streamlin[ed] the requirements of the regular 7(a) loan program." See Apr. 15, 2020 IFR, 85 Fed. Reg. at 20811–12, 20815. They also recognized SBA did not have an unlimited amount to lend in PPP loans. For example, the regulations established that PPP funds were to be distributed on a "first-come, first-served" basis until the allocated funds ran out. Id. at 20812–13.

Another way the SBA sought "[t]o preserve the limited resources available to the PPP program" was through what became known as the "Single Corporate Group Rule," or the "SCG Rule." Interim Final Rule, Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Corporate Groups and Non-Bank and Non-Insured Depository Institution Lenders ("First SCG Rule"), 85 Fed. Reg. 26324, 26324–25 (May 4, 2020). The Rule "limit[ed] the amount of PPP loans that any single corporate group [could] receive" by forbidding "businesses that are part of a single corporate group" from "receiv[ing] more than $20,000,000 of PPP loans in the aggregate." Id. at 26325. Per the Rule, a single corporate group was defined as all businesses that are majority owned by a common parent. Id. The Affiliation Waiver "appl[ied] independently" of the Rule and all businesses—including those to which the Affiliation Waiver applied—were subject to the Rule. See id.

The regulations also addressed applying for loan forgiveness.  While private lenders received and approved or denied loan forgiveness applications, SBA could "undertake a review at any time in [its] discretion."  Interim Final Rule, <u>Business Loan Program Temporary Changes; Paycheck Protection Program—SBA Loan Review Procedures and Related Borrower and Lender Responsibilities</u> ("June 1, 2020 IFR"), 85 Fed. Reg. 33010, 33012 (June 1, 2020).  This included when any documentation indicated the borrower was ineligible for a PPP loan.  <u>Id.</u>

On August 8, 2020, the PPP expired, <u>see</u> Act of July 4, 2020, Pub. L. No. 116-147, 134 Stat. 660 (2020), but the need for the aid it provided did not.  So Congress in December 2020 passed the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the "Economic Aid Act," or "EAA").  Consolidated Appropriations Act, 2021, Div. N, Title III, Pub. L. No. 116-260, 134 Stat. 1182, 1993–2052 (2020).  That act reestablished the PPP, extended it to March 31, 2021, and authorized SBA to loan another $147.5 billion to businesses.  <u>See</u> <u>id.</u> § 323(a)(1).  It also authorized so-called "second draw" PPP loans for businesses that had already received PPP loans in the "first draw."  <u>Id.</u> § 311(a); <u>see</u> 15 U.S.C. § 636(a)(37).

The criteria and limits for second draw loans under the EAA were largely the same as for first draw loans under the CARES Act, although some differed.  "The maximum amount of a covered loan made to an eligible entity" was capped at $2 million instead of $10 million, 15 U.S.C. § 636(a)(37)(C), and that amount became—for food and accommodation industry businesses only—a function of the entity's average monthly payroll costs, multiplied by 3.5 rather than the previous 2.5, <u>id.</u> § 636(a)(37)(C)(iv)(bb).  And while the EAA kept the CARES Act's Affiliation Waiver, it extended the waiver only to businesses in the accommodation and food industry with 300—not 500—employees or fewer.  <u>Id.</u> § 636(a)(37)(E).

The regulations SBA made to carry out the CARES Act also remained generally the same for second draw loans. However, SBA altered the SCG Rule, reducing a single corporate group's maximum aggregate second draw loan amount from $10 million to $4 million. <u>See</u> Second SCG Rule, 86 Fed. Reg. at 3716.

## II.    Factual and Procedural History

The Hotel Californian[4] is a hotel in Santa Barbara, California that is majority owned by Michael Rosenfeld. <u>See</u> Redacted J.A. Part 1 [ECF No. 30-1] ("J.A. vol. I") at 58. During the COVID-19 pandemic, the Hotel struggled alongside many others in the accommodations industry. <u>See id.</u> at 57 (explaining that the Hotel's gross receipts declined by 78% between the second quarter of 2019 and the second quarter of 2020). So it applied for a first draw PPP loan in spring of 2020. <u>Id.</u> The lender approved the $1,957,400 loan and the loan was disbursed on April 14, 2020. <u>Id.</u> The Hotel Californian used the loan to cover payroll costs, "which enabled it to keep the majority of its workers employed" despite the downturn in business due to the pandemic. Pl.'s Mot. Summ. J. [ECF No. 17] ("Pl.'s Mot.") at 13; <u>see also</u> J.A. vol. I at 23–24. The loan was later forgiven in full. J.A. vol. I at 57.

The pandemic continued into 2021, and thus so did the Hotel Californian's hardships. To keep itself afloat, the Hotel applied for a second draw PPP loan on January 20, 2021, seeking the maximum second draw loan amount of $2 million. Pl.'s Mot. at 13; Redacted J.A. Part 2 [ECF No. 30-2] ("J.A. vol. II") at 49. The loan was approved and disbursed in February 2021. J.A vol. II at 49. Like it did for its first draw loan, the Hotel Californian used the full $2 million on payroll costs. J.A. vol. I at 57. Therefore, like it did for its first draw loan, Hotel Californian applied to have its second draw PPP loan forgiven. J.A. vol. I at 58.

---

[4] 35 State Street Hotel Partners, LLC does business as the Hotel Californian. Compl. [ECF No. 1] at 1.

That's when the similarities to the Hotel's first draw loan ended. Two months after the Hotel Californian submitted its second draw forgiveness application, it received a letter from SBA "requesting additional documents or information for its review of" the Hotel's second draw loan and forgiveness application. J.A. vol. I at 44. SBA requested documents relating to the Hotel's affiliates because SBA's initial review showed that the Hotel, "together with its affiliates, may not meet SBA small business size standards and/or the" SCG Rule. Id. at 45.

The Hotel Californian complied with SBA's request and sent SBA documents explaining its common ownership. See id. at 58. In addition to being the majority owner of the Hotel Californian, Rosenfeld was at all relevant times the majority owner of three other hotels: Pine & Powell Partners, LLC ("P&P"), WRC Newport LLC ("Newport"), and WRC Huntington LLC ("Huntington"). See id. at 57; First SCG Rule, 85 Fed. Reg. at 26325 (defining "a single corporate group"). And like he did for the Hotel Californian, Rosenfeld applied for and received a $2 million second draw PPP loan for each of his three other hotels. J.A. vol. II at 53–54.

On August 25, 2022, SBA issued a final loan review decision denying Hotel Californian's forgiveness application because SBA determined the Hotel's second draw loan violated the SCG Rule. See J.A. vol. I at 1–2. The Hotel timely appealed the decision to SBA's Office of Hearings and Appeals ("OHA"), id. at 3, but before OHA could rule on the appeal, SBA withdrew its final loan review decision so it could conduct further review of the Hotel's application, see id. at 50; Combined Memo. Supp. Defs.' Mot. for Summ. J. & Opp'n to Pl.'s Mot. Summ. J. [ECF No. 19] ("Def.'s Mot.") at 40.

After further review, SBA again denied the Hotel's application on March 28, 2023 (the "Final Loan Review Decision," or "FLRD"). See J.A. vol. I at 67–68. Its reasoning remained largely the same: the Hotel was part of a "'family' of four affiliated entities defined by common

ownership" that had "received $8,000,000 in second draw loans, more than the corporate max of" $4 million and therefore did "not meet eligibility requirements for forgiveness." Id. at 67.

The Hotel Californian timely appealed this decision too. Id. at 56–66. As it had in its previous appeal, the Hotel argued that SBA's decision was contrary to law or in the alternative arbitrary and capricious. Id. In the Hotel's view, applying the SCG Rule to a business in the accommodations industry contradicted the Affiliation Waiver by "reintroduc[ing] an affiliation-based bar to eligibility." Id. at 62–65. And regardless of the rule's legitimacy, the Hotel posited that because SBA had granted Newport's forgiveness application—but denied the Hotel's—the denial was arbitrary. Id. at 65–66.

On August 18, 2023, an administrative law judge ("ALJ") affirmed SBA's denial of the Hotel's loan forgiveness application (the "Initial OHA Decision"). J.A. vol. II at 48–57. The ALJ first agreed that the Hotel violated the SCG Rule because the Hotel and its affiliates received an aggregate of $8 million in second draw loans. See id. at 53–54. The ALJ then declined to decide whether the SCG Rule was unlawful because it determined the OHA's jurisdiction does not extend to challenges to the validity of a regulation, and SBA's application of the regulation wasn't a "clear error." Id. at 56. In so doing, however, the ALJ noted that the Rule "does not functionally render hotel and restaurant PPP borrowers ineligible in contradiction of the Affiliation Waiver." Id. at 55 (emphasis added). He pointed to P&P and Newport for support: the two hotels would have had more than 300 employees, and thus would have been ineligible for a second draw loan, has SBA taken their affiliates' employees into account when determining eligibility. Id. at 55–56. Yet both were eligible for second draw loans, received said loans, and had them forgiven. Id. The ALJ also determined SBA's denial wasn't arbitrary and capricious because P&P and Newport had their $2

million loans forgiven while both the Hotel and Huntington—whose loans were disbursed after the other hotels'—did not (or so the ALJ thought).[5] Id. at 56–57; J.A. vol. I at 58.

Days after the Initial OHA Decision, the Hotel petitioned OHA for reconsideration, id. at 58–70, but OHA denied the Hotel's request, id. at 71–76. The denial reiterated that the FLRD's determination that the Hotel violated the SCG Rule was not clear error. Id. at 76. Following OHA's denial of reconsideration, the SBA Administrator declined to review the Initial OHA Decision too. Id. at 94.

As a result, the Hotel Californian filed the instant suit on March 14, 2024. Compl. [ECF No. 1 at 23]; see also 5 U.S.C. § 704 (subjecting "final agency action" to judicial review); 13 C.F.R. § 134.1211(c)(3) (explaining that "a reconsidered initial OHA decision becomes the final decision of SBA 30 calendar days after its service unless SBA . . . decides to review or reverse" it). Several months later, the Hotel filed its motion for summary judgment, see Pl.'s Mot., and SBA responded with its cross-motion, see Def.'s Mot.

## LEGAL STANDARD

Summary judgment is appropriate if the movant demonstrates "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the parties don't contest any material facts. So the sole question is which party is entitled to judgment as a matter of law.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The court itself must "decide all relevant questions of law, interpret constitutional and statutory provisions, and

---

[5] Despite the ALJ's statement to the contrary, Huntington's second draw loan forgiveness application had not been denied at the time of the FLRD. See J.A. vol. II at 79–80. In fact, Huntington's loan was forgiven five months after the FLRD and approximately two weeks after the Initial OHA Decision. Id.; Def.'s Mot. at 31; J.A. vol. I at 67–68.

determine the meaning or applicability of the terms of an agency action." § 706; see also Loper Bright Enters. v. Raimondo, 603 U.S. 369, 393 (2024) ("The text of the APA means what it says."). A court tasked with deciding "whether an agency's interpretation of its governing statute is contrary to law" thus "must exercise [its] 'independent judgment' and 'apply[] all relevant interpretive tools' to reach 'the best reading of a statute.'" Env't Def. Fund. v. EPA, 124 F.4th 1, 11 (D.C. Cir. 2024) (quoting Loper Bright, 603 U.S. at 394–95, 400). And a court tasked with deciding whether an agency action is arbitrary and capricious asks whether the agency's action was "reasonable and reasonably explained," id., "consider[ing] whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," MCI Worldcom Network Servs., Inc. v. FCC, 274 F.3d 542, 547 (D.C. Cir. 2001) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). In so doing, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

## ANALYSIS

The Hotel Californian argues that it is entitled to summary judgment for the same reasons it raised to SBA: the denial of the Hotel's second draw loan forgiveness application was erroneous because (1) as applied to the Hotel, the SCG Rule exceeds SBA's power under the governing statutes and (2) even if not, the denial was arbitrary and capricious.

### I.    Whether applying the SCG Rule to the Hotel exceeded SBA's statutory authority.

The Hotel's argument that SBA exceeded its statutory authority starts with the Hotel's claim that SBA's application of the SCG Rule to a business in the accommodation and food industry flatly contradicts the Affiliation Waiver. Pl.'s Mot. at 21–28. The SCG Rule, the Hotel reasons, was "an affiliation-based limitation" on a business's "eligibility" for a PPP loan: it

"render[ed] certain businesses unqualified . . . for Second Draw loans" if the businesses shared common ownership—just like SBA's affiliation rules for § 7(a) loans.  Id. at 23, 25.  In the Hotel's view, the SCG Rule as applied to businesses in the food and accommodations industry directly contradicts the Affiliation Waiver, which explicitly instructed SBA not to apply the affiliation rules to determine such businesses' eligibility for PPP loans.  Id. at 28.  And even if the application of the SCG Rule to a hotel didn't directly conflict with the Affiliation Waiver, the Hotel continues, it still surpassed SBA's statutory authority because the Rule set a cap on a hotel's loan amount below the cap Congress set itself.  See id. at 32.

SBA retorts that the Hotel's argument is based on mistaken premises.  First, "[t]he Corporate Group Rule does not conflict with the Affiliation Waiver because the Rule d[id] not restrict eligibility."  Def.'s Mot. at 17.  Instead, SBA explains, the Rule acted as a limit on the loan amount that eligible businesses could receive.  Id.  In other words, the Hotel and its affiliates were always eligible for PPP loans; the SCG Rule only made it so they could not receive a loan that exceeded a particular amount.  Id. at 17–18.  Since SBA's  application of the Rule only limited the amount the Hotel could receive, SBA contends the Rule didn't conflict with the statutes.  See id. Second, in SBA's view, its application of the SCG Rule didn't conflict with the statutes' caps on loan amounts.  The statutes only set a ceiling—not a floor—on loan amounts, and nothing in the statute prohibited SBA from constructing another, lower limit for certain businesses.  See id. at 19, 24–26.

SBA's arguments win out.

Recall that the CARES Act and the EAA provided that business concerns that would not be "small" under § 7(a) would be eligible for PPP loans so long as the business had—for second draw loans—not more than the higher of 300 employees or the applicable size standard for its

industry.  15 U.S.C. § 636(a)(37)(A)(iv), (a)(36)(D)(i), (a)(37)(E).  The Affiliation Waiver then

stated in relevant part that "the provisions applicable to affiliations under" 13 C.F.R. § 121.103

"or any successor regulation, are waived <u>with respect to eligibility</u> for a covered loan for . . .  any

business  concern"  that  operates  in  the  accommodations  and  food  industry.  <u>See</u>  15 U.S.C.

§ 636(a)(36)(D)(iv) (emphasis added); § 636(a)(37)(E).  The referenced affiliation rules of 15

C.F.R.  §  121.103,  in  turn,  explain  that  a  business  concern's  affiliates  are  considered  when

determining whether the business concern is "small" within the meaning of the Small Business

Administration  Act,  and  thus  eligible  for  § 7(a)  loans.  <u>See</u>  15 C.F.R.  §  121.103(a)(6)  ("In

determining the concern's size, SBA counts the receipts, employees, or other measure of size of

the concern whose size is at issue and all of its . . . affiliates."); <u>id.</u> § 121.301(a).

Viewing these together, one doesn't need a suite of canons of statutory construction to

conclude that the plain text of the Affiliation Waiver forbids SBA from using the affiliations of a

business in the accommodations and food industry to determine whether the business met the size

standards to be eligible for a PPP loan.  To illustrate, if a hotel had 250 employees and its two

affiliates had 1000, the hotel would still be eligible for a second draw PPP loan under 15 U.S.C.

§ 636(a)(37)(A)(iv).  But if the same were true of a business in another industry—say a clothing

store—the business would have more than 300 employees (or the applicable industry standard, if

higher)  and  thus  be  ineligible  for  a  second  draw  loan.  <u>See</u>  §  636(a)(37)(A)(iv).  The  Hotel

Californian agrees with this straightforward reading.  <u>See</u> Pl.'s Mot. at 23 ("SBA therefore has no

power to apply an affiliation-based limitation . . . in a way that renders hotels ineligible for PPP

loan[s].").

Now compare the Affiliation Waiver to the SCG Rule.  The Rule stated that "businesses

that are part of a single corporate group shall in no event <u>receive</u> more than $20,000,000" in first

draw loans—or $4 million for second draw loans—"in the aggregate." First SCG Rule, 85 Fed. Reg. at 26325; Second SCG Rule, 86 Fed. Reg. at 3720 (emphasis added).

That does not directly contradict the Affiliation Waiver. Rather than limiting a business's "eligibility for a covered loan," see 15 U.S.C. § 636(a)(36)(D)(iv), the SCG Rule limits the amount a business can "receive," First SCG Rule, 85 Fed. Reg. at 26325. This is all the more clear considering the statutory authority the Rule points to. The Rule cites 15 U.S.C. § 636(a)(36)(E), the CARES Act's maximum loan amount. Id. The eligibility requirements—including the Affiliation Waiver—lie in § 636(a)(36)(D). And while the definition of a "single corporate group" overlaps with the affiliation rules' definition of "affiliates,"[6] the rules use the definitions differently. Under the affiliation rules, a business's affiliates dictate which employees and/or income must be counted to determine the business's size. See 13 C.F.R. § 121.103(a). In contrast, under the SCG Rule, that a business belongs to a single corporate group dictates which other businesses' loan amounts must be counted to determine the maximum loan amount the business may receive. See First SCG Rule, 85 Fed. Reg. at 26325. So the fact that the SCG Rule could be said to be "affiliation-based" does not mean it conflicts with the Affiliation Waiver. But see Pl.'s Mot. at 23–24. That's why the Waiver could "continue to apply independent of" the SCG Rule, and why the "businesses [that were] eligible for the waiver" could be subject to the SCG Rule. First SCG Rule, 85 Fed. Reg. at 26325; see also id. (distinguishing the SCG Rule from the Affiliation Waiver because the latter "relate[d] to an applicant's eligibility for PPP loans").

The takeaway is that—as SBA argues and the Initial OHA Decision concluded—the SCG Rule was not an affiliation-based limit on PPP loan eligibility but a limit on the loan amount an

---

[6] Compare First SCG Rule, 85 Fed. Reg. at 26325 ("[B]usinesses are part of a single corporate group if they are majority owned, directly or indirectly, by a common parent.") with 13 C.F.R. § 121.301(f)(iii) (businesses in the same industry are affiliates if more than half-owned by the same individual).

eligible recipient could receive, and thus the Rule does not violate the Affiliation Waiver.  See Def.'s Mot. at 17; J.A. vol. II. at 55–56.  The Hotel resists this conclusion by pointing to the administrative record, which the Hotel argues shows that SBA understood the SCG Rule to be an affiliation-based eligibility limit during the agency's review of the Hotel's second draw loan forgiveness application.  See Pl.'s Mot. at 27.  The Hotel's first example is a June 2023 internal SBA review of the Hotel's application in which SBA determined that the Hotel did not "meet all Size Standards requirements" for loan eligibility "consider[ing] . . . affiliates."  See J.A. vol. II at 25.  This statement indicates that the reviewer construed the SCG Rule as a size requirement that limited loan eligibility.  However, the rest of the record—including SBA's later, public-facing decisions denying the Hotel's application—confirms that SBA in fact did not rely on this rationale.  See infra Part II (explaining SBA's rationale); Epsilon Elecs., Inc. v. Dep't of Treasury, 857 F.3d 913, 924 (D.C. Cir. 2017) ("[T]he grounds upon which an administrative order must be judged are those upon which the record" as a whole "discloses that its action was based." (quoting SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)).  Besides, even if it had, that wouldn't mean SBA violated the Affiliation Waiver by applying the SCG Rule to the Hotel—it would mean SBA misinterpreted its own regulation.

Next, the Hotel directs the Court's attention to SBA's statements that the Hotel "'d[id] not meet eligibility requirements for forgiveness' of the loan because of the Single Corporate Group Rule."  Pl.'s Mot. at 27 (emphasis added by plaintiffs) (quoting J.A. vol. I at 67 (FLRD)); cf. J.A. vol. II. at 56 (initial OHA Decision explaining that the Hotel "and its affiliates could all be potentially eligible for full forgiveness").  The Hotel reasons that this language shows the SCG Rule was a limit on loan eligibility.  Pl.'s Mot. at 27.  This argument misses a critical distinction made by the governing statute and the regulations implementing it.  The criteria for loan eligibility

are separate from the criteria for <u>loan-forgiveness</u> eligibility.  <u>Compare</u> 15 U.S.C. § 636(a)(37)(D) <u>and</u> Second SCG Rule, 86 Fed. Reg. at 3713–14 (discussing second draw loan eligibility requirements) <u>with</u> 15 U.S.C. § 636m <u>and</u> Second SCG Rule, 86 Fed. Reg. at 3717 (discussing loan-forgiveness eligibility).  So SBA's determination that the Hotel wasn't eligible for loan forgiveness because of the SCG Rule does not show SBA violated the Affiliation Waiver's prohibition against using the Hotel's affiliates to determine loan eligibility.[7]

In its last attempt to convince the Court that SBA's application of the SCG Rule directly violated the Affiliation Waiver, the Hotel argues that it doesn't matter how the SCG Rule is "label[ed]."  Pl.'s Mot. at 26.  Because, "[i]n ordinary speech, if a business fails to satisfy a condition . . . and therefore receives $0 . . . no one would say that the business was 'eligible' for the loan," the Hotel avers that the "substance" of the SCG Rule is to limit loan eligibility.  <u>Id.</u> at 26–27.  It's true that, colloquially, one may say that the Hotel was ineligible for a second draw loan if it was entitled to receive a loan of $0.  But the colloquial meaning of one word in the Affiliation Waiver does not give the Court license to ignore the rest of the Waiver, the other relevant statutory provisions, the text of the SCG Rule, and SBA's decisions denying the Hotel's application.  <u>See</u> <u>Noble v. Nat'l Assoc. of Letter Carriers, ALF-CIO</u>, 103 F.4th 45, 50 (D.C. Cir. 2024) (explaining that statutory interpretation requires "examining the plain text" and the statute's "structure and context" (citations omitted)).  For the reasons already explained, each of those shows that the SCG Rule, as applied to the Hotel, did not operate as an affiliate-based limitation on loan eligibility in violation of the Affiliation Waiver.[8]

---

[7] The Court does not conclude that the SCG Rule was a limit on loan-forgiveness eligibility.  <u>See</u> <u>infra</u> Part II.  It emphasizes this distinction here only to show SBA's statements about loan-forgiveness eligibility do not imply the SCG Rule is a limit on loan eligibility.

[8] Another district court concluded that the SCG Rule was not contrary to SBA's statutory authority, but appears to have assumed that the SCG Rule is a limit on loan eligibility.  <u>See</u> <u>Forest View Rehab. & Nursing Ctr., LLC, v. SBA</u>, Civ. A. No. 24-1490 (GNA), 2024 WL 5247837, at *7 (N.D. Ill. Dec. 30, 2024).  But the question of

Nevertheless, the Hotel argues, applying the SCG Rule to the Hotel exceeded SBA's statutory authority because it was "otherwise contrary to the text, structure, and purpose of the statute." Pl.'s Mot. at 28 (cleaned up). Much of the Hotel's argument depends on the SCG Rule having been a loan eligibility limitation,[9] which the Court has already determined it was not. One portion of the argument, however, rests on the (accurate) premise that the Rule was a limit on loan amounts. According to the Hotel, the CARES Act and the EAA specified a mandatory maximum loan amount, so SBA lacked the authority to create its own, lower maximum for corporate groups. Id. at 32. This is all the truer, per the Hotel, because the statutes provide the maximum by way of a specific formula "designed . . . to ensure that businesses would receive loans that covered at least a couple months of their payroll costs." Id. at 33; 15 U.S.C. § 636(a)(36)(E) (making maximum loan amount a function of the business's payroll costs, multiplied by 2.5); see also id. § 636(a)(37)(C)(iv) (same but multiplying accommodation and food industry businesses' payroll costs by 3.5).

The question is thus whether Congress's PPP-loan maximums precluded SBA from setting a lower maximum for corporate groups. To begin, statutes that set a maximum dollar amount are

---

whether the SCG Rule was in fact a limit on loan eligibility was not squarely presented there. And, regardless of another district court's conclusion, the statutory and regulatory language convince this Court that the Rule is not a limit on loan eligibility.

[9] For example, the Hotel argues that "Congress mandated that 'any' individual 'business concern . . . shall be eligible to receive' a PPP loan if it satisfies the conditions that the statute authorizes," and so SBA could not promulgate the SCG Rule to restrict eligibility further. Pl.'s Mot. at 30 (emphasis in original) (quoting 15 U.S.C. § 636(a)(36)(D)(i)). The Court need not determine whether SBA was authorized to promulgate regulations that further restricted PPP loan eligibility. The Court notes, however, that the rationale it gives later in this opinion for determining SBA was authorized to promulgate regulations further restricting maximum loan amounts would support answering the loan-eligibility question in the affirmative. See Pharaohs GC, Inc. v. SBA., 990 F.3d 217, 226–27 (2d Cir. 2021) (determining SBA had the power to promulgate regulations on PPP loan eligibility); In re Gateway Radiology Consultants, P.A., 983 F.3d 1239, 1257 (11th Cir. 2020) (same).

read to give the spender <u>discretion</u> to spend up to that amount.[10]  <u>Cf.</u> <u>CFPB v. Comm. Fin. Servs.</u>

<u>Assoc. of Am.</u>, 601 U.S. 416, 436 (2024).  That SBA was granted discretion to determine the

amount of PPP loans is evident here.  <u>See</u> <u>In re Gateway Radiology Consultants, P.A.</u>, 983 F.3d

1239, 1247–48 (11th Cir. 2020).  The CARES Act and EAA did not even mandate SBA guarantee

a particular number of PPP loans, but rather said that SBA "<u>may</u> guarantee covered loans," <u>see</u> 15

U.S.C. § 636(a)(36)(B) (emphasis added), and went on to define who is "eligible" for—not entitled

to—a PPP loan, <u>id.</u> at § 636(a)(36)(D)(i).  To "circumscribe [SBA's] discretion to allocate" PPP

loans, <u>see</u> <u>Lincoln v. Vigil</u>, 508 U.S. 182, 193 (1993), Congress limited the dollar amount SBA

could guarantee for each eligible business, <u>see</u> <u>Policy & Rsch., LLC v. Dep't of Health & Human</u>

<u>Servs.</u>, 313 F. Supp. 3d 62, 75 (D.D.C. 2018) (explaining that an agency generally has discretion

"regarding how it will spend funds . . . unless Congress has somehow cabined the agency's

discretion in the authorizing text of the statute").  Beyond that, Congress left determining loan

amounts to SBA.[11]  <u>See</u> 15 U.S.C. § 9012 (directing SBA to "issue regulations to carry out" the

CARES Act); <u>id.</u> at § 634(b)(6) (empowering SBA to "make such rules and regulations as [it]

deems necessary to carry out the authority vested in [it] by or pursuant to this chapter").

 Once given discretion, agencies can then "cabin their own discretionary funding

determinations by . . . regulation[]," <u>see</u> <u>Policy & Rsch.</u>, 313 F. Supp. 3d at 76, so long as the

regulations don't contradict the statutory circumscriptions.  That is what SBA did here.  Faced

with limited funds and a country full of struggling businesses, SBA decided to allocate the funds

by setting a maximum loan amount for corporate groups that was below the statutory maximum.

---

[10] The Court does not imply an answer to the question whether SBA could choose to spend zero dollars.  <u>Cf.</u> <u>Clinton v. City of New York</u>, 524 U.S. 417, 446 (1998); <u>Lincoln v. Vigil</u>, 508 U.S. 182, 193 (1993).  That is not at issue here.

[11] The Hotel does not argue (nor could it) that either the CARES Act or the EAA placed any other restriction on the amount in loans SBA could guarantee for an eligible business.

See First SCG Rule, 85 Fed. Reg. at 26325.  Put differently, SBA used its discretion to draw a smaller boundary on loan amount within the larger boundary Congress created.  So the SCG Rule's maximum was consistent with Congress's cap on loan amounts.

Cementing the fact that the SCG Rule's limit on loan amount isn't contrary to the statutory maximums is that the Rule and the statutory maximums operated independently and simultaneously.  The statutorily imposed maximums set caps on the amounts "eligible entit[ies]" could receive in PPP loans.  See 15 U.S.C. § 636(a)(37)(C)(iv).  An "eligible entity" was a business concern—i.e., a single business—that met the eligibility requirements.  See id. at § 636(a)(37)(A)(iv)(I).  The SCG Rule, in distinction, set a cap on the aggregate amount a single corporate group could receive.  First SCG Rule, 85 Fed. Reg. at 26325.  Thus, a single corporate group was subject to the SCG Rule's cap, and each business that was a part of that group was subject to the separate limitation of the statutory maximums.   If the SCG Rule had truly contradicted the statutory maximums, it would have rendered them useless.  But it did not.

Finally, the Hotel argues that SBA's application of the SCG Rule to deny the Hotel's loan forgiveness was contrary to SBA's statutory authority because it conflicted with the "statutory purposes and design" of the CARES Act and EAA.  Pl.'s Mot. at 33 (quoting Gonzales v. Oregon, 546 U.S. 243, 267 (2006)).  The Court agrees with the Hotel that the PPP was created "to help businesses weather the pandemic," and that Congress surely desired "to maximize relief for . . . businesses" in the hospitality industry.  See id. at 33–34 (citations omitted).  But "no law pursues its purposes at all costs."   Pulsifer v. United States, 601 U.S. 124, 152 (2024) (cleaned up).  Congress may have wanted to provide unlimited assistance to struggling businesses, but financially it could not.  The unambiguous statutory language shows that it thus allocated a limited fund for PPP loans, set statutory limits on which businesses could receive the loans, how much those

businesses could receive, and how much SBA could forgive, and then left the other details to SBA. Pursuant to that power, SBA determined how to allocate the funds across applicants and used the SCG Rule to do so. As explained above, that did not contradict the text of the governing statutes. And it also did not "frustrate" the purposes of those statutes. See NextEra Energy Res., LLC v. FERC, 118 F.4th 361, 371 (D.C. Cir. 2024). SBA still provided much needed funds to struggling businesses within the guidelines it and Congress defined.[12]

## II.    Whether SBA's denial of the Hotel's loan-forgiveness application was arbitrary and capricious.

Although SBA's application of the SCG Rule to the Hotel was within SBA's statutory authority, its denial of the Hotel's loan-forgiveness application on the basis of the SCG Rule was still not permissible under the APA. The Court concludes the denial was arbitrary and capricious.

In the Hotel's view, SBA's denial was arbitrary and capricious because SBA rendered "self-contradictory decisions" in applying the SCG Rule and "fail[ed] even to consider Hotel Californian's serious reliance interests." Pl.'s Mot. at 35. But SBA's denial was arbitrary and capricious for a more basic reason: SBA did not explain why the Hotel's receipt of a loan in excess of the SCG Rule's cap rendered the Hotel ineligible for loan forgiveness. See Mirror Lake Vill., LLC v. Wolf, 971 F.3d 373, 376 (D.C. Cir. 2020) ("An agency's actions are arbitrary and capricious if they are not 'reasonably explained.'" (quoting Jackson v. Mabus, 808 F.3d 933, 936 (D.C. Cir. 2015)).

---

[12] The Court also notes that, contrary to what the Hotel seems to believe, the purpose of the PPP was not solely to grant and forgive loans. See Pl.'s Mot. at 33–34. The purpose was to "provid[e] small businesses with the funds necessary to meet their payroll and operating expenses and therefore keep workers employed." See Springfield Hosp., 28 F.4th at 409. All loans—forgiven or not—provide funds for necessary expenses at a time a borrower cannot cover the expenses itself. That is, of course, the whole purpose of § 7(a) loans. See McClellan, 364 U.S. at 447. So SBA carried out the PPP's purpose not only by forgiving loans, but by guaranteeing them in the first place.

Throughout its review of the Hotel's second draw loan forgiveness application, SBA stuck to the same rationale for its denial.  See Epsilon Elecs., 857 F.3d at 924 ("[O]nce an agency's action is final and properly before [a court], [the court] review[s] the entire administrative record.").  The reason SBA gave in its Initial OHA Decision is representative: the Hotel was "part of a corporate group that received more than $4 million in Second Draw PPP loans in the aggregate," J.A. vol. II at 53–54, and P&P's and Newport's $2 million loans were forgiven before the Hotel's such that the corporate group had already reached the $4 million max, see id. at 56.  That was the extent of SBA's reasoning.  See also id. at 74–75 (OHA's denial of reconsideration); J.A. vol. I at 67–68 (FLRD).

That reasoning may have been well and good if SBA's decision was limited to a determination that the Hotel violated the SCG Rule.  The problem is that the SBA's ultimate decision was that the Hotel was ineligible for loan forgiveness.  In so deciding, SBA started and stopped with the SCG Rule.  It never explained why the Hotel's violation of that Rule made the Hotel ineligible for loan forgiveness.  SBA simply "jumped [from] the conclusion" that the Hotel violated the SCG Rule to the conclusion to deny loan forgiveness.  See Rutledge v. Del Toro, Civ. A. No. 23-1583 (CRC), 2024 WL 3225958, at *8 (D.D.C. June 28, 2024).   But the APA requires that an agency give the Court "[t]hat connective tissue."  See id.

This Court's conclusion that SBA didn't fully explain its decision is not based solely on the written decisions' brevity.  Perhaps a citation to a rule could adequately explain a decision if the text of that rule addressed each step of the reasoning needed to reach an agency's conclusion. See Frizelle v. Slater, 111 F.3d 172, 176 (D.C. Cir. 1997) ("An agency's decision need not be a model of analytic precision . . . .  A reviewing court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." (cleaned up)).  That was not the case here,

however.  By its terms, the SCG Rule simply limited the loan amount the members of a single corporate group could receive.  First SCG Rule, 85 Fed. Reg. at 26325 ("[B]usinesses that are part of a single corporate group shall in no event receive more than $20,000,000 of PPP loans in the aggregate."); Second SCG Rule, 86 Fed. Reg. at 3720 (same, except such groups "shall in no event receive more than $4,000,000 of Second Draw PPP Loans in the aggregate").  It had nothing to do with loan forgiveness on the back end, which is the relevant issue here.  It didn't state that a loan recipient's violation of the Rule would make it ineligible for loan forgiveness.

Despite the Rule's plain text, SBA argues to this Court that the SCG Rule did explain that "loans issued in excess of the limit . . . 'will not be eligible for forgiveness' because such loans would [be] 'regarded as a use of PPP funds for unauthorized purposes.'"  Def.'s Mot. at 20 (quoting First SCG Rule, 85 Fed. Reg. at 26325); see also First SCG Rule, 85 Fed. Reg. at 26325 n.1 (citing CARES Act § 1106(k), which authorized SBA to issue regulations on loan forgiveness).  But, as SBA acknowledges, "language 'cannot be interpreted apart from context.'"  Id. (quoting Smith v. United States, 508 U.S. 223, 229 (1993)).  Read in full, the paragraph SBA quotes states:

> It is the responsibility of an applicant for a PPP loan to notify the lender if the applicant has applied for or received PPP loans in excess of the amount permitted by this interim final rule and withdraw or request cancellation of any pending PPP loan application or approved PPP loan not in compliance with the limitation set forth in this rule. Failure by the applicant to do so will be regarded as a use of PPP funds for unauthorized purposes, and the loan will not be eligible for forgiveness. A lender may rely on an applicant's representation concerning the applicant's compliance with this limitation.

First SCG Rule, 85 Fed. Reg. at 26325 (emphasis added).  So the Rule did not say that receipt of a loan in excess of the cap by a member of a single corporate group would be deemed an unauthorized use and thus be ineligible for forgiveness.  It said an applicant who failed to notify the lender and request cancellation of his applications for or receipt of loans in excess of the cap would be ineligible for forgiveness.

True, it could be that SBA really denied the Hotel's loan forgiveness application because Rosenfeld failed to notify the lender that he applied for forgiveness of second draw loans in excess of the SCG Rule's $4 million cap.[13]  But SBA did not say as much.  And it's not this Court's role to "attempt itself to make up for such deficiencies."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  The Court is limited to reviewing the reasons SBA actually gave for its decision at the time it rendered its decision.  Id.; Grace v. Barr, 965 F.3d 883, 903 (D.C. Cir. 2020) ("When assessing the reasonableness of an agency's action, we look only to what the agency said at the time of the action—not to . . . post-hoc rationalizations." (cleaned up)).[14]  The only reason SBA gave for its denial of the Hotel Californian's second draw loan application was that the Hotel violated the SCG Rule.  It never connected the dots between those two conclusions.

Plus, SBA would run into another problem even were the Court to squint and read its denial of the Hotel's loan as being based on Rosenfeld's failure to notify: P&P and Newport's second

---

[13] Nor may it "reasonably be discerned" from the administrative record that SBA really denied the Hotel's loan-forgiveness application because Rosenfeld failed to notify the lender.  See Frizzelle, 111 F.3d at 176.  Nowhere in the joint appendix before this Court—from SBA's internal reviews and correspondences with the Hotel to its formal decisions—did SBA say anything about the SGC Rule's notification requirement.  The only mention of a disclosure notes that Rosenfeld's common ownership was "disclosed and attested" on forms the Hotel submitted to SBA.  See J.A. vol. I at 67 (FLRD).  The record's silence is likely why SBA does not argue to this Court that its rationale for its denial was the notice requirement.  None of this is to say that the Court believes (let alone impermissibly finds) that Rosenfeld in fact complied with the SCG Rule (or that he didn't).  It is only to say that the Court cannot read the notification requirement into SBA's rationale for denying the Hotel's loan-review application.

Also because of the record's lack of clarity as to whether Rosenfeld complied with the Rule's notification requirement, the Court cannot say SBA's failure to explain was harmless.  See Prohibition Juice Co. v. FDA, 45 F.4th 8, 24–25 (D.C. Cir. 2022); Calcutt v. FDIC, 598 U.S. 623, 630 (2023) (per curiam) (explaining that "remand may be unwarranted" only when "there is not the slightest uncertainty as to the outcome" because "the agency was required to take a particular action" (cleaned up)).

[14] The Initial OHA Decision also quoted an SBA regulation that said, "If SBA determines that a borrower is ineligible for the PPP loan, SBA will direct the lender to deny the loan forgiveness application."  J.A. vol. II at 53 (quoting Interim Final Rule, 86 Fed. Reg. 8283, 8295(V)(1)(e) (Feb. 5, 2021)).  But this doesn't save SBA's decision.  First, the Initial OHA Decision did not apply that regulation in its analysis; it only quoted the regulation once in the "Applicable Rules" section.  Id. at 52–56.  Second, the regulation would have been inapplicable anyway because the SCG Rule was not a limit on loan eligibility.  See id. at 55–56.

draw loans <u>were</u> forgiven.  The SCG Rule said that if "an applicant for a PPP loan" failed to "notify the lender" of his applications for or receipt of loans in excess of the corporate group cap, the loan he applied for would "not be eligible for forgiveness."  First SCG Rule, 85 Fed. Reg. at 26325. Rosenfeld submitted all four of his hotel's second draw loan applications and did so on the same day.  J.A. vol. I at 14–16, 26–28, 32–24, 38–40.  So, if Rosenfeld had the responsibility to notify the lender of the Hotel Californian's loan that he exceeded the Rule's limit, he had the responsibility to do so for <u>all four</u> of his hotels' loans.  Nothing indicates, however, that he notified any lender.  As a result, all four hotels' loans would have been ineligible for forgiveness.  Yet P&P and Newport's were deemed eligible for forgiveness.  And "[w]here an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation . . . its action is arbitrary and capricious and cannot be upheld." <u>Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.</u>, 403 F.3d 771, 777 (D.C.Cir.2005).

In short, SBA failed to explain "a rational connection between the facts found and the choice made."  <u>See</u> <u>Dickson v. Sec'y of Def.</u>, 68 F.3d 1396, 1404 (D.C. Cir. 1995).  So its decision was arbitrary and capricious.[15]  <u>See</u> <u>id.</u>

## III.    Remedy

The remaining question is the proper remedy for SBA's violation of the APA.  The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be . . .  arbitrary [and] capricious.'"  5 U.S.C. § 706(2).  In its motion, the Hotel requests not only vacatur, but also a declaratory judgment and an injunction.[16]  Pl.'s Mot. at

---

[15] The Court acknowledges that another district court has determined that SBA did not violate the APA when it denied a business's PPP loan-forgiveness application solely based on the SCG Rule.  <u>See</u> <u>Forest View Rehab.</u>, 2024 WL 5247837.  That case, however, has minimal persuasive value because it does not discuss—or even acknowledge— SBA's failure to <u>explain</u> why a violation of the SCG Rule alone supported a denial of loan forgiveness.

[16] It is unclear whether the Court would have jurisdiction over the Hotel's claim for an injunction against SBA.  <u>See</u> <u>Forest View Rehab.</u>, 2024 WL 5247837, at *4–5 (explaining the split in authority on whether SBA has

39–41.  But that request was premised on the Court's determination that SBA's denial was contrary

to statute and thus "unsustainable" on any reasoning.  See id. at 39.  That is not what the Court

ultimately concludes.  The Court concludes only that SBA's denial was inadequately reasoned,

meaning SBA may be "able to rehabilitate its rationale" upon remand.  Comcast Corp. v. FCC,

579 F.3d 1, 9 (D.C. Cir. 2009).  In such situations, the APA "contemplates vacatur as the usual

remedy."  AARP v. EEOC, 292 F. Supp. 3d 238, 242 (D.D.C. 2017); see also Allina Health Servs.

v. Sebelius, 746 F.3d 1102, 1110 (D.C. Cir. 2014) ("vacatur is the normal remedy" for an APA

violation).[17]  The Court thus vacates SBA's decision denying the Hotel loan forgiveness and

remands it to the SBA.

## CONCLUSION

No matter the legality of an agency's regulations, the APA requires the agency to

reasonably explain its decisions applying them.  Here, SBA did not.  The Court thus grants the

Hotel Californian's motion for summary judgment, denies SBA's cross-motion, vacates SBA's

decision denying the Hotel's second draw PPP loan forgiveness application, and remands this

matter to the SBA.  The Court will issue a separate order consistent with this opinion.


_____
/s/
JOHN D. BATES
United States District Judge

Dated: March 20, 2025

---

waived its sovereign immunity from suits for injunctive relief).  While other circuits have weighed in on the issue, see
id., the D.C. Circuit has not.  Here, the Court doesn't need to reach the issue because the Hotel's claim for an injunction
was based on its argument that the Hotel was in fact entitled to complete forgiveness of its second draw loan because
the SCG Rule violated the governing statutes—an argument the Court has rejected.

[17] SBA does not argue that vacating its denial of the Hotel's loan-forgiveness application would have
"disruptive consequences."  See Allina Health Servs., 746 F.3d at 1110; Allied–Signal, Inc. v. U.S. Nuclear Regul.
Comm'n, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).  This case thus does not fall within the minority of cases in which
remand without vacatur is appropriate.  Allina Health Servs., 746 F.3d at 1110.